Scott E. Gizer, State Bar Number 221962
  *sgizer@earlysullivan.com*
Padideh Zargari, State Bar Number 307409
  *pzargari@earlysullivan.com*
Lisa M. Zepeda, State Bar Number 231125
  *lzepeda@earlysullivan.com*
EARLY SULLIVAN WRIGHT
  GIZER & McRAE LLP
6420 Wilshire Boulevard, 17th Floor
Los Angeles, California 90048
Telephone:  (323) 301-4660
Facsimile:  (323) 301-4676

Attorneys for Plaintiff
SUN WEST MORTGAGE COMPANY, INC.

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SUN WEST MORTGAGE COMPANY, INC., a California corporation,<br><br>        Plaintiff,<br><br>    vs.<br><br>FIRST NATIONAL BANK OF PENNSYLVANIA, as successor to HOWARD BANK, a Maryland State Chartered trust company, as successor to FIRST MARINER BANK.<br><br>        Defendant. | Case No.:<br><br>**COMPLAINT FOR:**<br>**1. BREACH OF CONTRACT (GARCIA LOAN)**<br>**2. BREACH OF CONTRACT (BESNER LOAN)**<br>**3. BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING (GARCIA LOAN)**<br>**4. BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING (BESNER LOAN)** |

EARLY
SULLIVAN
WRIGHT
GIZER &
McRAE LLP
ATTORNEYS AT LAW

674817.2

**COMPLAINT**

Plaintiff Sun West Mortgage Company, Inc. ("Sun West") hereby files this Complaint against Defendant First National Bank of Pennsylvania ("FNB") as successor to Howard Bank ("Howard Bank"), which was a successor to First Mariner Bank ("First Mariner"), as follows:

## I.   **INTRODUCTION**

1.      Sun West brings this complaint to enforce a written settlement agreement executed on May 16, 2017 (the "Settlement Agreement") and address other misconduct by FNB, who is the successor to Howard Bank, which was acquired by FNB on or around January 24, 2022.  Howard Bank was a successor to First Mariner Bank d/b/a 1st Mariner Bank ("First Mariner"), a Maryland chartered trust company which was acquired by Howard Bank on or about March 1, 2018.[1]

2.      Sun West is a mortgage company for residential and commercial real estate, which offers a variety of mortgage-related products.  Sun West originates and services mortgages and Home Equity Conversion Mortgage (or "HECM") reverse mortgages.

3.      In March of 2011, First Mariner transferred to Sun West the servicing rights for a portfolio of approximately 2,200 reverse mortgage loans which were owned by the Federal National Mortgage Association ("Fannie Mae" or "FNMA").

4.      As explained further below, on August 6, 2015, Sun West filed a Complaint against First Mariner, and others, relating to and arising out of the transfer of servicing rights ("First Mariner Litigation").

5.      On May 16, 2017, Sun West and First Mariner settled the First Mariner

---

[1]      All references herein to FNB mean and refer to FNB as the successor to Howard Bank thus taking over all obligation under the Settlement Agreement from Howard Bank.  All references herein to Howard Bank mean and refer to Howard Bank as the successor to First Mariner thus taking over all obligation under the Settlement Agreement from First Mariner.  All references to First Mariner herein mean and refer to First Mariner Bank as Howard Bank's and FNB's predecessor and thus transferring all obligation under the Settlement Agreement to Howard Bank and to FNB.

EARLY
SULLIVAN
WRIGHT
GIZER &
McRAE LLP
ATTORNEYS AT LAW

674817.2

Litigation and entered into the Settlement Agreement.

6.      As discussed below, the Settlement Agreement required, among other things, FNB to repurchase from Sun West certain reverse mortgage loans in which First Mariner bank sold the servicing rights to Sun West after delivering the loans to Fannie Mae. FNB is a successor to Howard Bank which is a successor to First Mariner Bank, and per Section 12 of the Settlement Agreement, FNB is bound by the Settlement Agreement and must uphold its obligations to Sun West. (Ex. A, Settlement Agreement at ¶ 12.)  FNB has not contested that it is bound by the Settlement Agreement as successor to Howard Bank and First Mariner.

7.      Fannie Mae has demanded that Sun West repurchase three loans due to various errors which arise out of FNB's solicitation, processing, origination, underwriting, funding and/or closing of the loans.

8.      **The Garcia Loan:**   The Garcia Loan (Loan Number xxxxxx9153) is a HECM loan, which was originated and closed by First Mariner on or about October 10, 2007.

9.      The Garcia Loan is one of the Serviced Loans at issue in the Settlement Agreement for which FNB is required to repurchase under Paragraph 4 of the Settlement Agreement.

10.      On or about October 7, 2024, Sun West received an Initial Resolution Request ("IRR") from FNMA regarding the Garcia Loan.  In the IRR, FNMA identified a defect in this loan which it deemed to be uncorrectable.  FNMA reasoned that the Garcia Loan was not in first position at origination and stated in relevant part:

> The subject loan was delivered as a first lien transaction.
> It has come to our attention that the first lien status of the subject mortgage was misrepresented. A mortgage lien with Commercial Credit was recorded prior to the subject mortgage and was not released and had priority over the subject mortgage.

**COMPLAINT**

EARLY
SULLIVAN
WRIGHT
GIZER &
MCRAE LLP
ATTORNEYS AT LAW

674817.2

11.     Pursuant to Paragraph 4 of the Settlement Agreement, Sun West alerted FNB of these defects by letter dated October 8, 2024.  Sun West's correspondence included a copy of the IRR.

12.     On January 5, 2025, the deadline to repurchase the Garcia Loan, FNB did not repurchase the loan from FNMA.  Consequently, Sun West repurchased the Garcia Loan from FNMA on January 3, 2025.   The repurchase amount was $339,727.25.  As of October 15, 2025, the total payoff amount on the Garcia Loan due from FNB to Sun West is $355,300.71.  This amount is subject to increase for additional interest and fees.

13.     ***The Besner Loan:***  By letter dated May 20, 2025, Sun West initially alerted FNB of certain defects in the Besner Loan (Loan No. xxxxxx5200), which was originated by First Mariner.

14.     After several correspondence, by letter dated July 10, 2025, Sun West notified FNB that Sun West received an Initial Resolution Request ("IRR") from FNMA regarding the Besner Loan.  FNMA's IRR stated in relevant part as follows:

> Mortgage Eligibility – Miscellaneous
>
> Without corrective action the loan falls under guideline A1-3-02.  Subject to Servicing Defect Remedies Framework for servicing defects attributable to servicing violations, Fannie Mae is requiring the repurchase or the remittance of a make whole payment. As it currently stands, the lack of HUD qualification and of a recorded mortgage places the property at a very large loss risk which is not acceptable under guidelines. As a result the loan is not eligible for delivery to Fannie Mae.

15.     By letter dated July 10, 2025, Sun West provided written notice of its demand that FNB repurchase the Besner Loan pursuant to Paragraph 4 of the Settlement Agreement.  Sun West's correspondence included a copy of the FNMA's

EARLY
SULLIVAN
WRIGHT
GIZER &
MCRAE LLP
ATTORNEYS AT LAW

674817.2

IRR.  By email dated August 29, 2025, FNMA informed Sun West that it would not grant an extension on the Besner Loan and Sun West advised FNB of the same.  By letter dated September 3, 2025, Sun West further advised that if Sun West did not hear back from FNB, Sun West would repurchase the Besner Loan on September 12, 2025.  FNB did not respond and, therefore, Sun West repurchased the Besner Loan.  The repurchase amount was $513,661.82.  As of October 15, 2025, the total payoff amount on the Besner Loan due from FNB to Sun West is $517,432.40.  This amount is subject to increase for additional interest and fees.

16.    The above acts or omissions by FNB are violations of FNB's obligations under the Settlement Agreement.

17.    Despite FNB's obligations under the Settlement Agreement, FNB has failed to repurchase the subject two loans as required by Paragraph 4 of the Settlement Agreement.  As a result, Sun West has suffered significant financial harm of more than $872,733,11, including but not limited to Sun West's payments to repurchase the subject loans pursuant to FNMA's repurchase demands, plus interest, costs, expenses and attorneys' fees, and other payments due to FNMA regarding the subject loans in the amount of more than $950,000.00

18.    Therefore, as discussed below, Sun West has been injured and is now forced to bring these claims against FNB.

## II.    <u>PARTIES</u>

19.    Sun West is a corporation organized and existing under the laws of the State of California with its principal place of business in Cerritos, California.

20.    Upon information and belief, Defendant FNB is a national banking association with its principal place of business in Pittsburgh, Pennsylvania.  FNB is a successor to First Mariner Bank d/b/a 1st Mariner Bank. First Mariner Bank d/b/a 1st Mariner Bank was a Maryland chartered trust company with its principal place of business in Baltimore, Maryland.  By and through a merger completed and effective in or about March of 2018, First Mariner merged with and into Howard Bank.

EARLY
SULLIVAN
WRIGHT
GIZER &
MCRAE LLP
ATTORNEYS AT LAW
674817.2

Howard Bank was a Maryland chartered trust company, organized under the laws of the state of Maryland, with its principal place of business in Baltimore, Maryland. Howard Bank was the surviving entity. Paragraph 12 of the Settlement Agreement binds successors of the parties thereto. Thus, as a successor to First Mariner, Howard Bank is liable to Sun West under the Settlement Agreement and must uphold First Mariner's obligations to Sun West. (*See* Ex. A, Settlement Agreement, ¶ 12). By and through a merger completed and effected in or around January of 2022, Howard Bank merged with and into First National Bank of Pennsylvania, with First National Bank of Pennsylvania as the surviving entity. Thus, as a successor to Howard Bank, FNB is liable to Sun West under the Settlement Agreement and must uphold First Mariner's and/or Howard Bank's obligations to Sun West. (*See* Ex. A, Settlement Agreement, ¶ 12).

## III.    **JURISDICTION AND VENUE**

21.    This Court has jurisdiction over this action pursuant to Paragraph 13 of the Settlement Agreement between Sun West and First Mariner (and FNB as successor to Howard Bank which was a successor to First Mariner) in which the Parties agreed that any disputes relating to and the enforcement of any obligations arising under the Agreement shall be "subject to the exclusive jurisdiction and venue of the state or federal courts located in Los Angeles, California and that the Parties shall waive objections to personal jurisdiction in such courts in connection with any action seeking the enforcement of the terms so this Agreement." (Ex. A, at ¶ 13.) Additionally, this Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because there is complete diversity between the parties and because the amount in controversy exceeds $75,000, exclusive of interest and costs.

22.    Venue is proper in this Court because Sun West and First Mariner (and now FNB as successor to Howard Bank which was the successor to First Mariner) consented to litigation in this venue in the Settlement Agreement. (Ex. A, at ¶ 13.) Furthermore, venue is proper in this judicial district pursuant to 28 U.S.C. §

EARLY
SULLIVAN
WRIGHT
GIZER &
MCRAE LLP
ATTORNEYS AT LAW

674817.2

1391(b)(2) because a substantial part of the events or omissions giving rise to this action have occurred and/or will occur in this District.

## IV.    FACTUAL ALLEGATIONS

### A.    THE PRIOR LITIGATION INVOLVING SUN WEST AND FNB'S PREDECESSOR

23.    On March 31, 2011, First Mariner, Sun West, and NGFS Acquisition Group, LLC ("NGFS") entered into an Assignment of Servicing Rights (the "Assignment Agreement") through which First Mariner transferred to Sun West the servicing rights for a portfolio of approximately 2,200 reverse mortgage loans (the "Serviced Loans") owned by Fannie Mae.

24.    On or about August 6, 2015, Sun West filed a Complaint against First Mariner, and others in the U.S. District Court for the Central District of California, Case No. 2:15-CV-05982, relating to and arising out of the transfer of servicing rights for the Serviced Loans from First Mariner to Sun West ("First Mariner Litigation").

25.    During the First Mariner Litigation, Sun West alleged, among other things, that it suffered damages or losses relating to or arising out of the transfer of the servicing rights for the loans from First Mariner to Sun West as well as certain loans for which Sun West sought indemnification from First Mariner.

### B.    THE SETTLEMENT AGREEMENT

26.    On May 16, 2017, Sun West and First Mariner Bank settled the First Mariner Litigation and entered into the Settlement Agreement. (*See* Ex. A, "Settlement Agreement").[2]

27.    Pursuant to Paragraph 4 of the Settlement Agreement, First Mariner (and its successors, Howard Bank and FNB) is required to repurchase certain Serviced

---

[2]    The Settlement Agreement allows for the disclosure of its specific terms in certain scenarios, including matters connected to the enforcement of the Settlement Agreement. (Ex. A, at ¶ 9.) Accordingly, Sun West has attached a redacted copy of the Settlement Agreement herein.

EARLY
SULLIVAN
WRIGHT
GIZER &
MCRAE LLP
ATTORNEYS AT LAW

674817.2

Loans at issue in the First Mariner Litigation upon a repurchase demand by Fannie Mae, Ginnie Mae or other purchaser or assignee of the loans:

> In the event that Sun West is required to re-purchase or provide indemnification with respect to any of the Serviced Loans by Fannie Mae, Ginnie Mae, or any other purchaser or assignee (or any of their respective designees) of the Serviced Loans ... and the re-purchase or indemnity demand relates to or arises out of First Mariner's (or another third party's) solicitation, processing, origination, underwriting, funding and/or closing of a Serviced Loan, Sun West shall provide notice of such demand to First Mariner within 10 business days of the date on which the obligation is imposed on Sun West.  Said notice shall include a copy of the instructional notice given to Sun West to repurchase or indemnify with respect to the Serviced Loan(s).  Upon receipt of said notice, First Mariner shall have 21 days to re-purchase or indemnify with respect to the Serviced Loan.

(*See* Ex. A, Settlement Agreement, ¶ 4).

28.    Paragraph 12 of the Settlement Agreement binds successors of the parties thereto.  Thus, as a successor to First Mariner, FNB is liable to Sun West under the Settlement Agreement and must uphold First Mariner's obligations to Sun West. (*See* Ex. A, Settlement Agreement, ¶ 12).

29.    Paragraph 21 of the Settlement Agreement entitles a prevailing party to costs, attorneys fees and expenses for litigation between the parties arising out of the non-performance of any obligation under the Settlement Agreement.  (*See* Ex. A, Settlement Agreement, ¶ 21).

## C.    REPURCHASE DEMANDS BY FANNIE MAE AND FNB'S FAILURE TO RE-PURCHASE OR INDEMNIFY

30.    Sun West has been harmed by FNB's ongoing delays and other

EARLY
SULLIVAN
WRIGHT
GIZER &
MCRAE LLP
ATTORNEYS AT LAW
674817.2

misconduct in repurchasing or indemnifying Sun West with respect to two of the Serviced Loans subject to the Settlement Agreement, which have now been deemed unsellable by Fannie Mae, who in turn is obligating Sun West to re-purchase such loans.

## D.    PRIOR LITIGATION ARISING OUT OF THE SETTLEMENT AGREEMENT

31.    This is not the first lawsuit arising out of the Settlement Agreement.  On September 14, 2022, Sun West filed a prior lawsuit against FNB asserting causes of action for breach of the Settlement Agreement and/or breach of the implied covenant of good faith and fair dealing in connection with two loans known as the Barner Loan and the Hastings Loan (Case No. 8:22-cv-01700-MRA-AS).

32.    Following a three-day bench trial that began on November 4, 2024, the Court entered judgment in favor of Sun West in connection with the Hastings Loan. (**Exhibit B**; ECF No. 91, p. 2:10-14.)  The Court entered judgment in FNB's favor with respect to the Barner Loan.  (*Id.*, p. 2:16-19.)

33.    In its Findings of Fact and Conclusions of Law, the Court determined that FNB is the successor to First Mariner's obligations under the Settlement Agreement.  (**Exhibit C**; ECF No. 88, p. 4:7-10.)  The Court also recognized that it is undisputed that Sun West and FNB are parties to a valid and enforceable contract— the Settlement Agreement.  (*Id.*, p. 16:7-8.)

34.    With respect to the Hastings Loan, the Court found that Sun West produced sufficient evidence to show that it substantially performed under the Settlement Agreement.  (*Id.*, p. 17:17-18.)  In this regard, Paragraph 4 of the Settlement Agreement requires Sun West to make demand upon FNB within 10 business days of FNMA imposing an obligation on Sun West to repurchase a loan, to include a copy of FNMA's instructional notice with the demand, and to pass on any relief available to FNB during the 21-day period in which FNB must respond to FNB's demand.  The Court also found that Sun West had no contractual obligation

EARLY
SULLIVAN
WRIGHT
GIZER &
MCRAE LLP
ATTORNEYS AT LAW
674817.2

to provide the complete servicing files to FNB, but did so anyway.  (*Id*., p. 23:4-8.)
In connection with the Hastings Loan, FNMA required Sun West to either repurchase
the loan or appeal FNMA's decision.  (*Id*., p. 17: 18-24.)  Despite the foregoing, the
Court found that FNB never repurchased the loan and, therefore, breached the
Settlement Agreement.  (*Id*., p. 18:1-2.)  The Court also held that FNB has not acted
fairly and in good faith by refusing and failing to purchase the Hastings Loan.  (*Id*.,
p. 18:19-21.)  Thus, Sun West suffered damages in the payoff amount due to FNB's
failure to repurchase the Hastings Loan.  (*Id*., p. 18:3-4.)

35.    The Court further stated that Paragraph 21 of the Settlement Agreement
entitles a prevailing party to costs, attorneys' fees, and expenses for litigation between
the parties arising out of the non-performance of any obligation under the Settlement
Agreement.  (*Id*., p. 24:9-11.)

**E.    THE GARCIA LOAN**

36.    The Garcia Loan (Loan Number xxxxxx9153) is a HECM loan, which
was originated and closed by First Mariner on or about October 10, 2007.

37.    On or about July 11, 2024, Sun West self-reported this loan to FNMA
due to a defect in title that was identified when the loan was being reviewed for
assignment to HUD.  As a result of its contractual obligations to FNMA, Sun West is
obligated to self-report on loans in certain circumstances.

38.    During this review, it was determined that the title was not free and clear
for the subject property.  Specifically, a mortgage lien was recorded on November 2,
1998 in book 12574, page 558, against Shirley Garcia in favor of Commercial Credit
Corp. in the amount of $10,000.00 ("CCC Lien").  It was Sun West's understanding
that the CCC Lien has priority over the Garcia Loan.  Due to this, Sun West was
unable to assign the subject loan to HUD.

39.    Sun West alerted Stewart Title Insurance Company of the issue.  The
title defect resulted in a letter of indemnification from the title company, making the
loan ineligible for HUD assignment.

EARLY
SULLIVAN
WRIGHT
GIZER &
MCRAE LLP
ATTORNEYS AT LAW
674817.2

40.    On October 7, 2024, Sun West received an IRR from FNMA regarding the Garcia Loan.  In the IRR, FNMA identified a defect in the Garcia Loan which it deemed to be uncorrectable.  FNMA reasoned that the Garcia Loan was not in first position at origination and stated in relevant part:

> The subject loan was delivered as a first lien transaction. It has come to our attention that the first lien status of the subject mortgage was misrepresented. A mortgage lien with Commercial Credit was recorded prior to the subject mortgage and was not released and had priority over the subject mortgage.

41.    As set forth in FNMA's IRR, FNMA gave Sun West a deadline until December 6, 2024 to either: (1) Provide an appeal; or (2) Repurchase the Garcia Loan.

42.    Pursuant to Paragraph 4 of the Settlement Agreement, by letter dated October 8, 2024, Sun West alerted FNB to certain defects in the Garcia Loan.  Per the terms of the Settlement Agreement, Sun West attached a copy of FNMA's October 7th IRR to its October 8th correspondence to FNB.  A true and correct copy of Sun West's letter dated October 8, 2024 regarding the Garcia Loan is attached hereto as **Exhibit D.**

43.    Sun West subsequently obtained an extension from FNMA on the Garcia Loan until January 5, 2025 and updated FNB regarding this extension.

44.    On or about December 13, 2024, Sun West provided FNB with the origination and servicing files for the Garcia Loan.  At the request of FNB, Sun West requested another 30-day extension from FNMA.  Sun West requested this extension from FNMA. FNMA denied this request and Sun West informed FNB of this denial.

45.    Sun West also reiterated its demand that Sun West repurchase the Garcia Loan pursuant to the Settlement Agreement as it did not appear that there was any basis to appeal the loan.  A true and correct copy of Sun West's various email

EARLY
SULLIVAN
WRIGHT
GIZER &
MCRAE LLP
ATTORNEYS AT LAW
674817.2

correspondence in December 2024 regarding the Garcia Loan is attached hereto as **Exhibit E**.

46.    The Garcia Loan is one of the Serviced Loans at issue in the Settlement Agreement for which FNB is required to repurchase under Paragraph 4 of the Settlement Agreement.

47.    On January 5, 2025, the deadline to repurchase the Garcia Loan, FNB did not repurchase the loan from FNMA.

48.    Accordingly, on January 3, 2025, Sun West repurchased the Garcia Loan from FNMA.  The repurchase amount was $339,727.25.  Sun West was under a contractual obligation to FNMA to repurchase the Garcia Loan.

49.    As of October 15, 2025, the total payoff amount on the Garcia Loan due from FNB to Sun West is $355,300.71.  This amount is subject to increase for additional interest and fees.

50.    At the time of the filing of this Complaint, it is well past the allotted 21 days for FNB to repurchase or indemnify Sun West with respect to the Garcia Loan, and FNB has failed to provide Sun West any such indemnification as required under the Settlement Agreement.  (*See* Ex. A, Settlement Agreement, ¶ 4).

51.    The above acts or omissions by FNB are violation of FNB's obligations under the Settlement Agreement.

**F.    THE BESNER LOAN**

52.    The Besner Loan (Loan No. xxxxxx5200) was also originated by First Mariner.

53.    By letter dated May 20, 2025, Sun West alerted FNB of certain defects in the Besner Loan.  As stated in the letter, Sun West learned that it does not have a recorded first or second deed of trust on the Besner Loan in its files as such documents were not provided when the Besner Loan was transferred to Sun West from First Mariner, FNB's predecessor.

54.    Sun West asked FNB to provide the original copies of the recorded first

EARLY
SULLIVAN
WRIGHT
GIZER &
MCRAE LLP
ATTORNEYS AT LAW
674817.2

and second deeds of trust on the Besner Loan within FNB's possession, custody or control within ten (10) days of the May 20, 2025 letter. Sun West also notified FNB that these defects will render the Besner Loan ineligible for liquidation or otherwise for assignment to HUD unless FNB provided the recorded deeds of trust.

55.    Sun West advised FNB that it has also tendered a claim to FNB's title insurance company, Stewart Title Guaranty Company ("Stewart Title"), in an effort to seek its help in either obtaining the recorded documents or recording the documents.   Attached as **Exhibit F** is a true and correct copy of Sun West's letter dated May 20, 2025.

56.    Sun West further advised FNB that the May 20, 2025 letter served as written notice of the above defects in the Besner Loan and notice of Sun West's reservation of rights and claims, including but not limited to, the right to demand that FNB repurchase the Besner Loan or provide Sun West indemnification regarding the Besner Loan pursuant to Paragraph 4 of the Settlement Agreement.

57.    Sun West self-reported the Besner Loan to FNMA on or about June 5, 2025.  As a result of its contractual obligations to FNMA, Sun West is obligated to self-report on loans in certain circumstances.  Subsequently, FNMA informed Sun West that it was required to repurchase the Besner Loan.

58.    By letter dated June 16, 2025, Sun West informed FNB that Sun West self-reported the Besner Loan to FNMA.  Sun West further advised that a repurchase demand from FNMA was forthcoming and would keep FNB apprised.  Attached as **Exhibit G** is a true and correct copy of Sun West's letter dated June 16, 2025.

59.    On June 27, 2025, Sun West received an IRR from FNMA regarding the Besner Loan.  FNMA's IRR stated in relevant part as follows:

> Mortgage Eligibility – Miscellaneous
>
> Without corrective action the loan falls under guideline A1-3-02.  Subject  to  Servicing  Defect  Remedies Framework for servicing defects attributable to servicing

EARLY
SULLIVAN
WRIGHT
GIZER &
McRAE LLP
ATTORNEYS AT LAW

674817.2

violations, Fannie Mae is requiring the repurchase or the remittance of a make whole payment. As it currently stands, the lack of HUD qualification and of a recorded mortgage places the property at a very large loss risk which is not acceptable under guidelines. As a result the loan is not eligible for delivery to Fannie Mae.

60.     As set forth in the IRR, FNMA gave Sun West a deadline until August 26, 2025 to either: (1) Provide an appeal; or (2) Repurchase the Besner Loan.

61.     Pursuant to Paragraph 4 of the Settlement Agreement, by letter dated July 10, 2025, Sun West notified FNB that it had received an IRR from FNMA regarding the Besner Loan.  Pursuant to the terms of the Settlement Agreement, Sun West included FNMA's June 27th IRR in its July 10th letter to FNB.  A true and correct copy of Sun West's letter dated July 10, 2025 regarding the Besner Loan is attached hereto as **Exhibit H.**

62.     By letter dated August 7, 2025, Sun West provided FNB with an update on Sun West's tender of the claims to Stewart Title.  Sun West also reminded FNB of FNMA's repurchase or appeal deadline on the Besner Loan of August 26, 2025.  A true and correct copy of Sun West's letter dated August 7, 2025 regarding the Besner Loan is attached hereto as **Exhibit I.**

63.     On the last day on which Sun West had to repurchase the Besner Loan (August 26, 2025), FNB requested that Sun West seek an extension from FNMA.  By email dated August 26, 2025, Sun West informed FNB that Sun West had already requested an extension from FNMA on the Besner Loan on the prior day.  Sun West also included its correspondence with FNMA in this regard.

64.     By email dated August 29, 2025, Sun West informed FNB that FNMA would not grant an extension on the Besner Loan.  A true and correct copy of Sun West's email dated August 29, 2025 is attached hereto as **Exhibit J**.

65.     By letter dated September 2, 2025, Sun West notified FNB that FNMA

EARLY SULLIVAN WRIGHT GIZER & McRAE LLP
ATTORNEYS AT LAW
674817.2

has given 15 days from August 29, 2025 to either: (1) concur and remit due for the repurchase/make whole; or (2) concur to any repurchase alternative offered. As of that date, FNMA did not offer a repurchase alternative. Thus, the repurchase funds were required to be remitted to FNMA by September 12, 2025 (as the 15th day fell on a weekend.)

66.    Sun West further advised FNB that it was in breach of Section 4 of the Settlement Agreement. Sun West informed FNB that the loan payoff as of September 12, 2025 was $513,661.82. A true and correct copy of Sun West's email dated August 29, 2025 is attached hereto as **Exhibit K**.

67.    By letter dated September 3, 2025, Sun West advised FNB that Sun West received a correspondence from FNMA regarding the Besner Loan, in which FNMA ordered Sun West to "have this loan moved to concur to repurchase status in LQCS." In response, Sun West concurred the repurchase in LQCS.

68.    In light of the above, Sun West asked whether FNB would like Sun West to repurchase the Besner Loan immediately (in order to lower the interest owed to FNMA), or if FNB would prefer that Sun West repurchase on the deadline (September 12, 2025). Sun West further advised that if Sun West did not hear back from FNB, Sun West would repurchase the Besner Loan on September 12, 2025.

69.    FNB did not respond and, therefore, Sun West repurchased the Besner Loan. The repurchase amount was $513,661.82. Sun West was under a contractual obligation to FNMA to repurchase the Garcia Loan.

70.    As of October 15, 2025, the total payoff amount on the Besner Loan due from FNB to Sun West is $517,432.40. This amount is subject to increase for additional interest and fees.

71.    At the time of the filing of this Complaint, it is well past the allotted 21 days for FNB to repurchase or indemnify Sun West with respect to the Besner Loan, and FNB has failed to provide Sun West any such indemnification as required under the Settlement Agreement. (*See* Ex. A, Settlement Agreement, ¶ 4).

EARLY
SULLIVAN
WRIGHT
GIZER &
McRAE LLP
ATTORNEYS AT LAW
674817.2

72.    The above acts or omissions by FNB are violation of FNB's obligations under the Settlement Agreement.

**FIRST CLAIM FOR RELIEF**

(Breach of Written Agreement—The Garcia Loan)

73.    Sun West repeats and re-alleges the allegation contained in Paragraphs 1-72 of this Complaint as though fully set forth herein.

74.    Sun West and FNB (as a successor to Howard Bank which was a successor to First Mariner Bank) are parties to the Settlement Agreement, which is a valid written contract fully enforceable according to its terms.

75.    Sun West has performed all of the conditions and covenants required of it to be performed under the Settlement Agreement, except to the extent such performance was excused or prevented.  Sun West has satisfied each and every condition precedent under the Settlement Agreement for commencing suit against FNB.

76.    FNB has breached its contractual obligation under the Settlement Agreement by refusing to repurchase or indemnify Sun West with respect to the Garcia Loan.

77.    As a direct and proximate result of FNB's breaches, Sun West has been damaged in an amount according to proof at trial, and no less than $355,300.71, plus interest, attorneys' fees and costs.

78.    Paragraph 21 of the Settlement Agreement entitles a prevailing party to costs, attorneys fees and expenses.  (See Ex. A, Settlement Agreement, ¶ 21).

**SECOND CLAIM FOR RELIEF**

(Breach of Written Agreement—The Besner Loan)

79.    Sun West repeats and re-alleges the allegation contained in Paragraphs 1-78 of this Complaint as though fully set forth herein.

80.    Sun West and FNB (as a successor to Howard Bank which was a successor to First Mariner Bank) are parties to the Settlement Agreement, which is a

valid written contract fully enforceable according to its terms.

81.    Sun West has performed all of the conditions and covenants required of it to be performed under the Settlement Agreement, except to the extent such performance was excused or prevented.  Sun West has satisfied each and every condition precedent under the Settlement Agreement for commencing suit against FNB.

82.    FNB has breached its contractual obligation under the Settlement Agreement by refusing to repurchase or indemnify Sun West with respect to the Besner Loan.

83.    As a direct and proximate result of FNB's breaches, Sun West has been damaged in an amount according to proof at trial, and no less than $517,432.40, plus interest, attorneys' fees and costs.

84.    Paragraph 21 of the Settlement Agreement entitles a prevailing party to costs, attorneys fees and expenses.  (See Ex. A, Settlement Agreement, ¶ 21).

### THIRD CLAIM FOR RELIEF

(Breach of the Implied Covenant of Good Faith and Fair Dealing-

The Garcia Loan)

85.    Sun West repeats and re-alleges the allegation contained in Paragraphs 1-84 of this Complaint as though fully set forth herein.

86.    Like all contracts, the Settlement Agreement contains implied covenants of good faith and fair dealing.  The implied covenant requires, among other things, that FNB treat Sun West fairly and in good faith and do nothing to deprive Sun West of the benefits of the Settlement Agreement and/or to frustrate the agreed-upon purposes of the Settlement Agreement. The obligations of the covenant extend beyond the formation of the contract and to its enforcement.

87.    In the alternative to its cause of action for Breach of Contract, Sun West alleges that FNB breached the implied covenant of good faith and fair dealing in the Settlement Agreement.

EARLY
SULLIVAN
WRIGHT
GIZER &
MCRAE LLP
ATTORNEYS AT LAW

674817.2

88.     FNB unfairly and in bad faith deprived Sun West of the benefit of the bargain between the parties and the right to receive the benefits of the Settlement Agreement by its conduct, including by its intentional delays in repurchasing the Garica Loan.  FNB has refused to repurchase and/or indemnify Sun West for the Garcia Loan, while never asserting any claims that it was not obligated to repurchase the Garcia Loan under the Settlement Agreement.  FNB is fully aware of its obligations under the Settlement Agreement, but is delaying the process in bad faith and forcing Sun West to file the instant lawsuit in order to enforce the Settlement Agreement.

89.     As a direct and proximate result of these breaches, Sun West has been damaged in an amount according to proof at trial, plus interest, attorneys' fees and costs.

90.     Paragraph 21 of the Settlement Agreement entitles a prevailing party to costs, attorneys fees and expenses.  (See Ex. A, Settlement Agreement, ¶ 21).

### <u>FOURTH CLAIM FOR RELIEF</u>

(Breach of the Implied Covenant of Good Faith and Fair Dealing-

The Besner Loan)

91.     Sun West repeats and re-alleges the allegation contained in Paragraphs 1-90 of this Complaint as though fully set forth herein.

92.     Like all contracts, the Settlement Agreement contains implied covenants of good faith and fair dealing.  The implied covenant requires, among other things, that FNB treat Sun West fairly and in good faith and do nothing to deprive Sun West of the benefits of the Settlement Agreement and/or to frustrate the agreed-upon purposes of the Settlement Agreement. The obligations of the covenant extend beyond the formation of the contract and to its enforcement.

93.     In the alternative to its cause of action for Breach of Contract, Sun West alleges that FNB breached the implied covenant of good faith and fair dealing in the Settlement Agreement.


674817.2

EARLY
SULLIVAN
WRIGHT
GIZER &
MCRAE LLP
ATTORNEYS AT LAW

94.    FNB unfairly and in bad faith deprived Sun West of the benefit of the bargain between the parties and the right to receive the benefits of the Settlement Agreement by its conduct, including by its intentional delays in repurchasing the Besner Loan.  FNB has refused to repurchase and/or indemnify Sun West for the Besner Loan, while never asserting any claims that it was not obligated to repurchase the Besner Loan under the Settlement Agreement.  FNB is fully aware of its obligations under the Settlement Agreement, but is delaying the process in bad faith and forcing Sun West to file the instant lawsuit in order to enforce the Settlement Agreement.

95.    As a direct and proximate result of these breaches, Sun West has been damaged in an amount according to proof at trial, plus interest, attorneys' fees and costs.

96.    Paragraph 21 of the Settlement Agreement entitles a prevailing party to costs, attorneys fees and expenses.  (See Ex. A, Settlement Agreement, ¶ 21).

## V.    **PRAYER FOR RELIEF**

WHEREFORE, Sun West prays for the following relief:

1.    For compensatory damages in an amount to be proved at trial but no less than $872,733.11 as discussed above;

2.    For an order compelling FNB to specifically perform under the Settlement Agreement, including repurchase of the subject loans as contemplated thereunder;

3.    For the full amount of Sun West's costs and attorneys' fees incurred herein as required by the Settlement Agreement, and/or as allowed by law;

4.    For pre-judgment and post-judgment interest as allowed by law; and

///

///

///

///

EARLY
SULLIVAN
WRIGHT
GIZER &
MCRAE LLP
ATTORNEYS AT LAW

674817.2

5.    For such other relief as the Court may deem appropriate.

Dated:  October 28, 2025

Respectfully submitted,

EARLY SULLIVAN WRIGHT
GIZER & McRAE LLP

By: */s/ Scott E. Gizer*
        Scott E. Gizer
        Padideh Zargari
        Attorneys for Plaintiff
        SUN WEST MORTGAGE COMPANY,
        INC.

5828067.1

---

**COMPLAINT**

19

674817.2

# EXHIBIT A

## SETTLEMENT AND RELEASE AGREEMENT

This SETTLEMENT AND RELEASE AGREEMENT (the "Agreement") is made and entered into as of the 16th day of May, 2017 (the "Effective Date"), by and among Sun West Mortgage Company, Inc. ("Sun West") and First Mariner Bank d/b/a 1st Mariner Bank ("1st Mariner"). Collectively, Sun West and 1st Mariner shall be referred to as the "Parties" and individually as a "Party."

## Recitals

WHEREAS, on or about March 31, 2011, 1st Mariner, Sun West, and NGFS Acquisition Group, LLC ("NGFS") entered into an Assignment of Servicing Rights (the "Assignment Agreement") through which 1st Mariner transferred to Sun West the servicing rights for a portfolio of approximately 2,200 reverse mortgage loans (the "Serviced Loans") owned by the Federal National Mortgage Association ("Fannie Mae");

WHEREAS, on or about June 1, 2011, in accordance with the terms of the Assignment Agreement, 1st Mariner did, in fact, transfer the servicing rights for the Serviced Loans to Sun West and, upon that transfer, Sun West assumed all servicing responsibilities related to the Serviced Loans and First Mariner's servicing responsibilities related to the Serviced Loans ceased;

WHEREAS, on or about July 8, 2011, 1st Mariner, Sun West, and NGFS entered into an Amendment to Assignment of Servicing Rights;

WHEREAS, on or about June 24, 2014, LTC Global, Inc. ("LTC") and NGFS filed a lawsuit against Sun West in the U.S. District Court for the Central District of California, Case No. 2:14-CV-04903 (PSG/AS), relating to and arising out of a Services and Indemnification Agreement that LTC, NGFS, and Sun West entered into on or about March 31, 2011 (the "LTC Litigation");

WHEREAS, on or about August 6, 2015, Sun West filed a Complaint against 1st Mariner, LTC, and NGFS in the U.S. District Court for the Central District of California, Case No. 2:15-CV-05982 (PSG/AS), relating to and arising out of the transfer of servicing rights for the Serviced Loans from 1st Mariner to Sun West under the Assignment Agreement (the "Lawsuit");

WHEREAS, in the Lawsuit, Sun West alleges that it has suffered the following damages or losses relating to or arising out of the transfer of the servicing rights for the Serviced Loans from 1st Mariner to Sun West under the Assignment Agreement: (1) $4,090,228 in losses associated with debenture interest curtailed by the U.S. Department of Housing and Urban Development ("HUD") and/or Fannie Mae in connection with 183 Serviced Loans (identified in Exhibit A to this Agreement); (2) ███████ in expenses incurred by Sun West in connection with the LTC Litigation, including, but not limited to, its legal fees, expert costs, and the settlement payment that Sun West paid to LTC to resolve the LTC Litigation; and (3) $1,442,849 related to eight (8) Serviced Loans (identified in Exhibit B to this Agreement) for which Sun West seeks indemnification from 1st Mariner (collectively, the "Claimed Damages");

WHEREAS, Sun West represents and warrants that it reimbursed Fannie Mae for losses associated with debenture interest curtailed by HUD in connection with the Serviced Loans identified in Exhibit A to this Agreement;

WHEREAS, Sun West represents and warrants that it re-purchased two Serviced Loans from Fannie Mae for which it seeks indemnification from 1st Mariner: the "Samad" loan (Fannie Mae Loan No. ████ 9285/Sun West Loan No. ████ 6600) and the "Lockhart" loan (Fannie Mae Loan No. ████ 0573/Sun West Loan No. ████ 2800).

WHEREAS, the Parties now wish to resolve any and all claims arising out of or relating to the Lawsuit;

NOW THEREFORE, to avoid the burden and expense of further litigation, without any admission of fault or liability by any of the Parties, and in consideration of the promises contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

## **Terms and Releases**

1.     <u>PAYMENT.</u>

1st Mariner shall pay the amount of ████████████████████ ████████ to Sun West within 30 days of the date on which this Agreement is fully executed by the Parties.

2.     <u>RELEASES</u>

(a)   Subject to the terms of Section 4, *infra*, Sun West does, for itself and for its respective past and present officers, directors, members, shareholders, owners, partners, employees, agents, representatives, predecessors, successors, affiliates, assigns, insurers, and attorneys, and all persons acting by, through, or under them, hereby unconditionally remise, release, and forever discharge 1st Mariner (and its officers, directors, members, shareholders, owners, partners, employees, agents, insurers, representatives, predecessors, successors, affiliates, assigns, and attorneys) of and from any and all claims, actions, causes of action, suits, accounts, covenants, contracts, controversies, debts, damages, judgments, indemnities, promises, rights of appeal, and demands of whatever kind or nature that Sun West ever had, now have, or hereafter can, shall, or may have for, upon, or by reason of any matter, cause, or thing, whether known or unknown and whether suspected or unsuspected, from the beginning of the world to the date of this Agreement arising out of, connected with, or relating to the subject matter of the Lawsuit, including, without intended limitation, the Claimed Damages, the Assignment Agreement, the Serviced Loans, and any and all servicing activities related to the Serviced Loans. This Section, however, shall not be construed to release 1st Mariner from any obligation under this Agreement.

(b)     Subject to the terms of this Agreement, 1st Mariner does, for itself and for its respective past and present officers, directors, members, shareholders, owners, partners, employees, agents, representatives, predecessors, successors, affiliates, assigns, insurers, and attorneys, and all persons acting by, through, or under them, hereby unconditionally remise, release, and forever discharge Sun West (and its officers, directors, members, shareholders, owners, partners, employees, agents, insurers, representatives, predecessors, successors, affiliates, assigns, and attorneys) of and from any and all claims, actions, causes of action, suits, accounts, covenants, contracts, controversies, debts, damages, judgments, indemnities, promises, rights of appeal, and demands of whatever kind or nature that 1st Mariner ever had, now have, or hereafter can, shall, or may have for, upon, or by reason of any matter, cause, or thing, whether known or unknown and whether suspected or unsuspected, from the beginning of the world to the date of this Agreement arising out of, connected with, or relating to the subject matter of the Lawsuit.  This Section, however, shall not be construed to release Sun West from any obligation under this Agreement.

3.      NOTIFICATION REGARDING LOAN FILE DOCUMENTS.

Sun West agrees that it will notify 1st Mariner within 30 days of the Effective Date of this Agreement regarding any loan documents, including, but not limited to, Assignments of Mortgages and Allonges, relating to any of the Serviced Loans that it does not possess and that are required to properly service the Serviced Loans.  In the event that Sun West does not notify 1st Mariner of any such loan document within 30 days of the Effective Date, as described above, Sun West hereby waives its right to bring a claim against 1st Mariner relating to, arising out of, or otherwise caused by Sun West's lack of possession of such loan document.

4.      RE-PURCHASE DEMANDS.

In the event that Sun West is required to re-purchase or provide indemnification with respect to any of the Serviced Loans by Fannie Mae, Ginnie Mae, or any other purchaser or assignee (or any of their respective designees) of the Serviced Loans (other than the eight (8) Serviced Loans set forth in Exhibit B), and the re-purchase or indemnity demand relates to or arises out of 1st Mariner's (or another third party's) solicitation, processing, origination, underwriting, funding and/or closing of a Serviced Loan, Sun West shall provide notice of such demand to 1st Mariner within 10 business days of the date on which the obligation is imposed on Sun West.  Said notice shall include a copy of the instructional notice given to Sun West to repurchase or indemnify with respect to the Serviced Loan(s).  Upon receipt of said notice, 1st Mariner shall have 21 days to re-purchase or indemnify with respect to the Serviced Loan.  Sun West, however, agrees in good faith to pass through to 1st Mariner any relief made available to Sun West by Fannie Mae, Ginnie Mae, or any other purchaser or assignee (or any of their respective designees) of the Serviced Loans in connection with its administration and enforcement of re-purchase or indemnification requests relating to the Serviced Loans.  In the event that Sun West does not notify 1st Mariner of any such re-purchase or indemnity demand within 10 business days as described above, Sun West hereby waives its right to assert a claim for indemnification from 1st Mariner in connection with the re-purchase or indemnity demand for

such Serviced Loan(s).  The Parties acknowledge that this Section does not pertain to requests for repayment or reimbursement of curtailed debenture interest made by HUD and/or Fannie Mae to Sun West, and further acknowledge that this Section does not impose upon 1st Mariner any obligation to indemnify or reimburse Sun West for any losses associated with curtailed debenture interest in connection with any of the Serviced Loans.

5.    <u>RE-PURCHASE OF THE LOCKHART AND SAMAD LOANS.</u>

Within 14 days of the date on which the settlement amount described in Section 1, *supra*, is received by Sun West or its attorneys, Sun West shall transfer, or cause to be transferred, ownership of the "Samad" loan (Fannie Mae Loan No. ████19285/Sun West Loan No. ████6600) and the "Lockhart" loan (Fannie Mae Loan No. ████0573/Sun West Loan No. ████2800) to 1st Mariner.  1st Mariner agrees to work with Sun West to take the appropriate steps to effect the transfer of ownership for the "Samad" and "Lockhart" loans from Sun West to 1st Mariner.

6.    <u>DISMISSAL OF THE LAWSUIT.</u>

Within five (5) business days of the date on which the settlement amount described in Section 1, *supra*, is received by Sun West or its attorneys, Sun West shall dismiss, or cause to be dismissed, with prejudice, all claims asserted against 1st Mariner in the Lawsuit.

7.    <u>NO ADMISSION OF LIABILITY.</u>

This Agreement does not and shall not constitute an admission by any Party of any liability or of any violation or breach of any right, contract, statute, or other provision, regulation, ordinance, order, or common law in the United States relating to the subject matter of this Agreement.

8.    <u>ACKNOWLEDGEMENT OF CONSIDERATION.</u>

The Parties agree and acknowledge that the consideration received hereunder shall constitute full payment for satisfaction, discharge, compromise, and release for the claims that have been released herein.

9.    <u>CONFIDENTIALITY.</u>

(a)    The Parties agree that, except as provided below, they will not reveal, release, or publicize in any manner the terms of this Agreement, whether directly, indirectly, through implication, or otherwise, except to respond to any inquiry with a statement substantially similar to "the Parties have amicably resolved the matter."  The specific terms of this Agreement will not be disclosed by the Parties, except: (i) with the specific written consent of the other Parties; (ii) as required by any court or other governmental body, or as otherwise required by law; (iii) to legal counsel, accountants, banks, financing sources, and other advisors or consultants of the Parties (who shall first agree to the terms and conditions of this paragraph); (iv) in connection with the enforcement hereof; or (v) to the extent a Party reasonably deems

disclosure necessary to implement the terms of this Agreement. The Parties shall otherwise refrain from commenting publicly regarding the subject matter of this Agreement.

(b)    Should a party receive a request for disclosure of this Agreement or become required by law to produce this Agreement or disclose any of the terms of this Agreement, the Party receiving such a request shall promptly, and in no case more than five (5) business days following receipt of such a request (so long as it is possible and legally permitted to provide such notification), notify the other Party to afford it the opportunity to object to or to seek a protective order before the disclosure of any such information.

10.    NON-DISPARAGEMENT.

The Parties agree that they will not at any time disparage any other Party in any manner likely to be harmful to that Party or its reputation, business or otherwise.

11.    CAPACITY AND AUTHORITY.

The Parties stipulate, agree, and warrant that the persons executing this Agreement have the necessary and appropriate authority and capacity to execute this Agreement and to make such Agreement fully binding and enforceable against each of the Parties.

12.    BINDING AGREEMENT.

The provisions of this Agreement shall bind and inure to the benefit of the Parties and their respective predecessors, successors, parents, subsidiaries, affiliates, heirs, and assigns.

13.    GOVERNING LAW AND VENUE.

This Agreement shall be governed by and interpreted in accordance with the laws of the State of California, without regard to its conflicts of law provisions.  The Parties further agree that all disputes relating to and the enforcement of any obligations arising under this Agreement shall be subject to the exclusive jurisdiction and venue of the state or federal courts located in Los Angeles, California, and that the Parties shall waive objections to personal jurisdiction in such courts in connection with any action seeking the enforcement of the terms of this Agreement.

14.    WAIVER OF JURY TRIAL.

The Parties hereby waive the right to a trial by jury in any action or proceeding based upon, or related to, this Agreement. This waiver is knowingly, intentionally, and voluntarily made by the Parties, who acknowledge that no Party has made any representations of fact to induce this waiver of trial by jury or in any way to modify or nullify its effect.

15.    CONSTRUCTION.

This Agreement is the product of arm's length negotiations between the Parties, and no Party shall be deemed to be the drafter of this Agreement, nor shall any part of this Agreement

be construed against any Party on the basis of that Party's identity as a drafter of any part of this Agreement. In the event of uncertainty in the terms of the Agreement, such uncertainty shall be resolved fairly and in accordance with the intent of the Parties set forth herein and without regard as to who caused the uncertainty to exist.

16. HEADINGS.

The headings for each Section of this Agreement are for convenience only and are not intended to have substantive effect.

17. RECITALS.

The above Recitals form an integral and substantive part of this Agreement and are incorporated herein by reference.

18. CONSULTATION AND UNDERSTANDING OF TERMS.

The Parties acknowledge that they have read this Agreement, have had a full opportunity to consult with legal counsel with regard to it, and have signed this Agreement voluntarily and with a full understanding of its terms. The Parties represent and warrant that they are entering into this Agreement after investigation and advice by their attorneys, that they have determined this Agreement is satisfactory for their purposes, that their decision to enter into this Agreement is based upon knowledge and information that they deem adequate, that in entering into this Agreement they are not relying in any manner on any fact, information, statement, disclosure, nondisclosure or representation made by any other Party not contained herein or any alleged duty of any other Party to disclose any facts or information, and that this Agreement is binding, valid and enforceable.

19. COUNTERPARTS.

This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, but all of which together shall constitute but one and the same instrument. Delivery of executed scanned signature pages by e-mail or facsimile transmission will constitute effective and binding execution and delivery.

20. SEVERABILITY.

If any term or other provision of this Agreement is invalid, illegal, or incapable of being enforced by any law or public policy, all other terms or provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party. Upon such determination that any term or other provision is invalid, illegal, or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

21.    <u>ATTORNEYS' FEES.</u>

In the event of litigation between the Parties arising out of or related to the performance or non-performance of any obligation of any Party to this Agreement, the prevailing Party shall be entitled to recover its costs, expenses, and reasonable attorneys' fees.

22.    <u>WAIVER OF UNKNOWN CLAIMS.</u>

Each of the Parties hereto understands and acknowledges that there are laws that may invalidate releases of claims that may be unknown to the releasing party. Each of the Parties hereto expressly waives any rights conferred upon them by Section 1542 of the California *Civil Code* ("Section 1542"), and expressly consents that this Settlement Agreement and the releases set forth in Section 2, *supra*, shall be given full force and effect according to all of its terms, including those terms relating to unknown and unsuspected claims, if any. Section 1542 provides as follows:

**A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.**

In connection with such waiver and relinquishment, each of the Parties hereto acknowledges that they are aware that they may later discover facts in addition to or different from those which they currently know or believe to be true with respect to the subject matters of the Serviced Loans, this Lawsuit and Settlement Agreement, but that it is their intention to hereby fully, finally, and forever release all of the matters and claims identified in the releases contained herein which now exist, may exist, or previously existed between them and/or any of the parties released by them in accordance with this Settlement Agreement, whether known or unknown, suspected or unsuspected. In furtherance of such intent, the releases in this Settlement Agreement shall be and remain in effect as full and complete releases, notwithstanding the discovery or existence of such additional or different facts by the Parties, or any of them, or by any person acting on their respective behalves. The Parties represent and warrant that they understand and acknowledge the significance and consequence of this waiver of the provisions of Section 1542 and hereby assume full responsibility for any damage, loss or liability that it or they may hereafter incur by reason of such waiver.

23.    <u>NOTICE.</u>

Any notices required or desired to be given hereunder shall be in writing and shall be served by United States mail, e-mail, overnight air courier service (such as Federal Express), or personal delivery as provided herein. Service of any notice upon a Party hereto shall be deemed complete on the day such notice is served by personal delivery during regular business hours (and shall be deemed complete on the following day if personally delivered after regular business hours); on the day following delivery of the notice to an overnight air courier delivery service with all costs fully prepaid; or on the third day following deposit of the notice in the United States mail with postage thereon fully prepaid (unless sent by Express Mail overnight delivery, in which case service shall be complete on the day following deposit). To be effective, any

notice must be served upon both the Party and the persons designated to receive a copy thereof at the addresses set forth below, unless a Party has given prior written notice of a change of person or address:

> If to Sun West:
>
> Sun West Mortgage Company, Inc.
> 18000 Studebaker Road, #200
> Cerritos, California 90703
> Attn: Pavan S. Agarwal
>
> with a copy to:
>
> Early Sullivan Wright Gizer & McRae LLP
> 6420 Wilshire Boulevard, 17th Floor
> Los Angeles, California 90048
> Attn: Scott E. Gizer, Esq.
>
> If to 1st Mariner:
>
> First Mariner Bank
> 3301 Boston Street
> Baltimore, Maryland 21224
> Attn: Legal Department
>
> with a copy to:
>
> Miles & Stockbridge P.C.
> 100 Light Street
> Baltimore, Maryland 21202
> Attn: Michael Blumenfeld, Esq.

24.    **ENTIRE AGREEMENT.**

This Agreement contains the entire agreement between the Parties with respect to the subject matter herein, and any and all prior and contemporaneous oral and written agreements and discussions are superseded by this Agreement. No provision of this Agreement can be waived, modified, amended, or supplemented except in a writing signed by the Parties hereto.

*    *    *

IN WITNESS WHEREOF, the Parties hereto warrant that they have read all of this Agreement and fully understand everything contained herein.  Each Party fully and freely assents to all terms of the Agreement, as executed below.

**Sun West Mortgage Company, Inc.**

_____
Name: Pavan A. Agarwal
Title: Chief Executive Officer
Date:

**First Mariner Bank**

_____
By:  Joseph Howard
Title:  SVP, General Counsel
Date:

IN WITNESS WHEREOF, the Parties hereto warrant that they have read all of this Agreement and fully understand everything contained herein. Each Party fully and freely assents to all terms of the Agreement, as executed below.

**Sun West Mortgage Company, Inc.**

Name: Pavan A. Agarwal
Title: Chief Executive Officer
Date: 5/15/ 2017

**First Mariner Bank**

By: Joseph Howard
Title: SVP, General Counsel
Date:

177262.1

IN WITNESS WHEREOF, the Parties hereto warrant that they have read all of this Agreement and fully understand everything contained herein. Each Party fully and freely assents to all terms of the Agreement, as executed below.

**Sun West Mortgage Company, Inc.**

_____
Name: Pavan A. Agarwal
Title: Chief Executive Officer
Date:

**First Mariner Bank**

_____
By: Joseph Howard
Title: SVP, General Counsel
Date:

**EXHIBIT A**

1.

2.

3.

4.

5.

6.

7.

8.

9.

10.

11.

12.

13.

14.

15.

16.

17.

18.

19.

20.

21.

22.

23.

24.

25.

26.

27.

28.

29.

30.

31.

32.

33.

34.

35.

36.

37.

38.

39.

40.

41.

42.

43.

44.

45.

46.

47.

48.

49.

50.

51.

52.

53.

54.

55.

56.

57.

58.

59.

60.

61.

62
63
64
65
66
67
68
69
70
71
72
73
74
75
76
77
78
79
80
81
82
83
84
85
86
87
88
89
90
91
92

93.

94.

95.

96.

97.

98.

99.

100

101

102

103

104

105

106

107

108

109

110

111

112

113

114

115

116

117

118

119

120

121

122

123

124.

125.

126.

127.

128.

129.

130.

131.

132.

133.

134.

135.

136.

137.

138.

139.

140.

141.

142.

143.

144.

145.

146.

147.

148.

149.

150.

151.

152.

153.

154.

155.

156.

157.

158.

159.

160.

161.

162.

163.

164.

165.

166.

167.

168.

169.

170.

171.

172.

173.

174.

175.

176.

177.

178.

179.

180.

181.

182.

183.

## EXHIBIT B

1.
2.
3.
4.
5.
6.
7.
8.

# EXHIBIT B

JS-6

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SUN WEST MORTGAGE COMPANY INC.,<br><br>        Plaintiff,<br><br>    vs.<br><br>FIRST NATIONAL BANK OF PENNSYLVANIA,<br><br>        Defendant. | Case No. 8:22-cv-01700-MRA (ASx)<br><br>**JUDGMENT**<br><br>Judge:  Hon. Mónica Ramírez Almadani |

**JUDGMENT**

In this case, Plaintiff Sun West Mortgage Company, Inc. alleged claims for breach of contract and breach of implied covenant of good faith and fair dealing against Defendant First National Bank of Pennsylvania. The Court conducted a bench trial that began on November 4, 2024. On July 3, 2025, the Court issued its Findings of Fact and Conclusions of Law. ECF 88. Accordingly, the Court enters judgment as follows.

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED AS FOLLOWS**:

1. That Plaintiff Sun West Mortgage Company, Inc. ("Plaintiff") shall have judgment in its favor and against Defendant First National Bank of Pennsylvania ("Defendant") on Plaintiff's claims for relief for breach of the written settlement agreement, dated May 16, 2017 ("Settlement Agreement"), with respect to Loan Number #xxxxxx0145 (the "Hastings Loan");

2. That Defendant shall have judgment entered in its favor and against Plaintiff on Plaintiff's claims for relief for breach of the Settlement Agreement with respect to Loan Number #xxxxxx4089 (the "Barner Loan");

3. That Plaintiff shall recover from Defendant the amount of $511,918.55: the payoff balance of the Hastings Loan as of July 7, 2025; a copy of the payoff is attached hereto as **Exhibit A**;

4. That Plaintiff is entitled to pre-judgment interest;

5. That Plaintiff is entitled to post-judgment interest; and

//
//
//
//

6. The prevailing party, if any, is entitled to an award of attorneys' fees and costs pursuant to Paragraph 21 of the Settlement Agreement in an amount to be determined by the Court.

**IT IS SO ORDERED.**

Dated: July 10, 2025

_____
HON. MONICA RAMIREZ ALMADANI
UNITED STATES DISTRICT COURT JUDGE

# EXHIBIT A

Case 8:25-cv-01304-PR-ADS Document 1 Filed 07/28/25 Page 45 of 164 PageID #1853



# SUN WEST MORTGAGE

## 18303 GRIDLEY RD., CERRITOS, CA 90703

### *Loan Servicing Division*

| | |
|---|---|
| Local No.: | (562) 924-7884 |
| Toll-Free No.: | (800) 453-7884 |
| Fax No.: | (866) 463-2216 |
| E-Mail: | Payoff@swmc.com |

Customer Service hours:

8:30 A.M. - 5:00 P.M. Monday - Friday PT

## *REVERSE MORTGAGE*

| | |
|---|---|
| Statement Date: | 07/07/2025 |
| SWMC Loan No.: | 111154202400 |
| Loan Type: | HECM-HOME EQUITY |
| Payment Plan: | Line of Credit |
| TIN / SSN: | ***-**-5495 |
| Property Address: | 34623 CHRISTANNA HIGHWAY |

### Ending Balance Summary

| | |
|---|---|
| Ending Balances as of: | 07/01/2025 |
| Principal Limit | $403,631.40 |
| Net Principal Limit(NPL) | ($71,452.03) |
| Net Line of Credit | ($71,452.03) |
| Repair Set-Aside | $0.00 |
| 1st Year Property Charges Set-Aside | $0.00 |
| Tax & Insurance Set-Aside | $0.00 |
| Loan Balances | |
| Closing: | $40,226.70 |
| Reporting Month: | July, 2025 |
| Beginning: | $472,500.86 |
| Ending: | $475,083.43 |

### *THIS IS NOT A BILL*

| | |
|---|---|
| Name: | HELEN R HASTINGS |
| Address: | 34623 CHRISTANNA HIGHWAY BLACKSTONE, VA 23824- |

## PAYOFF INFORMATION

| | |
|---|---|
| (1) Loan Balance for Prior Period | $475,083.43 |
| (2) Interest on Loan Balance for Prior Period at per diem $86.2967 | $517.78 |
| (3) MIP on Loan Balance for Prior Period at 0.00% per annum | $0.00 |
| (4) Schedule Payment Amount for This Period | $0.00 |
| (5) Interest on Scheduled Payment Amount for This Period | $0.00 |
| (6) MIP on Scheduled Payment Amount for This Period at 0.00% per annum | $0.00 |
| (7) Unscheduled Draws for This Period | $0.00 |
| (8) Interest on Unscheduled Draws for This Period at per annum 6.6300% | $0.00 |
| (9) MIP on Unscheduled Draws for This Period at 0.00% per annum | $0.00 |
| (10) Servicing Fee for This Period | $35.00 |
| (11) Prepayment for This Period | $0.00 |
| (12) Interest Credit on Prepayment for This Period | $0.00 |
| (13) MIP Credit on Prepayment for This Period | $0.00 |
| Miscellaneous Servicing Fees | $36,282.34 |

| TOTAL PAYOFF DUE AS OF | 07/07/2025 | $511,918.55 |
|---|---|---|

# EXHIBIT C

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

SUN WEST MORTGAGE CO., INC.,

                Plaintiff,

    v.

FIRST NATIONAL BANK OF
PENNSYLVANIA,

                Defendant.

Case No. 8:22-cv-01700-MRA-AS

**FINDINGS OF FACT AND
CONCLUSIONS OF LAW**

This matter is before the Court following a three-day bench trial that began on November 4, 2024. Scott Gizer and Padideh Zargari appeared for Plaintiff Sun West Mortgage Company, Inc. Michael Blumenfeld, Meredith Storm, and Ryan Cosgrove appeared for Defendant First National Bank of Pennsylvania. At the trial's conclusion, the Court ordered the parties to submit revised written proposed findings of fact and conclusions of law. The parties submitted their respective proposed findings. ECF 85, 86.

Having considered the testimony presented at trial, the exhibits admitted into evidence, the parties' stipulated facts, and the arguments of counsel, as presented at trial and in the parties' post-trial submissions, the Court makes the following findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

1  I.   **FINDINGS OF FACT**[1]

2      *A.   The Parties*

3      Plaintiff Sun West Mortgage Company, Inc. ("Sun West") is a mortgage company

4  that offers a variety of mortgage-related products, including mortgage servicing and Home

5  Equity Conversion Mortgage ("HECM") reverse mortgages.  FPTCO ¶¶ 1-2.  Defendant

6  First National Bank of Pennsylvania ("FNB") is the successor to Howard Bank, which was

7  acquired by FNB on or around February 4, 2022.  *Id.* ¶ 3.  Howard Bank was a successor

8  to First Mariner Bank d/b/a 1st Mariner Bank ("First Mariner"), a Maryland chartered trust

9  company.  *Id.* ¶ 4.

10     *B.   The Settlement Agreement Between Sun West and First Mariner*

11     In 2011, First Mariner, as predecessor to FNB, transferred to Sun West the servicing

12 rights for a portfolio of approximately 2,200 reverse mortgage loans owned by the Federal

13 National Mortgage Association ("FNMA").  FPTCO ¶ 5; Day 1 Tr. at 30:13-21, 61:15-24;

14 Exs. 9, 10, 16.

15     On August 6, 2015, Sun West filed a Complaint against First Mariner in the U.S.

16 District Court for the Central District of California, Case No. 2:15-CV-05982, relating to

17 the transfer of servicing rights as to the portfolio ("First Mariner Litigation").  FPTCO ¶ 6.

18 On May 16, 2017, Sun West and First Mariner settled the First Mariner Litigation and

19 entered into a settlement agreement (the "Settlement Agreement")."  *Id.* ¶ 8; Ex. 16.  Loan

20 Number #xxxxxx4089 (the "Barner Loan") and Loan Number #xxxxxx0145 (the "Hastings

21 Loan") are among the 2,200 reverse mortgages covered by the Settlement Agreement.

22 FPTCO ¶¶ 12, 13.  The Hastings and Barner Loans are at issue in this trial.  *Id.* ¶ 11.

23 //

24 _____

25     [1] The transcript for day 1 of the trial (November 4, 2024) is cited to as "Day 1 Tr."

26 *See* ECF 82.  The transcript for day 2 (November 5, 2024) is cited to as "Day 2 Tr."  *See* ECF 79.  The transcript for day 3 (November 6, 2024) is cited to as "Day 3 Tr."  *See* ECF

27 80.  The Final Pretrial Conference Order, which contains the parties' stipulated facts, is cited to as "FPTCO."  *See* ECF 59.

28

Paragraph 2 of the Settlement Agreement states, in relevant part:

Subject to the terms of Section 4, infra, Sun West does . . . hereby unconditionally remise, release, and forever discharge [First Mariner] . . . from any and all claims, actions, causes of action . . . and demands of whatever kind or nature that Sun West ever had, now have, or hereafter can, shall, or may have for, upon, or by reason of any matter, cause, or thing, whether known or unknown and whether suspected or unsuspected, from the beginning of the world to the date of this Agreement arising out of, connected with, or relating to the subject matter of this Lawsuit, including . . . the Serviced Loans, and any and all servicing activities related to the Serviced Loans.

FPTCO ¶ 9; Ex. 16 ¶ 2. Paragraph 4 of the Agreement states, in relevant part:

In the event that Sun West is required to re-purchase or provide indemnification with respect to any of the Serviced Loans by [FNMA], Ginnie Mae, or any other purchaser or assignee (or any of their respective designees) of the Serviced Loans . . . and the re-purchase or indemnity demand relates to or arises out of [First Mariner's] (or another third party's) solicitation, processing, origination, underwriting, funding and/or closing of a Serviced Loan, Sun West shall provide notice of such demand to [First Mariner] within 10 business days of the date on which the obligation is imposed on Sun West. Said notice shall include a copy of the instructional notice given to Sun West to repurchase or indemnify with respect to the Serviced Loan(s). Upon receipt of said notice, [First Mariner] shall have 21 days to re-purchase or indemnify with respect to the Serviced Loan(s).

FPTCO ¶ 10; Ex. 16 ¶ 4. As such, pursuant to Paragraph 4 of the Agreement, FNB was required to repurchase from Sun West certain reverse mortgage loans that were originated by First Mariner, serviced by Sun West, and delivered to FNMA (the "Serviced Loans"). Day 2 Tr. at 203:10-17; Ex. 16 ¶ 4.

Paragraph 4 of the Agreement also provides:

Sun West, however, agrees in good faith to pass through to [First Mariner] any relief made available to [Sun West] by [FNMA], Ginnie Mae, or any other purchaser or assignee . . . of the Serviced Loans in connection with its

administration and enforcement of repurchase or indemnification requests relating to the Serviced Loans.  In the event that Sun West does not notify [First Mariner] of any such re-purchase or indemnity demand within 10 business days as described above, Sun West hereby waives its right to assert a claim for indemnification from [First Mariner] in connection with the re-purchase or indemnity demand for such Serviced Loan(s).

FPTCO ¶ 10; Ex. 16 ¶ 4.

Paragraph 12 of the Agreement binds successors of the parties to the Agreement. Day 1 Tr. at 31:5-9; FPTCO ¶ 14; Ex. 16 ¶ 12.  FNB is the successor to First Mariner's obligations under the Settlement Agreement.  Day 1 Tr. at 31:5-9; Day 2 Tr. at 76:8-13; Ex. 16.

### C.    Home Equity Conversion Mortgages

The Barner and Hastings Loans are HECM reverse mortgages, a type of reverse mortgage that is insured by the Federal Housing Administration ("FHA") within the United States Department of Housing and Urban Development ("HUD")."  Day 1 Tr. at 24:15-20, 94:17-19, 95:25-96:1.  Private lending institutions can be approved to underwrite FHA loans under HUD's Direct Endorsement Program.  Day 2 Tr. at 138:12-16.

Before closing, a Direct Endorsement ("D.E.") Underwriter carefully reviews all aspects of a loan file—including the credit appraisal, credit report, income documentation, and the title commitment—to determine whether the loan meets HUD's reverse mortgage guidelines and is therefore insurable.  Day 1 Tr. at 106:14-107:23; Day 2 Tr. at 138:21-139:20; Day 3 Tr. at 6:25-7:6.  It is reasonable for an underwriter to rely on a clean title commitment when originating a reverse mortgage.  Day 3 Tr. at 10:7-10; Day 2 Tr. at 49:10-16, 52:8-11.

Sun West's expert witness, H. Marc Helm, is not a D.E. Underwriter.  Day 2 Tr. at 17:1-2. Sun West's corporate representative, Sydney Fernandez, is not a D.E. Underwriter. Day 1 Tr. at 106:11-12.  FNB's expert witness, West Beibers, and FNB's corporate representative, Mick Rizzo, are both D.E. Underwriters and were the only D.E. Underwriters to testify at trial.  Day 2 Tr. at 138: 5-7; Day 3 Tr. at 6:8-23.

### D. Federal National Mortgage Association Repurchase Demands

Loan Quality Connect ("LQC") is FNMA's online platform for communicating with loan servicers, also known as "responsible parties," regarding information for loans that have been selected for quality control reviews, including action items such as missing or defective information and repurchase demands. Day 2 Tr. at 147:2-9, 147:17-25. Only "responsible parties" (servicers such as Sun West) or a sub-servicer approved to act on behalf of a responsible party for a particular loan can submit a written appeal of an FNMA repurchase demand through LQC. Day 1 Tr. at 79:12-17; Day 2 Tr. at 170:2-11.

FNMA's determination in a repurchase demand that a loan defect is "uncorrectable" or that that of which it complains is a defect may be appealed. Day 2 Tr. at 174:20-175:15, 176:9-17; Ex. 115 at 5. In the event the appeal results in a determination that there is no defect or that the defect is correctable, FNMA's guidelines provide that the initial demand for a servicing remedy will be considered withdrawn and, if applicable, FNMA will issue a notice of servicing defect, allowing the seller/servicer to correct the defect during the servicing correction period set forth in the notice. Day 2 Tr. at 174:20-175:15, 176:9-17; Ex. 115 at 5. If a lender/servicer does not appeal FNMA's repurchase demand within the allotted time frame, it has no further right to challenge FNMA's repurchase demand or continue with the management escalation process. Day 2 Tr. at 173:15-24, 237:20-238; Ex. 115 at 8.

### E. The Barner Loan

First Mariner originated the Barner Loan on February 13, 2008, and issued the same to June P. Barner. Day 1 Tr. at 60:25-61:14; Exs. 64, 65. First Mariner prepared the First Deed of Trust and the legal description benefitting First Mariner to real property located at 8015 Mandan Road #101, Greenbelt, Maryland 20770 (the "Barner Property")." Day 1 Tr. at 60:25-61:14; Ex. 65. Stewart Title Guaranty Company ("Stewart") issued a clean title commitment and title policy for the Barner Property without exception. Day 1 Tr. at 109:24-110:12; Ex. 67. The Barner Loan was insured by HUD at the time of its origination. Day 2 Tr. at 140:6-24; Day 3 Tr. at 9:25-10:6.

In or around 2009, the Barner Loan was sold to FNMA, but First Mariner retained the servicing rights.  Day 1 Tr. at 25:24-26:14.  In June 2011, First Mariner assigned and transferred the Barner Loan servicing rights to Sun West.  Ex. 10 at 1.

In or around November 2018, as part of the foreclosure process, Sun West ordered a 20+ year title search of the Barner Property, which revealed two judgment liens filed against June S. Barner in favor of the State of Maryland in 2002 for unpaid taxes.  Day 2 Tr. at 163:25-164:11; Exs. 76, 105 at 94-95.  On November 27, 2018, Sun West, as the insured under the Stewart policy, tendered a claim to Stewart to address the two liens.  Day 1 Tr. at 64:10-17; Ex. 18.  On December 13, 2018, Stewart responded to Sun West's tender and offered to issue a letter of indemnity in favor of the title insurance underwriter that issues a policy to the third-party purchaser of the Barner Property at a foreclosure sale.  Day 1 Tr. at 64:24-65:11; Ex. 77.

Sun West's servicing notes reflect that by early 2019, Sun West was aware that it had several options for resolving the Barner Loan title issue, including but not limited to paying off the tax liens.  Day 1 Tr. at 133:23-134:4; Ex. 105 at 113-116.  On December 5, 2019, Sun West contacted the Comptroller of Maryland to verify the liens and obtain a payoff amount.  Day 1 Tr. at 66:24-67:22; Exs. 79, 105 at 139.  The payoff amount for the 2002 tax liens was approximately $25,000.00.  Exs. 79, 105 at 139.  After receiving the payoff amounts, Sun West did not pay the tax liens or request that Howard Bank pay the liens.  Day 1 Tr. at 138:20-139:6; Day 2 Tr. at 153:19-25, 161:13-18; Day 3 Tr. at 14:16-24.  Sun West's corporate representative, Sydney Fernandez, testified at trial that the liens would have gone away if Sun West had paid them at that time.  Day 1 Tr. at 138:20 – 139:6.

On November 15, 2020, June Barner died, triggering an event of default.  Day 2 Tr. at 164:5-11; Ex. 136.  On April 7, 2021, Sun West sued Stewart in the Circuit Court for Prince George's County, Maryland, alleging that the 2002 tax liens prevented Sun West from conveying clear title to the Barner Property in a foreclosure sale and requesting that

the Court order Stewart to pay to Sun West the total amount due and owing under the 2002 tax liens.  Ex. 21.

While the Stewart litigation remained pending, on or around September 20, 2021, Sun West self-reported to FNMA that the Barner Loan had a defective title and FNMA's lien was not in first position due to the existence of the two senior tax liens.  Day 1 Tr. at 72:8-18; Day 2 Tr. at 166:13-16, 167:2-10; FPTCO ¶ 34; Ex. 24.  Soon thereafter, on September 29, 2021, Sun West's General Counsel, Stephen Ma, informed Joseph Howard, Senior Vice President and General Counsel for Howard Bank, of the state tax liens and the Stewart litigation.  Ex. 25.  Sun West further provided a copy of the Stewart complaint, which attached the Comptroller of Maryland's payoff as an exhibit.  *Id*.  Sun West's letter asked Howard Bank to take immediate action to either mitigate this issue or be prepared to repurchase the loan.  *Id*.

In June 2021, Stewart had moved to dismiss the complaint in the lawsuit.  FPTCO ¶ 33; Ex. 22.  On November 17, 2021, the Court granted the motion to dismiss the complaint without prejudice.  FPTCO ¶ 35; Ex. 28.

On December 16, 2021, in response to Sun West's self-report, FNMA issued an Initial Resolution Request ("IRR") to Sun West stating in pertinent part:

> [FNMA's] analysis of the subject loan reflects certain elements that do not meet, or no longer meet, the terms or requirements of the Lender Contract due to certain selling and/or servicing violations listed below [. . . ] At least one of the defects listed below was determined to be a servicing repurchase defect and/or was deemed to be uncorrectable.  The subject loan was delivered as a first lien transaction.  It has come to our attention that there were tax liens placed against the borrower January 10, 2002 and October 31, 2002. Per Maryland law, these liens attach to the assets, including real property.  As the tax liens are in first lien position, the loan was ineligible for delivery to [FNMA].

Day 1 Tr. at 76:4-19; Ex. 32 at 4.  The IRR stated that Sun West, as the "responsible party," must resolve the matter by February 14, 2022, in one of two ways: either (1) appeal the

decision to repurchase in written form through LQC or (2) repurchase the Barner Loan. Day 1 Tr. at 76:4-9, 72:5-18; FPTCO ¶ 28; Exs. 24, 32 at 3-4.

On December 23, 2021, Mr. Ma emailed Joseph Howard, serving notice under Paragraph 4 of the Settlement Agreement by advising Howard Bank of FNMA's repurchase demand to Sun West, attaching the same, and demanding that Howard Bank repurchase the Barner Loan. Day 1 Tr. at 76:4-19; Day 2 Tr. at 96:17-97:24; Ex. 32 at 1. Sun West explained that FNMA had identified certain defects with the Barner Loan that were deemed to be uncorrectable since the Barner Loan deed of trust was not in first lien position at origination. Day 1 Tr. at 76:4-19; Ex. 32 at 1.

On direct examination at trial, Sydney Fernandez testified that Sun West did not appeal the repurchase demand because (1) FNB had not communicated as to "how they wanted to appeal the case, and so there was never an argument provided to Sun West to submit to Fannie Mae," and (2) Sun West had "no reasonable argument to make" since the tax liens took priority over FNMA's lien. Day 1 Tr. at 80:2-12. But the evidence at trial and Mr. Fernandez's own further testimony discredit this factually.

In an email dated February 3, 2022, Mr. Howard (in relevant part) informed Mr. Ma that Howard Bank would be finalizing its merger with FNB the following day and that he would no longer be with the company. Ex. 43 at 2. He also stated that "FNB has indicated that it will appeal the Barner loan." *Id*. On February 4, 2022, Howard Bank merged with FNB. FPTCO ¶ 3.

On February 11, 2022, Michael Blumenfeld ("Mr. Blumenfeld"), counsel for FNB, attempted to directly appeal FNMA's Barner Loan repurchase demand by emailing FNMA. Ex. 46. In an email dated the same day (February 11, 2022), Mr. Blumenfeld informed Mr. Ma that he had notified FNMA of FNB's position and specifically directed Mr. Ma (on behalf of Sun West) to file a formal written appeal of FNMA's repurchase demand as to the Barner Loan through LQC on or before February 14, 2022, and explained FNB's reasoning behind the appeal: that FNB believed the liens were federal tax liens and, absent

a filed/recorded notice that such lien had been asserted, they lacked priority. Day 1 Tr. at 80:21-81:17; Exs. 43 at 1, 48 at 3.

Mr. Blumenfeld followed-up with Mr. Ma via email on February 14, 2022, and once again requested that Sun West file a formal written appeal of FNMA's repurchase demand through LQC. Ex. 48 at 2. In response, Mr. Ma advised Mr. Blumenfeld that Sun West had "already notified FNMA of FNB's position regarding the Barner Loan" and had requested an extension of FNMA's repurchase deadline until March 15, 2022. *Id.*

On February 17, 2022, in response to Mr. Blumenfeld's February 11, 2022, email, FNMA forwarded Mr. Blumenfeld's email to Sun West and directed Sun West to upload the appeal into LQC. Ex. 46. Sun West did not upload the appeal into LQC as FNMA instructed. Day 1 Tr. at 79:22-80:1.

Importantly, by February 17, 2022, the 2002 tax liens had been satisfied at no expense to Sun West and Sun West's title to the Barner Property was free and clear. Day 1 Tr. at 84:15-25; Day 2 Tr. at 106:24-107:12; Ex. 105 at 193. However, Sun West did not inform FNB of this fact. Day 2 Tr. at 60:2-5. Sun West also did not seek on its own to appeal FNMA's repurchase demand on this basis. Day 2 Tr. at 107:1-12.

On March 15, 2022, the deadline for Sun West to repurchase the Barner Loan or appeal FNMA's repurchase demand passed without Sun West filing a formal appeal on behalf of FNB. Day 1 Tr. at 77:19-78:6.

Mr. Fernandez confirmed at trial that only Sun West as the servicer could have filed the appeal, that no appeal was filed with respect to the Barner Loan, that Sun West never told FNB that it would not be filing an appeal, that he did not know why Sun West did not notify FNB about not filing the appeal but that it "[p]robably just got missed," and that "[Sun West] should have probably informed [FNB], but [he didn't] know what happened." Day 1 Tr. at 79:12-82:2, 153:11-23. On cross-examination, Mr. Fernandez further testified that Sun West never communicated to FNB that it disagreed with FNB's grounds for appeal. Day 1 Tr. 153:19-21.

FNMA did not rescind its IRR.  Day 2 Tr. at 72:20-73:14.  Sun West remained obligated to FNMA for the repurchase of the Barner Loan in the amount of $141,663.64, which it paid.  Day 1 Tr. at 87:25-88:9, 158:6-20, 227:18-232:18; Exs. 51, 53, 54, 55, 56.  Sun West sold the Barner Property to a third party via a short sale that closed on or about April 14, 2022, from which Sun West received $127,242.58.  Day 1 Tr. at 43:7-25, 82:8-83:20, 86:13-24; Exs. 52, 53, 105.  Sun West never advised FNB that it was in the process of selling the Barner Property, even though the sale was initiated around December 2021.  Day 2 Tr. at 177:15-178:4; Ex. 31.  As of November 4, 2024, the total payoff amount on the Barner Loan due from FNB to Sun West was $179,843.69.  Day 1 Tr. at 89:19-23; FPTCO ¶ 15; Exs. 16, 61.

Sun West did not submit a mortgage insurance claim to HUD.  Day 2 Tr. at 178:5-180:3; Ex. 57.  Mr. Fernandez testified at trial that, due to the origination defects, the loan was not insurable, and HUD would not have insured the loan; therefore, it would have amounted to "claim fraud" to make a claim on such a loan.  Day 1 Tr. at 96:2-16.  FNB presented credible evidence at trial, however, that an unknown defect at a loan's origination does not necessarily make the loan uninsurable by HUD, so long as the defect is corrected once it is discovered.  Day 2 Tr. at 151:21-152:18, 174:6-19; Day 3 Tr. at 11:25-12:4.

A servicer may initiate a claim with HUD on behalf of a lender/investor under certain circumstances, including, but not limited to, when the short sale proceeds are insufficient to satisfy the debt.  Day 1 Tr. at 231:25-232:15.  Filing a claim for mortgage insurance benefits with HUD allows a HECM lender/servicer to recoup the shortfall incurred upon default.  Day 1 Tr. at 25:11-21; Day 2 Tr. at 179:12-16, 194:15-19.  As a result of Sun West's failure to submit a claim to HUD, Sun West (and FNB) did not attempt to recoup losses it incurred through the default and sale of the Barner Loan.  Day 1 Tr. at 25:11-21; Day 2 Tr. at 179:12-23.  FNB has not repurchased the Barner Loan or indemnified Sun West for the loan.  FPTCO ¶¶ 27, 37; Exs. 60, 61.

//

//

### F.    The Hastings Loan

On or about March 10, 2009, First Mariner originated the Hastings Loan and issued the same to Helen R. Hastings. Day 1 Tr. at 32:2-18; Ex. 68. The Hastings Loan is secured by a First Deed of Trust benefitting First Mariner and a Second Deed of Trust benefitting the Secretary of HUD to real property located at 34623 Christanna Highway, Blackstone, Virginia 23824 (the "Hastings Property"). Ex. 68; Ex. 75 at 75. In April 2009, Chicago Title Insurance Company ("Chicago Title") issued a clean title commitment and title policy for the Hastings Property. Ex. 70. First Mariner prepared the Hasting's Deed of Trust and utilized the legal description prepared by Chicago Title. Day 1 Tr. at 32:2-18; Ex. 68. In or around 2009, the Hastings Loan was sold to FNMA, but First Mariner retained the servicing rights. Day 1 Tr. at 25:24-26:14. In June 2011, First Mariner assigned and transferred the servicing rights to Sun West. Day 1 Tr. at 30:13-21; Ex. 9.

In or around March 2013, Helen Hastings died, triggering an event of default. Day 1 Tr. at 25:3-10; Ex. 124-3. On October 8, 2013, Charles Hastings, one of Ms. Hastings' heirs, via legal counsel, sent a letter to Sun West's counsel, alleging that Sun West's lien on the Hastings Property was not enforceable because the property line ran through the residential structure and the legal description on the Deed of Trust only encumbered a portion of the property, the garage. Day 1 Tr. at 34:6-25; FPTCO ¶ 16; Ex. 11; Ex. 124 at 20. Sun West internally investigated and contracted with outside counsel to investigate the issue, confirming the deficiency. Day 1 Tr. at 35:1-11.

On April 27, 2015, Sun West, as the insured under the Chicago Title Policy, submitted a claim to Chicago Title to resolve the cloud on title. Day 1 Tr. at 36:23-37:11; FPTCO ¶ 17; Ex. 13. Around the same time, on May 8, 2015, Sun West self-reported the deficiencies in the Hastings Deed of Trust to FNMA. Day 1 Tr. at 37:12-38:0; 214:1-9; Ex. 14.

On September 30, 2015, by way of a boundary line adjustment, Charles Hastings attempted to correct the issue with the Hastings legal description. Ex. 75 at 52-54. On or around February 2, 2016, a property appraiser informed Sun West that the Hastings septic

system was likely encumbering another lot.  Day 2 Tr. at 183:12-15; Ex. 124 at 158.  The septic system issue arose after First Mariner originated the Hastings Loan.  Day 2 Tr. at 64:2-12, 184:0-185:7; Day 3 Tr. at 17:13-18:8.  Sun West's servicing notes reflect that by March 2016, Sun West was considering making a repurchase demand to First Mariner for the Hastings Loan.  *See* FPTCO ¶¶ 18-20; Ex. 15 at 1.

On February 6, 2018, Sun West filed a Complaint in the Circuit Court for Brunswick County, Virginia (Case No. CL18-42, "*Sun West v. Hastings*") regarding the Hastings Property boundaries and the effect of the legal description on Sun West's lien, requesting an order from the Court regarding the validity and priority of its Deed of Trust.  Day 1 Tr. at 38:21-39:10, 176:1-177:1; Exs. 17, 75; FPTCO ¶¶ 21-22.  On August 12, 2019, the Court issued an order ruling that the Deed of Trust was "valid and enforceable" and that its instrument "constitutes a first priority lien deed of trust" upon the Hastings Property.  Ex. 19.

The servicing notes for the Hastings Loan show that Sun West tried to liquidate the Hastings Property on behalf of FNMA in the open market in August 2020 but was not able to do so.  Ex. 124 at 283; *see also* Day 1 Tr. at 44:23-45:2.  Consistent with this evidence, the servicing notes reflect that FNMA was not satisfied that the legal description issue had been completely resolved.  Day 1 Tr. at 40:10-42:25.  In July 2021, FNMA Title Specialist Monica Guadagno emailed Sun West asking for an update on the legal description.  Ex. 23.  The email indicated this was a second request for an update.  *Id.*  In September 2021, FNMA requested from Sun West copies of the loan origination appraisal and prior title policy, which Sun West quickly provided.  Exs. 26 and 27.

On November 4, 2021, Sun West received an IRR from FNMA regarding the Hastings Loan, stating in pertinent part:

> [FNMA's] analysis of the subject loan reflects certain elements that do not meet, or no longer meet, the terms or requirements of the Lender Contract due to certain selling and/or servicing violations listed below [. . . ]

**Incorrect Legal Description (Origination)**

It has come to our attention that the legal description on the recorded security instrument for the subject transaction was incorrect at origination. [. . .] An attempt was made to correct the issue, but the plat does not completely enclose the area and the ownership of the area is in question as the plat shows it to be a part of the neighboring tax parcel 4-13.

**Ineligible Property – Utilities**

[FNMA's] Selling Guide guidelines requires property utilities to meet community standards, be adequate, be in service and be accepted by community residents. A survey dated 7/29/2015 revealed that the well and pump house is not on the parcel encumbered by the mortgage. The subject property must have the right to access them and have a legally binding agreement for their access and maintenance. Also, no septic tank and drain field is shown on the subject property. As no agreement has been located for use by the subject property, the loan was not eligible for delivery to [FNMA].

Ex. 29 at 4. The IRR stated that by January 3, 2022, Sun West, as the "responsible party" for the Hastings Loan, must resolve the identified issues in one of two ways: either (1) provide an appeal to FNMA's decision in written form through LQC or (2) be prepared to repurchase the loan. Day 1 Tr. at 45:23-46:3; FPTCO ¶ 23; Exs. 29 at 4, 83.

On November 23, 2021, 12 business days after Sun West received FNMA's IRR, Mr. Ma, on behalf of Sun West, emailed a letter to Mr. Howard, on behalf of Howard Bank, as predecessor to FNB, advising Howard Bank of FNMA's repurchase demand to Sun West, attaching the same, and asking whether Howard Bank wished to appeal FNMA's decision. Ex. 29. Mr. Ma's letter served as written notice of Sun West's demand that Howard Bank repurchase or indemnify Sun West regarding the Hastings Loan under Paragraph 4 of the Settlement Agreement. Day 1 Tr. at 49:8-14; Ex. 29 at 2. The letter stated that Sun West "anticipate[s] that *another Repurchase Demand* will be issued by [FNMA] in or around January 3, 2022." Ex. 29 at 1.

At the request of Howard Bank, Sun West obtained a first extension of FNMA's January 3, 2022, appeal/repurchase deadline contained in the IRR. Day 1 Tr. at 49:15-

51:2; Day 1 Tr. at 50:7-9; Exs. 30, 34; FPTCO ¶ 25; Ex. 34. On or around January 10, 2022, Howard Bank, in cooperation with Sun West, obtained another extension from FNMA on the IRR. The extended deadline was February 2, 2022. Day 1 Tr. at 50:7-9; FPTCO ¶ 25; Ex. 34.

Unsatisfied that the legal description issues had been resolved, on January 18, 2022, FNMA filed a lawsuit in the Circuit Court for Brunswick County, Virginia (Case No. CL22-25) against the neighbors of the Hastings property to correct remaining errors in the legal description. Ex. 37; Day 1 Tr. at 209:22-25. The complaint described Sun West's prior litigation and attached the court order in the *Sun West v. Hastings* matter as Exhibit D. Ex. 37 at 3; Day 1 Tr. at 216:12-217:12. At trial, Mr. Howard testified that Sun West did not inform Howard Bank about FNMA's ongoing lawsuit or Sun West's prior lawsuit, and that knowledge of these lawsuits would have affected Howard Bank's decision to repurchase the Hastings Loan. Day 2 Tr. at 111:1-114:4. The evidence shows that Mr. Howard asked for the survey for the Hastings property and the eligible property utilities paragraph, which Sun West provided to him. Day 3 Tr. at 116:10-117:3. Mr. Howard did not request any other information. *Id.*; Day 2 Tr. at 231:7-23.

On February 1, 2022, Sun West (Blanca Hoskins) emailed FNMA agreeing to repurchase the Hastings Loan. Day 1 Tr. at 198:21-199:19; Day 2 Tr. at 114:11-23; Ex. 41. On February 3, 2022, Joseph Howard sent an email to Sun West, in which he clearly stated that Howard Bank would repurchase the Hastings Loan, and that "FNB had requested repurchase numbers directly from FNMA prior to initiating the wire." Ex. 43 at 2; Day 2 Tr. at 86:13-23. Mr. Rizzo testified that FNB was aware of this correspondence and did not object. Day 2 Tr. at 226:11-21. Mr. Fernandez confirmed that Sun West communicated to FNMA that it would repurchase the loan before Mr. Howard sent the email confirming that Howard Bank would repurchase the loan. Day 1 Tr. at 198:9-199:22.

On February 10, 2022, Sun West provided FNB with a payoff demand from FNMA for the Hastings Loan which was good through March 5, 2022. FPTCO ¶ 26. On February 11, 2022, FNB's counsel, Mr. Blumenfeld, communicated to Sun West that FNB

understood the repurchase amount was good through March 5, 2022, and that FNB was "reviewing the loan file and the documentation provided" and would "confirm [its] next steps shortly." Ex. 48 at 3. On March 3 and 4, 2022, FNB requested that Sun West file an additional request for an extension with FNMA through LQC for repurchase of the Hastings Loan. Ex. 48 at 1. Mr. Blumenfeld stated in his email to Mr. Ma that "[he] [didn't] think it [would] be logistically possible to satisfy today's deadline" due to "Howard and FNB only recently complete[ing] their closing (February 5)." Ex. 48 at 1. Mr. Ma responded on March 4, 2022, stating that "Sun West ha[d] submitted a request to Fannie Mae for a further extension on its March 5, 2022, repurchase deadline," but "Sun West ha[d] not yet received a response from Fannie Mae . . ." *Id.* On March 5, 2022, FNMA's deadline to repurchase the Hastings Loan expired, and FNB did not repurchase the loan from FNMA. Day 1 Tr. at 52:12-25, 57:2-10; FPTCO ¶ 27; Ex. 42.

On March 16, 2022, Sun West repurchased the Hastings Loan from FNMA for $402,385.88. Day 1 Tr. at 55:11-58:15; Exs. 33 at 2, 86, 132, 133. FNB has not indemnified Sun West for the repurchase amount. FPTCO ¶ 27. As of November 4, 2024, the total payoff amount on the Hastings Loan due from FNB to Sun West was $497,701.65. Day 1 Tr. at 57:24-58:13; Ex. 60.

Sun West did not submit a mortgage insurance claim to HUD for the Hastings Loan. Day 1 Tr. at 66:19-24; Day 2 Tr. at 178:5-180:3; Ex. 57. Mr. Fernandez testified that doing so would have been tantamount to making a fraudulent claim because of the loan's origination defects. Day 1 Tr. at 94:23-95:23. Both Mr. Rizzo and Mr. Biebers from FNB admitted the issues with the septic tank and utilities that were caused by the 2015 survey could not have occurred had the legal description in the Hastings Deed of Trust been complete at the time of origination. Day 2 Tr. at 223:19-225:18; Day 3 Tr. at 31:12-35:24. It was only because the Deed of Trust did not encumber the entirety of the Hastings' collateral that they were able to record the 2015 survey without Sun West's consent. Day 2 Tr. at 225:8-14; Day 3 Tr. at 31:12-35:24. Sun West has not been able to sell the Hastings Loan. Day 1 Tr. at 43:7-45:2.

## II.    **CONCLUSIONS OF LAW**

### A.    *Breach of Contract*

The elements of a breach of contract cause of action are: "(1) existence of the contract; (2) plaintiff's performance or excuse for nonperformance; (3) defendant's breach; and (4) damages to plaintiff as a result of the breach." *Aton Ctr., Inc. v. United Healthcare Ins. Co.*, 93 Cal. App. 5th 1214, 1230 (2023).

The first element of this claim is met. Sun West and FNB agree that they were parties to a valid and enforceable contract—the Settlement Agreement.

The Court addresses the other elements of this claim with respect to each loan.

*First*, with respect to the **Barner Loan**, Sun West failed to produce evidence sufficient to satisfy the second element of this claim against FNB. Sun West did not do all, or substantially all, of the significant things the Settlement Agreement (a contract) required it to do, and there is no excuse for its nonperformance.

First Mariner originated the Barner Loan without knowledge of any title defects, including tax liens, as evidenced by receiving a title commitment and title insurance. FNB complied with its obligations under the terms of the Settlement Agreement by directing Sun West to appeal FNMA's repurchase demand findings through LQC. Sun West violated Paragraph 4 of the Settlement Agreement by failing to pass through to FNB the relief made available to it by FNMA (*i.e.*, the right to file an appeal) in connection with FNMA's enforcement of its repurchase demand. Sun West knew it was the only party permitted to appeal FNMA's repurchase request. FNB explicitly directed Sun West to file an appeal on February 11, 2022, and February 14, 2022. Sun West improperly refused and never informed FNB that it did not file the appeal or why it decided not to appeal.

The reason provided by Sun West for its nonperformance—that it believed at the time that any appeal lacked merit because the 2002 tax liens were state liens, not federal liens—is insufficient and unpersuasive. Even if the Court were to fully credit Mr. Fernandez's testimony that Sun West believed this information at the time, or that Sun

West's assessment was correct (*i.e.*, that the appeal lacked merit), Sun West did not *communicate* its disagreement to FNB. Paragraph 4 of the Settlement Agreement does not allow Sun West to make unilateral decisions like this; rather, Sun West was obligated to pass through any relief made available to it in good faith, which it did not do. That the 2002 tax liens had been satisfied at no expense to Sun West and Sun West's title to the Barner Property was free and clear as of February 17, 2022, further demonstrates a lack of good faith on the part of Sun West to give FNB the opportunity to appeal the repurchase demand on this related or separate basis. FNB's witnesses credibly testified that this information would have been relevant to any appeal. Based on these facts, there was no excuse for Sun West's unilateral decision not to appeal the repurchase demand pursuant to Paragraph 4 of the Settlement Agreement.

Thus, all of the conditions required for FNB's performance did not occur and were not waived and/or excused. Sun West caused its alleged damages and ultimately failed to prove by a preponderance of the evidence that FNB breached the Settlement Agreement as to this loan.

*Second*, as for the **Hastings Loan**, Sun West produced evidence sufficient to show that it substantially performed under the Settlement Agreement. Paragraph 4 of the Settlement Agreement requires Sun West to make demand upon FNB within 10 business days of FNMA imposing an obligation on Sun West to repurchase a loan, to include a copy of FNMA's instructional notice with the demand, and to pass on any relief available to FNB during the 21-day period in which FNB must respond to Sun West's demand. FNMA issued an IRR to Sun West for the Hastings Loan that required Sun West to either repurchase the loan or appeal FNMA's decision. Sun West in turn notified Howard Bank and obtained at least two extensions of the deadline to repurchase or appeal. On February 3, 2022, Howard Bank, through Joseph Howard, agreed to repurchase the loan. As explained below, Sun West did not waive any rights to enforce the Settlement Agreement based on the date it sent the notice to repurchase or appeal to FNB.

As to the third and fourth elements of a breach of contract claim, FNB never repurchased the loan, thus breaching the Settlement Agreement. As of November 4, 2024, Sun West suffered $497,701.65 in damages—the payoff amount—due to FNB's failure to repurchase the Hastings Loan. Accordingly, Sun West has met its burden to show that FNB breached the Settlement Agreement as to this loan.

### B.   Breach of Implied Covenant of Good Faith and Fair Dealing

"The [implied] covenant of good faith and fair dealing [is] implied by law in every contract." *Thrifty Payless, Inc. v. The Americana at Brand, LLC*, 218 Cal. App. 4th 1230, 1244 (2013) (quoting *Durell v. Sharp Healthcare*, 183 Cal. App. 4th 1350, 1369 (2010)). "The covenant is read into contracts and functions 'as a *supplement* to the express contractual covenants, to prevent a contracting party from engaging in conduct which (while not technically transgressing the express covenants) frustrates the other party's rights to the benefits of the contract.'" *Id.* (quoting *Racine & Laramie, Ltd. v. Dep't of Parks & Recreation*, 11 Cal. App. 4th 1026, 1031-32 (1992)).

As discussed above, Sun West and FNB were parties to a valid and enforceable contract—the Settlement Agreement. Sun West did not do all, or substantially all, of the significant things the Settlement Agreement (a contract) required it to do with respect to the Barner Loan. However, Sun West did all, or substantially all, of the material things that the Settlement Agreement required it to do with respect to the Hastings Loan. Thus, FNB has not acted fairly and in good faith by refusing and failing to repurchase the Hastings Loan. As of November 4, 2024, Sun West suffered $497,701.65 in damages due to FNB's breach of the Settlement Agreement.

### C.   Defendant's Affirmative Defenses

With respect to the Hastings Loan, FNB raises only the following affirmative defenses: (1) failure to mitigate damages; (2) laches; (3) release; (4) waiver; and (5) estoppel. *See* ECF 86 at 20-24. All other affirmative defenses therefore have been waived or abandoned.

### 1.     Failure to Mitigate Damages

To establish failure to mitigate damages, Defendant has the burden of proving: (1) that Plaintiff failed to use reasonable efforts to mitigate damages; and (2) the amount by which damages would have been mitigated.  *See* Ninth Circuit, Manual of Model Civil Jury Instructions, sect. 5.3; *see also Agam v. Gavra*, 236 Cal. App. 4th 91, 111 (2015).

At trial, Sun West provided evidence it made significant efforts to prevent further damage associated with the Hastings Loan, as follows:

    a.  Sun West immediately began investigating the nature of the defects when it learned of them.

    b.  Sun West tendered a claim to its title insurer, which was rejected.

    c.  Sun West filed a lawsuit against the heirs of the Hastings Property to cure the legal description errors.

    d.  Sun West tried to liquidate the Hastings Property after foreclosing on FNMA's behalf, but the defects at issue prevented a sale.

    e.  Sun West did not submit a claim to HUD because of the loan's origination defects, which it determined made the loan uninsurable.

Based on the above, the Court finds that Sun West used reasonable efforts to mitigate its damages.  And FNB has not established or meaningfully argued the amount by which damages would have been mitigated if Sun West had taken other steps to mitigate.

### 2.     Laches

"Laches is an equitable defense that prevents a plaintiff, who 'with full knowledge of the facts, acquiesces in a transaction and sleeps upon his rights.'" *Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 950-51 (9th Cir. 2001) (quoting *S. Pac. Co. v. Bogert*, 250 U.S. 483, 500 (1919) (McReynolds, J., dissenting)).  "To demonstrate laches, the 'defendant must prove both an unreasonable delay by the plaintiff and prejudice to itself.'" *Id.* (quoting *Couveau v. Am. Airlines, Inc.*, 218 F.3d 1078, 1082 (9th Cir. 2000)).

FNB argues that Sun West's claims are barred by the doctrine of laches.  However, "[u]nder California law, laches is available as a defense only to claims sounding in equity, not to claims at law." *Wyler Summit P'ship v. Turner Broadcasting Syst., Inc.*, 235 F.3d 1184, 1193 (9th Cir. 2000) (citing *Wells Fargo Bank, N.A. v. Bank of America NT & SA*, 32 Cal. App. 4th 424 (1995)).  A breach of contract claim is an action at law, not equity, and so the doctrine of laches is inapplicable. *See Wyler Summit P'ship*, 235 F.3d at 1193–94 (holding that breach of contract claim seeking money damages was an action at law that precluded defense of laches).

In regard to Sun West's Breach of the Covenant of Good Faith and Fair Dealing claim, FNB must establish, by a preponderance of the evidence, that Sun West unreasonably delayed the filing of this lawsuit, and FNB was prejudiced as a result. *See Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 950-51 (9th Cir. 2001).  Sun West did not unreasonably delay the filing of this lawsuit – it was filed within a year of FNB's breach. Further, there is no evidence the passage of this short period of time prejudiced FNB by, for example, resulting in the loss of evidence (often the prejudice invoked in support of a laches defense). *See Maguire v. Hibernia Sav. & Loan Soc*., 23 Cal. 2d 719, 736 (1944).

### 3.    Release

To establish a "release" defense, Defendant must prove: (1) a clear and unambiguous release; (2) that the release does not violate public policy; and (3) that the injury at issue reasonably relates to the release's object or purpose. *See, e.g.*, *Skilstaf, Inc. v. CVS Caremark Corp.*, 669 F.3d 1005, 1017 (9th Cir. 2012); *see also Diamond v. Schweitzer*, 110 Cal. App. 5th 866 (2025).

FNB's contention that Sun West "released" any claims with respect to the Hastings Loan ignores the terms of the Settlement Agreement.  The release provisions of Section 2 expressly state that they are "Subject to the terms of Section 4…" ("RE-PURCHASE DEMANDS") and the releases in Section 2 do not release any of First Mariner's obligations under the Settlement Agreement.  Section 4 obligates First Mariner and its successors to repurchase loans from Sun West that Sun West is obligated to repurchase

from FNMA.  It is undisputed that at the time the Settlement Agreement was executed, Sun West had not received any request by FNMA to repurchase the Hastings Loan and, thus, that obligation was not released based on the express terms of Sections 2 and 4.  Rather, the IRR was not received until 2021.

### 4. Waiver

"Waiver is the intentional relinquishment of a known right with knowledge of its existence and the intent to relinquish it."  *United States v. King Features Entm't, Inc.*, 843 F.2d 394, 399 (9th Cir. 1988); *see also Oakland Raiders v. Oakland-Alameda Cnty. Coliseum, Inc.*, 144 Cal. App. 4th 1175, 1189 (2006).  The burden is on the party claiming waiver of a right to prove it by clear and convincing evidence; any doubt will be decided against waiver.  *See Waller v. Truck Ins. Exch., Inc.*, 11 Cal. 4th 1, 31 (1995)).

Here, FNB's attempt to apply the waiver defense is dependent upon the terms of the Settlement Agreement.  That is, FNB argues that Sun West did not adhere to the condition precedent in Paragraph 4 of the Settlement Agreement and has expressly forfeited its right to require FNB to repurchase the Hastings Loan.  For the reasons discussed above, it cannot be said that Sun West waived its rights under the Settlement Agreement with respect to the Hastings Loan since it substantially complied with the condition precedent, FNB was not prejudiced by any late notice, and FNB agreed to repurchase the Hastings Loan despite any alleged waiver.

While FNB claimed the notice for the Hastings Loan was late, the Court finds there is little merit to this claim.  FNMA's IRR was sent on November 4, 2021, and Sun West delivered notice to FNB in a November 23, 2021, letter.  Accordingly, 12 business days had lapsed between FNMA's IRR and the November 23, 2021, letter.  All witnesses acknowledged at the time of the IRR that there was no obligation for Sun West to repurchase the Hastings Loan as Sun West had the option to appeal.  *See* Day 1 Tr. at 45:25-47:2; 75:18-76:3, Ex. 84; Day 2 Tr. at 173:6-12, 204:5-13.  Consistent with this testimony, at no point prior to this litigation did Howard Bank, FNB or its counsel claim the notice

for the Hastings Loan was untimely. Day 1 Tr. at 218:6-19. The conduct of the parties prior to a dispute arising is instructive when interpreting a contract. *Southern Pacific Transportation Co. v. Santa Fe Pacific Pipelines, Inc.,* 74 Cal.App.4th 1232, 1242 (1999). Accordingly, contrary to FNB's contentions, Sun West substantially complied with the condition precedent and did not intentionally relinquish its right to seek repurchase or indemnification from FNB under the Settlement Agreement.

### 5. Estoppel

"To establish a defense of estoppel, 'a party must show that the adverse party, either intentionally or under circumstances that induced reliance, engaged in conduct upon which [the relying party] relied and that the relying party acted or changed [its] position to [its] detriment.'" *European Motorcars, Ltd. v. Desert European Motorcars, Inc.*, No. EDCV 11-197 RSWL (DTBx), 2011 WL 3809933, at *3 (C.D. Cal. Aug. 25, 2011) (internal citations omitted)). More specifically, the party asserting the defense must show: "1) the party to be estopped must be apprised of the facts; 2) that party must intend that his conduct shall be acted upon, or must so act that the party asserting the estoppel has a right to believe it was so intended; 3) the other party must be ignorant of the true facts; and 4) he must rely upon the conduct to his injury." *Wells Fargo Bank v. Goldzband*, 53 Cal. App. 4th 596, 628 (1997) (quoting *Morrison v. Cal. Horse Racing Bd.*, 205 Cal. App. 3d 211, 217 (1988)).

FNB contends that Sun West, in its communications with Howard Bank/FNB regarding repurchasing the Hastings Loan, omitted material information relating to both FNMA's allegations—namely, that the boundary issue FNMA identified had been litigated and resolved in Sun West's favor—and Sun West's agreement to repurchase the Hastings Loan from FNMA. But Sun West did provide to FNB documents it requested after it succeeded Howard Bank, and FNB did not establish that the Settlement Agreement imposed any affirmative obligations to provide more than a copy of the IRR to Howard Bank, which Sun West did. In addition, Mr. Howard acknowledged Sun West mentioned it took steps to correct the Hastings Loan, but either never asked what those steps were, or,

if he did ask, he could not remember having had the discussion with Sun West's counsel. FNB's assertion that Sun West was somehow hiding documents from FNB is unavailing. At trial, Mr. Howard admitted he could not recall anything he asked for from Sun West which he did not receive. Mr. Rizzo testified he asked Sun West for the entire servicing file for both loans to FNB even before the instant lawsuit was initiated and received both. All of the information FNB claimed was omitted from them was provided in the servicing files. Thus, even though Sun West had no contractual obligation to do so, the Court finds that Sun West provided all the information requested by FNB in good faith.

As for Sun West's agreement to repurchase the Hastings Loan from FNMA prior to FNB's repurchase decision, FNB failed to establish that it would have acted differently— chosen to appeal instead of to repurchase—had it known that Sun West had agreed to repurchase the loan two days prior. FNB also failed to establish how it was injured because of not knowing this information since it never requested to appeal the repurchase demand – it simply requested an extension of the repurchase deadline consistent with its decision to repurchase the loan.

//
//
//
//
//
//
//
//
//
//
//
//
//

**III.   RELIEF**

The Court finds that Sun West has suffered the following damages as of November 4, 2024: the payoff balance of the Hastings Loan, which was $497,701.65.

Consistent with and within five (5) days of this Order, the Court orders Plaintiff to submit a proposed judgment, including the updated payoff balance on the Hastings Loan.

The Court also directs the parties to submit additional briefing of no more than 10 pages within fourteen (14) days of this Order concerning each party's entitlement to attorneys' fees and costs pursuant to Paragraph 21 of the Settlement Agreement.  Paragraph 21 of the Settlement Agreement entitles a prevailing party to costs, attorneys' fees, and expenses for litigation between the parties arising out of the non-performance of any obligation under the Settlement Agreement.  FPTCO ¶ 15; Ex. 16 ¶ 21.

**IT IS SO ORDERED.**

Dated: July 3, 2025

HON. MONICA RAMIREZ ALMADANI
UNITED STATES DISTRICT JUDGE

# EXHIBIT D



**EARLY**
**SULLIVAN**
**WRIGHT**
**GIZER &**
**MCRAE LLP**
ATTORNEYS AT LAW

SCOTT E. GIZER
(323) 301-4660
SGizer@earlysullivan.com

October 8, 2024

**VIA E-MAIL**

Mr. Michael E. Blumenfeld                    Mr. Brian Mancos
Nelson Mullins                               First National Bank of Pennsylvania
100 S. Charles Street, Suite 1600
Baltimore, MD 21204
Email: *michael.blumenfeld@nelsonmullins.com*  Email: *mancosb@fnb-corp.com*

> **Re:   Loan # 111154086500**
> **FNMA Loan Number: 6000319153**
> **Borrower Name: Shirley Garcia**
> **Property Address: 9506 Rosevale Street, Fort Washington, MD, 20744**

Mr. Mancos and Mr. Blumenfeld:

I write this letter on behalf of Sun West Mortgage Company ("Sun West") regarding the above-referenced loan (the "Garcia Loan") which was originated by First Mariner Bank. Pursuant to Paragraph 12 of the Settlement and Release Agreement between Sun West and First Mariner Bank effective May 16, 2017 (the "Settlement Agreement"), I am sending this correspondence to you as the representative and counsel for First National Bank of Pennsylvania ("FNBP"), which is the successor to Howard Bank, which is the successor to First Mariner Bank.

The Garcia Loan is a Home Equity Conversion Mortgage (HECM) loan, which was originated and closed by First Mariner Bank on or about October 10, 2007. On, or about, July 11, 2024, Sun West self-reported this loan due to a defect in title that was identified when the loan was being reviewed for assignment to the Department of Housing and Urban Development (HUD). During this review, it was determined that the title is not free and clear for the subject property. Specifically, a mortgage lien was recorded on November 2, 1998 in book 12574, page 558, against Shirley Garcia in favor of Commercial Credit Corporation in the amount of $10,000.00 ("CCC Lien"). It is our understanding that the CCC Lien has priority to the Garcia Loan. Due to this, Sun West is unable to assign the subject loan to HUD. Sun West alerted Stewart Title Insurance Company of the issue. The title defect resulted in a letter of indemnification from the title company, making the loan ineligible for HUD assignment.

5778152.1
EARLY SULLIVAN WRIGHT GIZER & MCRAE LLP | 6420 WILSHIRE BOULEVARD | 17TH FLOOR | LOS ANGELES, CALIFORNIA 90048
TEL: (323) 301-4660 | FAX: (323) 301-4676 | WWW.EARLYSULLIVAN.COM

LAS VEGAS | LOS ANGELES | NEW YORK | PHOENIX | TAMPA

October 8, 2024
Page 2



On October 7, 2024, Sun West received correspondence from Fannie Mae regarding the Garcia Loan.  In the correspondence, Fannie Mae identified a defect for this loan which it deemed to be uncorrectable.  Fannie Mae's reasoning is that the Garcia Loan was not in first position at origination and states:

"The subject loan was delivered as a first lien transaction. It has come to our attention that the first lien status of the subject mortgage was misrepresented. A mortgage lien with Commercial Credit was recorded prior to the subject mortgage and was not released and had priority over the subject mortgage."

As set forth in Fannie Mae's attached letter, Fannie Mae has given Sun West a deadline until December 6, 2024 to either:

1. Provide an appeal; or
2. Repurchase the Garcia Loan.

Pursuant to Paragraph 4 of the Settlement and Release Agreement, please allow this letter to serve as written notice of Sun West's demand that FNBP repurchase the Garcia Loan.

We hope that the parties can resolve this without the need for court intervention and more litigation.

Please contact me at your earliest convenience to discuss further.  Nothing in this correspondence serves as a waiver of any of Sun West's rights, claims and objections, all of which are expressly reserved.

Very truly yours,

*/s/ Scott E. Gizer*

Scott E. Gizer
of Early Sullivan Wright Gizer & McRae llp

Attachment

**Fannie Mae**

**Sun West Mortgage Company Inc.**

**Date:** 10/7/2024

**Loan Information:**

**Fannie Mae Loan Number:** 6000319153
**Seller Loan Number:** 160177
**Servicer Loan Number:**
**Responsible Party ID:** 214110024

Fannie Mae's analysis of the subject loan reflects certain elements that do not meet, or no longer meet, the terms or requirements of the Lender Contract due to certain selling and/or servicing violations listed below.  We value your business, and want to work with you to resolve this matter.

We have identified the following defect(s) for this loan. At least one of the defects listed below was determined to be a servicing repurchase defect and/or was deemed to be uncorrectable.

**Loan Not in  First Lien Position at Origination**
The subject loan was delivered as a first lien transaction. It has come to our attention that the first lien status of the subject mortgage was misrepresented.   A mortgage lien with Commercial Credit was recorded prior to the subject mortgage and was not released and had priority over the subject mortgage..

Please review the options below for resolving this matter. You have until 12/6/2024 to either:

• Provide an appeal in written form through  Loan Quality Connect (LQC).
• Remit the amount due for the repurchase. Refer to the Fannie Mae Servicing Guide for specific instructions on remitting funds.

Note:  Responsible parties are reminded that if they repurchase a mortgage loan that was modified under HAMP, they are obligated to comply with any and all legal obligations created with the borrower in connection with the modification of the loan, including, without limitation,  any legal obligation to pay the borrower an earned performance incentive.

If you have any questions concerning this letter or its content, please contact the underwriter listed below.

**CURE Underwriter Name:**        LQC CURE Team E
**Phone:**
**Email:**                          terrlenders_xnt@fanniemae.com

## Additional Loan Information

**Fannie Mae Loan Number:** 6000319153
**Seller Name:** First Mariner Bank
**Seller No:** 246510016
**Servicer Name:** Sun West Mortgage Company Inc.
**Servicer No:** 214110024
**Originator Name:**
**REO Status:**
**Review Type:**
**LTV:** 65.0000%
**CLTV:** 65.0000%
**HCLTV:** 65.0000%
**Product:** Not Available At This Time
**Occupancy:** Primary Residence
**Loan Purpose:**
**Property Type:**
**AUS:** DU
**Recommendation:** DU Recommendation
**Contract Number:** DFT333404
**Closing Date:** 10/10/2007
**LPI Date:**
**Special Feature Code(s):** See SFCs in loan review
**Origination Appraiser:**
**Master Contract No:** MC05766
**Loan Purchase Date:** 10/24/2007
**Pool#:**

# EXHIBIT E

| | |
|---|---|
| **From:** | Padideh Zargari |
| **Sent:** | Monday, December 30, 2024 6:37 PM |
| **To:** | 'Michael Blumenfeld' |
| **Cc:** | Scott Gizer; 'Meredith Storm' |
| **Subject:** | RE: Loan Number: 111154086500 - Shirley Garcia and Loan Number: 111154026800 - Perrota 12.15.2024 |

Hi Michael,

I hope you had a good holiday.  As you know, the deadline to repurchase the Perrota and Garcia loans is near; Perrota is tomorrow, and Garcia is January 5th (which is a Sunday).  Since we have no confirmation that FNB is going to repurchase these two loans, Sun West will be moving forward with the repurchase of both loans from FNMA.

We are still hoping that the parties can resolve this without a need for court intervention.  But, if by January 31, 2025, we do not have confirmation from FNB that it will be repurchasing or indemnifying Sun West for the Perrota and Garcia loans, Sun West will have no choice but to file another lawsuit.

I am out of town this week, but please let me know if a call next week would be helpful.

Thanks,

Padideh

---

**From:** Padideh Zargari
**Sent:** Monday, December 23, 2024 4:21 PM
**To:** Michael Blumenfeld <Michael.Blumenfeld@nelsonmullins.com>
**Cc:** Scott Gizer <sgizer@earlysullivan.com>; Meredith Storm <meredith.storm@nelsonmullins.com>
**Subject:** RE: Loan Number: 111154086500 - Shirley Garcia and Loan Number: 111154026800 - Perrota 12.15.2024

Hi Michael,

As I have previously mentioned, for both the Perrota and Garcia loans, Sun West has tried to obtain the current payoff information for the senior liens but has been unable to do so.  That is why we were hoping FNB can help, and the parties can work together.  As for the extension, FNMA has denied an extension on both loans.  Please see the screenshots below :

Garcia

 Exception Queue > **Loan Details**    Loan #: 60003191

## Lender Comments



**Add Comment**

Type: All ⌄

Sort By: Date Descending

**Anthony Nguyen** - *12/23/2024, 12:41 PM*

denied 2nd extension request

**Type:** Document Review

**Kimberly Boroughs** - *12/3/2024, 5:28 AM*

Approved for one-time delayed delivery extension through January 6, 2024. Pleas

**Type:** Document Review

Perrota



As to the HUD indemnifications, your previous emails stated that FNB has indemnified HUD, so we are asking for the documentation, including the indemnification agreement(s).  Sun West has an obligation to inform FNMA of the indemnification.  Sun West owns the servicing rights and is servicing the loans on behalf of FNMA (who owns the loans), so Sun West has a right to that information and has a fiduciary obligation to inform FNMA of such events.   We again request that you send us any correspondence between FNB and HUD regarding the two loans, and any related documents (including the Indemnification Agreement).

Thanks,

Padideh

**From:** Michael Blumenfeld <Michael.Blumenfeld@nelsonmullins.com>
**Sent:** Sunday, December 15, 2024 6:54 PM
**To:** Padideh Zargari <pzargari@earlysullivan.com>
**Cc:** Scott Gizer <sgizer@earlysullivan.com>; Meredith Storm <meredith.storm@nelsonmullins.com>
**Subject:** Loan Number: 111154086500 - Shirley Garcia and Loan Number: 111154026800 - Perrota 12.15.2024

Hi Padideh,

Thank you for providing the link for the servicing and origination files. As we are just receiving information on these loans for the first time, we will now review the files provided. We again request payoff information on the alleged liens. Once we complete our review of the origination and servicing files and receive the payoff information for the alleged liens, FNB can make an informed decision of the best way to proceed here. So, I think at this time the best of course of action is to obtain another 30-day extension and formally request that you do so.

Also, I am a little confused, as to your request re HUD. Why does Sun West need to know whether FNB has agreed to indemnify HUD on these loans? Has Sun West submitted a claim to HUD for these loans?

Thank you,

Michael



**MICHAEL E. BLUMENFELD**  PARTNER
michael.blumenfeld@nelsonmullins.com
100 S. CHARLES STREET | SUITE 1600
BALTIMORE, MD 21201
T 443.392.9402  F 443.392.9499
NELSONMULLINS.COM   VCARD   VIEW BIO

---

**From:** Padideh Zargari <pzargari@earlysullivan.com>
**Sent:** Friday, December 13, 2024 8:18 PM
**To:** Michael Blumenfeld <Michael.Blumenfeld@nelsonmullins.com>
**Cc:** Scott Gizer <sgizer@earlysullivan.com>; Meredith Storm <meredith.storm@nelsonmullins.com>
**Subject:** Re: Loan Number: 111154086500 - Shirley Garcia and Loan Number: 111154026800 - Perrota 12.13.2024

Hi Michael,

Below please see a dropbox link containing the origination and servicing files for both loans.
https://www.dropbox.com/scl/fo/retvs9k20lzc6ciktvjvg/ANzXrUAPi1GNuRxNM8y8y_4?rlkey=90d21qmkn78yzkz6yipp95m1f&st=d6oo37bz&dl=0

As we stated below, Sun West has tried to determine the cost to pay off any outstanding liens on these loans and has been unsuccessful since the liens are old and have changed hands.  We were hoping the parties can work together to figure this out. Furthermore, we are still waiting for a response from you on whether FNB indemnified HUD on both loans, and we are still waiting for the requested documents.  Please send that to us immediately

Moreover, since we are nearing the 10 business days deadline for both loans, we are reiterating our demands that FNB repurchase both the Perrota and Garcia loans per the terms of the settlement agreement as it does not appear that there is a basis to appeal either at this point.

Thank you.

On Dec 13, 2024, at 5:51 AM, Michael Blumenfeld <Michael.Blumenfeld@nelsonmullins.com> wrote:

 Good morning,

I am just writing to follow up on our communications below. I was hoping to have received the origination and servicing files by now, as of course, it will take some time to review them. Also, can you please provide us with any specific defect information, including what it would cost to pay off any outstanding liens or other defects. As SunWest's deadline is nearing, please, provide them to us immediately.

Thank you so much.

Michael

---

**MICHAEL E. BLUMENFELD  PARTNER**
**michael.blumenfeld@nelsonmullins.com**
**100 S. CHARLES STREET | SUITE 1600**
**BALTIMORE, MD 21201**
**T 443.392.9402  F 443.392.9499**

On Dec 3, 2024, at 7:20 PM, Padideh Zargari <pzargari@earlysullivan.com> wrote:

Hi Michael,

Sorry we missed your call, Scott are I are busy preparing for an arbitration that is starting next week, but I just wanted to get a quick response over to you.

Sun West has obtained an extension on both loans.

FNMA has granted an extension on the Perrota loan to 12/31/2024.  Please see below.

 FNMA has granted an extension on the Garcia loan to 1/5/2025.  Please see below.

For both the Garcia and Perrota loans, Sun West has tendered the claim to the respective title companies, but both title companies have only offered to issue Letters of Indemnity.  Those letters are attached here for your review.  For both loans, Sun West has made efforts to obtain a payoff demand from the senior lien holders but is having difficultly locating the current lien holders as these liens are old and have changed hands.  Does FNB have any resources to help determine who the current lienholders

are? It may be prudent for the parties to work together to see if the liens can be paid off and then work to see if FNMA is satisfied and if any issues are resolved.

Has FNB indemnified HUD as to both the Perrota and Garcia loans? Can you please provide us with any and all communications FNB (or its counsel) has had with FHA with respect to these two loans, and any documents (including the Indemnification Agreement)? I am being told that Sun West is obligated to inform FNMA of FNB's indemnification of HUD with respect to these loans, so they need to see the documentation.

I've asked Sun West for the servicing/origination files for these loans.  I will send it over to you once I receive it.

As far as the repurchase demand letters from Sun West, our position remains unchanged- FNMA has imposed an obligation on Sun West to appeal or repurchase the Perrota loan by 12/31/24 and the Garcia loan by 1/5/2025.  While this does not trigger the 10-business day deadline under the Settlement Agreement, Sun West has made demand on FNB to repurchase and to pass along any relief extended to Sun West (i.e., to appeal).

Thanks,
Padideh

---

**From:** Michael Blumenfeld <Michael.Blumenfeld@nelsonmullins.com>
**Sent:** Tuesday, December 3, 2024 1:38 PM
**To:** Jacqueline Hosey <jhosey@earlysullivan.com>; Scott Gizer <sgizer@earlysullivan.com>; Padideh Zargari <pzargari@earlysullivan.com>
**Cc:** Meredith Storm <meredith.storm@nelsonmullins.com>
**Subject:** Loan Number: 111154086500 - Shirley Garcia

Hi Scott, Padideh and Jacqueline,

I write as a follow-up to my voicemails from yesterday to each of you. The referenced/attached request is very similar in issue to those we just litigated. Can you advise us whether Sun West was (or if) it is planning on doing anything to correct the defect and or the cost to cure the defect.

Also, as you noted during the trial, Sun West did not consider the nearly identical repurchase/appeal letters and dates in the repurchase/appeal letters to be Fannie Mae repurchase demands by Sun West or its counsel, so we have no reason to assume anything different here.

Regardless, given the pending issues in our trial and our lack of information on this loan, please consider this a formal request for an extension directed to Sun West or if necessary please request an extension from Fannie Mae. The arbitrary deadline you provided to FNB is **the 6th**, so if necessary, please make the request for an extension **today**.

Finally, please provide us with the origination and servicing files for our review.

Thank you,

Michael



**MICHAEL E. BLUMENFELD**  PARTNER
michael.blumenfeld@nelsonmullins.com
**100 S. CHARLES STREET | SUITE 1600**
**BALTIMORE, MD 21201**
T 443.392.9402  F 443.392.9499
**NELSONMULLINS.COM**  VCARD  VIEW BIO

**From:** Michael Blumenfeld <michael.blumenfeld@nelsonmullins.com>
**Sent:** Monday, December 2, 2024 7:54 PM
**To:** Jacqueline Hosey <jhosey@earlysullivan.com>; Scott Gizer <sgizer@earlysullivan.com>; Padideh Zargari <pzargari@earlysullivan.com>
**Cc:** Meredith Storm <meredith.storm@nelsonmullins.com>
**Subject:** Loan Number: 111154026800 - Perrota

Hi Scott, Padideh and Jacqueline,

I hope you all had a nice Thanksgiving. I write as a follow-up to my voicemails from earlier today to each of you. The referenced/attached request is very similar in issue to those we just litigated. As you may know, we already indemnified HUD out of necessity, but again, we have no idea of how Sun West was (or if) it is planning on doing anything to correct the defect.

Also, as you noted during the trial, Sun West did not consider the nearly identical repurchase/appeal letters and dates in the repurchase/appeal letters to be Fannie Mae repurchase demands by Sun West or its counsel, so we have no reason to assume anything different here.

Regardless, given the pending issues in our trial and our lack of information on this loan, please consider this a formal request for an extension directed to Sun West or if necessary please request an extension from Fannie Mae. The arbitrary deadline you provided to FNB is **today**, so if necessary, please make the request for an extension **today**.

Finally, please provide us with the origination and servicing files for our review.

Thank you,

Michael



**MICHAEL E. BLUMENFELD**  PARTNER
michael.blumenfeld@nelsonmullins.com

**100 S. CHARLES STREET | SUITE 1600**
**BALTIMORE, MD 21201**

T 443.392.9402   F 443.392.9499

**NELSONMULLINS.COM**   VCARD   **VIEW BIO**

---

**From:** Jacqueline Hosey <jhosey@earlysullivan.com>
**Sent:** Tuesday, October 8, 2024 6:47 PM
**To:** Michael Blumenfeld <michael.blumenfeld@nelsonmullins.com>; mancosb@fnb-corp.com
**Cc:** Scott Gizer <sgizer@earlysullivan.com>; Padideh Zargari <pzargari@earlysullivan.com>
**Subject:** Loan Number: 111154026800

Mr. Mancos and Mr. Blumenfeld,

Attached please find correspondence from Scott Gizer, regarding the above referenced loan.

**JACKIE HOSEY** | PARALEGAL
Early Sullivan Wright Gizer & McRae LLP
323.301.4660 Main
323.761.7925 Direct
323.301.4676 Fax

6420 Wilshire Blvd., 17th Floor, Los Angeles, CA 90048
jhosey@earlysullivan.com

This message and any attached documents may contain information from the law firm of Early Sullivan Wright Gizer & McRae LLP that is confidential and/or privileged. If you are not the intended recipient, you may not read, copy, distribute or use this information. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message.

**Confidentiality Notice**
This message is intended exclusively for the individual or entity to which it is addressed. This communication may contain information that is proprietary, privileged, confidential or otherwise legally exempt from disclosure. If you are not the named addressee, you are not authorized to read, print, retain, copy or disseminate this message or any part of it. If you have received this message in error, please notify the sender immediately either by phone (800-237-2000) or reply to this e-mail and delete all copies of this message.

<image002.png>
<image003.png>
<image004.jpg>
<Perrota_Chicago Title Letter.pdf>
<Claim Determination letter-LOI-111154086500 GARCIA, SHIRLEY (1).pdf>

# EXHIBIT F



**EARLY
SULLIVAN
WRIGHT
GIZER &
MCRAE LLP**
ATTORNEYS AT LAW

PADIDEH ZARGARI
DD:  323-301-4663
pzargari@earlysullivan.com

May 20, 2025

**VIA E-MAIL**

Michael E. Blumenfeld
Nelson Mullins Riley & Scarborough LLP
100 S. Charles Street, Ste. 1600
Baltimore, MD 21201
michael.blumenfeld@nelsonmullins.com

Re:    **Loan # 111154225200**
       **Borrower Name: Richard Besner and Carol Besner**
       **Property Address: 15 Ludlow Street, Staten Island, New York 10312**

Dear Michael:

I write this letter on behalf of Sun West Mortgage Company ("Sun West") regarding the above-referenced loan (the "Besner Loan").  Sun West has learned that it does not have a recorded first or second deed of trust on the Besner Loan in its files as such documents were not provided when the Besner Loan was transferred to Sun West.

In light of the above, we ask that FNB of Pennsylvania ("FNBP") please provide the original copies of the recorded first and second deeds of trust on the Besner Loan, that it may have in its possession, custody or control within ten (10) days of the date of this letter.[1]  The above-referenced defects will render the Besner Loan ineligible for liquidation or otherwise for assignment to HUD unless FNBP provides the recorded deeds of trust.  Sun West has also tendered a claim to FNBP's title insurance company, Stewart Title Guaranty Company ("Stewart Title"), in an effort to seek its help in either obtaining the recorded documents, or recording the documents.  The tender package to Stewart Title, which includes the unrecorded first and second deeds of trust, are enclosed herein.  We will keep you appraised of Stewart Title's response.  Sun West is also under an obligation to self-report this defect to FNMA.

---

[1] Pursuant to Paragraph 12 of the Settlement Agreement, this correspondence is being sent to FNBP as the successor to Howard Bank which was the successor to First Mariner Bank. All references herein to FNBP mean and refer to FNBP as the successor to Howard Bank and First Mariner Bank.

EARLY SULLIVAN WRIGHT GIZER & MCRAE LLP | 6420 WILSHIRE BOULEVARD | 17TH FLOOR | LOS ANGELES, CALIFORNIA 90048
TEL: (323) 301-4660 | FAX: (323) 301-4676 | WWW.EARLYSULLIVAN.COM

CALABASAS | LAS VEGAS | LOS ANGELES | PHOENIX

Michael E. Blumenfeld
May 20, 2025
Page 2



       Additionally, please let this correspondence serve as written notice of the above defects in the Besner Loan and notice of Sun West's reservation of rights and claims, including, but not limited to, the right to demand that FNBP repurchase the Besner Loan or provide Sun West indemnification regarding the Besner Loan pursuant to Paragraph 4 of the Settlement and Release Agreement between Sun West Mortgage Company, Inc. and First Mariner Bank effective May 16, 2017 (the "Settlement Agreement").

       We appreciate your cooperation in this regard.   Nothing in this correspondence serves as a waiver of any of Sun West's rights, claims and objections, all of which are expressly reserved.

Very truly yours,

*/s/Padideh Zargari*

Padideh Zargari
on behalf of
EARLY SULLIVAN WRIGHT GIZER & MCRAE LLP

cc:   Scott E. Gizer

Enclosures

5811683.1




05/13/2025

<u>VIA UPS</u>
Attn.: Claim Department,
Stewart Title Guaranty Company
1360 Post Oak Blvd. Suite 100,
Houston TX 77056

               Re:        Policy Number: M-8902-823085
                              Date of Policy: May 15, 2009
                              Subject Property: 15 LUDLOW STREET, STATEN ISLAND, NY, 10312
                              Loan Number: 111154225200
                              Borrower: Richard Besner and Carol Besner
                              Mortgage Amount: $765,000.00

Dear Mr. Morris,

Sun West Mortgage Company, Inc. ("SWMC") hereby tenders a claim as the insured under the Title Policy Number: M-8902-823085.

The loan is in the process of assigning to HUD and we have verified the online records and could not find the first and second deed of trust recorded. The collateral package provided by the custodian also doesn't have the recorded deed of trusts. Kindly provide us with the recorded copy of the first and second deed of trust documents.

Enclosed for your review are the following documents.
1. a copy of Final Title Policy
2. a copy of Un-recorded Insured 1st and 2nd Mortgages
3. a copy of Allonge for Note endorsement and copy of the Notes
4. a copy of the HUD-1

Please advise regarding the status of this claim as soon as possible. If you need any additional information or have further questions, please do not hesitate to contact me directly.

Thank you.

Sincerely,


Jamie Krenek
Legal Department
Sun West Mortgage Company, Inc.
Toll-Free: (800) 453-7884 (ext. 70213)
Direct Line: (562) 270-1929
Fax: (562) 252-4774
Email: title@swmc.com


Enclosures: As referenced above

Final Title Policy



# Final Title Policy

Revision Date: 12/7/2004

loan 1027548

ALTA Loan Policy (6-17-06)

LOAN POLICY OF TITLE INSURANCE
ISSUED BY



**stewart**
title insurance company

*IMO1925*
*BESNER*

Any notice of claim and any other notice or statement in writing required to be given to the Company under this Policy must be given to the Company at the address shown in Section 17 of the Conditions.

## COVERED RISKS

SUBJECT TO THE EXCLUSIONS FROM COVERAGE, THE EXCEPTIONS FROM COVERAGE CONTAINED IN SCHEDULE B, AND THE CONDITIONS, STEWART TITLE INSURANCE COMPANY, A New York corporation (the "Company") insures as of Date of Policy and, to the extent stated in Covered Risks 11, 13, and 14, after Date of Policy, against loss or damage, not exceeding the Amount of Insurance, sustained or incurred by the Insured by reason of:

1. Title being vested other than as stated in Schedule A.
2. Any defect in or lien or encumbrance on the Title. This Covered Risk includes but is not limited to insurance against loss from
   (a) A defect in the Title caused by
     (i) forgery, fraud, undue influence, duress, incompetency, incapacity, or impersonation;
     (ii) failure of any person or Entity to have authorized a transfer or conveyance;
     (iii) a document affecting Title not properly created, executed, witnessed, sealed, acknowledged, notarized, or delivered;
     (iv) failure to perform those acts necessary to create a document by electronic means authorized by law;
     (v) a document executed under a falsified, expired, or otherwise invalid power of attorney;
     (vi) a document not properly filed, recorded, or indexed in the Public Records including failure to perform those acts by electronic means authorized by law; or
     (vii) a defective judicial or administrative proceeding.
   (b) The lien of real estate taxes or assessments imposed on the Title by a governmental authority due or payable, but unpaid.
   (c) Any encroachment, encumbrance, violation, variation, or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the Land. The term "encroachment" includes encroachments of existing improvements located on the Land onto adjoining land, and encroachments onto the Land of existing improvements located on adjoining land.
3. Unmarketable Title.
4. No right of access to and from the Land.
5. The violation or enforcement of any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting, or relating to
   (a) the occupancy, use, or enjoyment of the Land;
   (b) the character, dimensions, or location of any improvement erected on the Land;
   (c) the subdivision of land; or
   (d) environmental protection

Countersigned by

_____
Authorized Signature

NORTHEASTERN METRO ABSTRACT CORP.
Company

Hicksville, NY
City, State

*President*

*Secretary*

| Policy Serial No. | M-8912-0008213085 |
|---|---|

If you want information about coverage or need assistance to resolve complaints, please call our toll free number 1-800-433-0014. If you make a claim under your policy, you must furnish written notice in accordance with Section 3 of the Conditions. Visit our World-Wide Web site at http://www.StewartNewYork.com.

File No.: 13439

ALTA LOAN POLICY

## SCHEDULE A

Title No.:  **NMR-09-13439**                    Policy No.:  **M - 8902 - 823085**

Date of Policy:  **May 15, 2009**

Amount of Insurance:  **$510,000.00**                    County:  **Richmond**

1.  Name of Insured:

   **1st Mariner Bank, ISAOA, its successors and/or assigns.**

2.  The estate or interest in the land which is encumbered by the insured mortgage is:

   **Fee Simple**

3.  Title to the estate or interest in the land is vested in:

   **Richard Besner and Carol Besner by deed dated 9/28/1978, and recorded 10/3/1978 in Liber 2267 on page 196 in the Richmond County Clerk's Office.**

4.  The insured mortgage and assignments thereof, if any, are described as follows:

   **Mortgage made by Richard Besner                    to 1st Mariner Bank, ISAOA in the amount of $510,000.00 dated 5/15/2009 to be duly recorded in the Richmond County Clerk's Office.**

5.  The land referred to in this policy is described as follows:

   See Schedule A Description, attached hereto and made a part hereof.

Section:                    Block: **5672**                    Lot: **4**

Property Address:          **15 Ludlow St., Staten Island, New York**

**S T E W A R T   T I T L E**
**INSURANCE COMPANY**

# Stewart Title Insurance Company

## Schedule A Description

Title No:    **NMR-09-13439**

ALL that certain plot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in the Borough of Staten Island, County of Richmond, City and State of New York, being described as follows:

BEGINNING at a point on the Easterly side of Ludlow Street, a distance of 118 feet Southerly from the point formed by the intersection of the Southerly side of McArthur Avenue with the Easterly side of Ludlow Street;

RUNNING THENCE North 80 degrees 23 minutes 13 seconds East 100 feet to a point;

RUNNING THENCE South 9 degrees 36 minutes 47 seconds East 30 feet to a point;

RUNNING THENCE South 80 degrees 23 minutes 13 seconds West and part of the distance through a party wall 100 feet to a point;

RUNNING THENCE Northerly along the Easterly side of Ludlow Street North 9 degrees 36 minutes 47 seconds West 30 feet to the point or place of BEGINNING.

ALTA LOAN POLICY

## SCHEDULE B
## PART I

Title No.:    **NMR-09-13439**                              Policy No.:**M - 8902 -  823085**

This policy does not insure against loss or damage (and the Company will not pay costs , attorney's fees or expenses) which arise by reason of:

1.  None

Unless a Schedule B part II is attached, there are no subordinate matters that affect the title to the estate or interest referred to in Schedule A.

4623 (7/93)                              Page 3                    **S T E W A R T   T I T L E**
                                                                        **INSURANCE COMPANY**



**stewart**
title insurance company

### STANDARD NEW YORK ENDORSEMENT

### (LOAN POLICY)

1. Exclusion Number 7 is deleted, and the following is substituted:

   7. Any lien on the Title for real estate taxes, assessments, water charges or sewer rents imposed by governmental authority and created or attaching between Date of Policy and the date of recording of the Insured Mortgage in the Public Records. This Exclusion does not modify or limit the coverage provided under Covered Risk 11(b).

2. Exclusions From Coverage is amended by adding a new Exclusion Number 8:

   8. Any consumer protection law including, without limitation, New York Banking Law Sections 6-l ("High-Cost Home Loans") and 6-m ("Subprime Home Loans"), relating to a mortgage on Land improved or to be improved by a structure or structures intended principally for occupancy by one-to-four families.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

Countersigned By:

May 15, 2009

Date

Agency Name, Address & ID Number:

**NORTHEASTERN METRO ABSTRACT CORP.**
8 Duffy Avenue
Hicksville, NY 11801
(516) 349-5900

**STEWART  TITLE**

INSURANCE   COMPANY

1987

President

Secretary

STANDARD NEW YORK ENDORSEMENT (12/1/08)
FOR USE WITH ALTA LOAN POLICY (6-17-06)

Fourth Reprint (5/1/07)
Second Revision (12/1/08)

# STEWART TITLE
## INSURANCE COMPANY

HEREIN CALLED THE COMPANY

### ENVIRONMENTAL PROTECTION LIEN ENDORSEMENT

### -NEW YORK-

**ATTACHED TO AND MADE A PART OF POLICY NUMBER**   M-8902-823085

The insurance afforded by this endorsement is only effective if the land is used or is to be used primarily for residential purposes.

The Company insures the insured against loss or damage sustained by reason of lack of priority of the lien of the insured mortgage over:

(a)  any environmental protection lien which, at Date of Policy, is recorded in those records established under state statutes at Date of Policy for the purpose of imparting constructive notice of matters relating to real property to purchasers for value and without knowledge, or filed in the records of the clerk of the United States district court for the district in which the land is located, except as set forth in Schedule B; or

(b)  any environmental protection lien provided for by any state statute in effect at Date of Policy, except environmental protection liens provided for by the following state statutes:

(Section 1307 of Public Health Law)

This endorsement is made a part of the policy and is subject to all of the terms and provisions thereof and of any prior endorsements thereto.  Except to the extent expressly stated it neither modifies any of the terms and provisions of the Policy and any prior endorsements, nor does it extend the effective date of the policy and any prior endorsements, nor does it increase the amount of insurance.

DATED:   May 15, 2009

Signed by:

**STEWART TITLE**
INSURANCE    COMPANY

Authorized Office or Agent

Metro

President

Secretary

TIRSA 8.1 EPL (10/21/97)
NY-1026

# STEWART TITLE
## INSURANCE COMPANY

HEREIN CALLED THE COMPANY

RESIDENTIAL MORTGAGE ENDORSEMENT

(1 to 4 Family)

Attached to and made a part of Policy Number     M- 8902 -823085 _____

Unless expressly excepted in Schedule B, the company insures the owner of the indebtedness secured by the insured mortgage against loss or damage sustained by reason of any inaccuracies in the following assurances:

1.  That the location of any easement and/or right of way referred to in Schedule B is ascertainable and fixed; and

    That the exercise of any rights pursuant to any easement and/or right of way referred to in Schedule B will not interfere with the use of the buildings and improvements presently located on the insured premises for residential purposes, and that none of the improvements located on the insured premises encroach upon said easement or right of way.

2.  That there are no violations of any covenant, conditions or restrictions referred to in Schedule B, and that a future violation thereof will not cause a forfeiture or reversion of title or otherwise affect the lien of the mortgage insured.

This Endorsement is made a part of the policy and is subject to all of the terms and provisions thereof and of any prior endorsements thereto. Except to the extent expressly stated, it neither modifies any of the terms and provisions of the policy and any prior endorsements, nor does it extend the effective date of the policy and any prior endorsements, nor does it increase the amount of insurance.

DATED:    May 15, 2009

                                        STEWART   TITLE
                                        INSURANCE   COMPANY

Countersigned by:

_____
Authorized Countersignature

Northeastern Metro Abstract Corp.
8 Duffy Ave
Hicksville, NY 11801
(516) 349-5900 FAX (516) 349-7062

President

Secretary

TIRSA RESIDENTIAL MORTGAGE ENDORSEMENT (1-4 FAMILY) (8/15/94)
NY-1008

# S T E W A R T   T I T L E
## INSURANCE   C O M P A N Y
### HEREIN CALLED THE COMPANY

## WAIVER OF ARBITRATION ENDORSEMENT

(Loan Policy)

**ENDORSEMENT TO BE ATTACHED TO AND MADE A PART OF LOAN POLICY OF TITLE INSURANCE NUMBER    M- 8902 -823085**

This policy is amended by deleting therefrom Condition and Stipulation Section 13.

Nothing herein contained shall be construed as extending to changing the effective date of said policy, unless otherwise expressly stated.

This endorsement, when countersigned below by a validating signatory, is made a part of said policy and is subject to the Exclusions from Coverage, schedules, conditions and stipulations therein, except as modified by the provisions hereof.

**DATED:**    May 15, 2009

Countersigned By:

_____
Authorized Office or Agent

Northeastern Metro Abstract Corp.
8 Duffy Ave
Hicksville, NY 11801
(516) 349-5900 FAX (516) 349-7062

**STEWART   TITLE**
INSURANCE   COMPANY

_____
President

_____
Secretary

TIRSA Waiver of Arbitration Endorsement (Loan Policy) (9/1/93)
NY-1028

## Covered Risks – Cont.

if a notice, describing any part of the Land, is recorded in the Public Records setting forth the violation or intention to enforce, but only to the extent of the violation or enforcement referred to in that notice.

6. An enforcement action based on the exercise of a governmental police power not covered by Covered Risk 5 if a notice of the enforcement action, describing any part of the Land, is recorded in the Public Records, but only to the extent of the enforcement referred to in that notice.

7. The exercise of the rights of eminent domain if a notice of the exercise, describing any part of the Land, is recorded in the Public Records.

8. Any taking by a governmental body that has occurred and is binding on the rights of a purchaser for value without Knowledge.

9. The invalidity or unenforceability of the lien of the Insured Mortgage on the Title. This Covered Risk includes but is not limited to insurance against loss from any of the following impairing the lien of the Insured Mortgage:
   (a) forgery, fraud, undue influence, duress, incompetency, incapacity, or impersonation;
   (b) failure of any person or Entity to have authorized a transfer or conveyance;
   (c) the Insured Mortgage not being properly created, executed, witnessed, sealed, acknowledged, notarized, or delivered;
   (d) failure to perform those acts necessary to create a document by electronic means authorized by law;
   (e) a document executed under a falsified, expired, or otherwise invalid power of attorney;
   (f) a document not properly filed, recorded, or indexed in the Public Records including failure to perform those acts by electronic means authorized by law; or
   (g) a defective judicial or administrative proceeding.

10. The lack of priority of the lien of the Insured Mortgage upon the Title over any other lien or encumbrance.

11. The lack of priority of the lien of the Insured Mortgage upon the Title
    (a) as security for each and every advance of proceeds of the loan secured by the Insured Mortgage over any statutory lien for services, labor, or material arising from construction of an improvement or work related to the Land when the improvement or work is either:

   (i) contracted for or commenced on or before Date of Policy; or
   (ii) contracted for, commenced, or continued after Date of Policy if the construction is financed, in whole or in part, by proceeds of the loan secured by the Insured Mortgage that the Insured has advanced or is obligated on Date of Policy to advance; and
   (b) over the lien of any assessments for street improvements under construction or completed at Date of Policy.

12. The invalidity or unenforceability of any assignment of the Insured Mortgage, provided the assignment is shown in Schedule A, or the failure of the assignment shown in Schedule A to vest title to the Insured Mortgage in the named Insured assignee free and clear of all liens.

13. The invalidity, unenforceability, lack of priority, or avoidance of the lien of the Insured Mortgage upon the Title
    (a) resulting from the avoidance in whole or in part, or from a court order providing an alternative remedy, of any transfer of all or any part of the title to or any interest in the Land occurring prior to the transaction creating the lien of the Insured Mortgage because that prior transfer constituted a fraudulent or preferential transfer under federal bankruptcy, state insolvency, or similar creditors' rights laws; or
    (b) because the Insured Mortgage constitutes a preferential transfer under federal bankruptcy, state insolvency, or similar creditors' rights laws by reason of the failure of its recording in the Public Records
       i) to be timely, or
       ii) to impart notice of its existence to a purchaser for value or to a judgment or lien creditor.

14. Any defect in or lien or encumbrance on the Title or other matter included in Covered Risks 1 through 13 that has been created or attached or has been filed or recorded in the Public Records subsequent to Date of Policy and prior to the recording of the Insured Mortgage in the Public Records.

The Company will also pay the costs, attorneys' fees, and expenses incurred in defense of any matter insured against by this Policy, but only to the extent provided in the Conditions.

## Exclusions from Coverage

The following matters are expressly excluded from the coverage of this policy, and the Company will not pay loss or damage, costs, attorneys' fees, or expenses that arise by reason of:

1. (a) Any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting, or relating to
   (i) the occupancy, use, or enjoyment of the Land;
   (ii) the character, dimensions, or location of any improvement erected on the Land;
   (iii) the subdivision of land; or
   (iv) environmental protection; or the effect of any violation of these laws, ordinances, or governmental regulations. This Exclusion 1(a) does not modify or limit the coverage provided under Covered Risk 5.
   (b) Any governmental police power. This Exclusion 1(b) does not modify or limit the coverage provided under Covered Risk 6.

2. Rights of eminent domain. This Exclusion does not modify or limit the coverage provided under Covered Risk 7 or 8.

3. Defects, liens, encumbrances, adverse claims, or other matters:
   (a) created, suffered, assumed, or agreed to by the Insured Claimant;
   (b) not Known to the Company, not recorded in the Public Records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;
   (c) resulting in no loss or damage to the Insured Claimant;

   (d) attaching or created subsequent to Date of Policy (however, this does not modify or limit the coverage provided under Covered Risk 11, 13, or 14); or
   (e) resulting in loss or damage that would not have been sustained if the Insured Claimant had paid value for the Insured Mortgage.

4. Unenforceability of the lien of the Insured Mortgage because of the inability or failure of an Insured to comply with applicable doing-business laws of the state where the Land is situated.

5. Invalidity or unenforceability in whole or in part of the lien of the Insured Mortgage that arises out of the transaction evidenced by the Insured Mortgage and is based upon usury or any consumer credit protection or truth-in-lending law.

6. Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that the transaction creating the lien of the Insured Mortgage, is:
   (a) a fraudulent conveyance or fraudulent transfer, or
   (b) a preferential transfer for any reason not stated in Covered Risk 13(b) of this policy.

7. Any lien on the Title for real estate taxes or assessments imposed by governmental authority and created or attaching between Date of Policy and the date of recording of the Insured Mortgage in the Public Records. This Exclusion does not modify or limit the coverage provided under Covered Risk 11(b).

## CONDITIONS

**1.    DEFINITION OF TERMS**
The following terms when used in this policy mean:
(a)    "Amount of Insurance": The amount stated in Schedule A, as may be increased or decreased by endorsement to this policy, increased by Section 8(b) or decreased by Section 10 of these Conditions.
(b)    "Date of Policy": The date designated as "Date of Policy" in Schedule A.
(c)    "Entity": A corporation, partnership, trust, limited liability company, or other similar legal entity.
(d)    "Indebtedness": The obligation secured by the Insured Mortgage including one evidenced by electronic means authorized by law, and if that obligation is the payment of a debt, the Indebtedness is the sum of
  i)    the amount of the principal disbursed as of Date of Policy;
  ii)    the amount of the principal disbursed subsequent to Date of Policy;
  iii)    the construction loan advances made subsequent to Date of Policy for the purpose of financing in whole or in part the construction of an improvement to the Land or related to the Land that the Insured was and continued to be obligated to advance at Date of Policy and at the date of the advance;
  iv)    interest on the loan;
  v)    the prepayment premiums, exit fees, and other similar fees or penalties allowed by law;
  vi)    the expenses of foreclosure and any other costs of enforcement;
  vii)    the amounts advanced to assure compliance with laws or to protect the lien or the priority of the lien of the Insured Mortgage before the acquisition of the estate or interest in the Title;
  viii)    the amounts to pay taxes and insurance; and
  ix)    the reasonable amounts expended to prevent deterioration of improvements; but the Indebtedness is reduced by the total of all payments and by any amount forgiven by an Insured.
(e)    "Insured": The Insured named in Schedule A.
  (i)    The term "Insured" also includes
    (A)    the owner of the Indebtedness and each successor in ownership of the Indebtedness, whether the owner or successor owns the Indebtedness for its own account or as a trustee or other fiduciary, except a successor who is an obligor under the provisions of Section 12(c) of these Conditions;
    (B)    the person or Entity who has "control" of the "transferable record," if the Indebtedness is evidenced by a "transferable record," as these terms are defined by applicable electronic transactions law;
    (C)    successors to an Insured by dissolution, merger, consolidation, distribution, or reorganization;
    (D)    successors to an Insured by its conversion to another kind of Entity;
    (E)    a grantee of an Insured under a deed delivered without payment of actual valuable consideration conveying the Title
      (1)    if the stock, shares, memberships, or other equity interests of the grantee are wholly-owned by the named Insured,
      (2)    if the grantee wholly owns the named Insured, or
      (3)    if the grantee is wholly-owned by an affiliated Entity of the named Insured, provided the affiliated Entity and the named Insured are both wholly-owned by the same person or Entity;
    (F)    any government agency or instrumentality that is an insurer or guarantor under an insurance contract or guaranty insuring or guaranteeing the Indebtedness

secured by the Insured Mortgage, or any part of it, whether named as an Insured or not;
  (ii)    With regard to (A), (B), (C), (D) , and (E) reserving, however, all rights and defenses as to any successor that the Company would have had against any predecessor Insured, unless the successor acquired the Indebtedness as a purchaser for value without Knowledge of the asserted defect, lien, encumbrance, or other matter insured against by this policy.
(f)    "Insured Claimant": An Insured claiming loss or damage.
(g)    "Insured Mortgage": The Mortgage described in paragraph 4 of Schedule A.
(h)    "Knowledge" or "Known": Actual knowledge, not constructive knowledge or notice that may be imputed to an Insured by reason of the Public Records or any other records that impart constructive notice of matters affecting the Title.
(i)    "Land": The land described in Schedule A, and affixed improvements that by law constitute real property. The term "Land" does not include any property beyond the lines of the area described in Schedule A, nor any right, title, interest, estate, or easement in abutting streets, roads, avenues, alleys, lanes, ways, or waterways, but this does not modify or limit the extent that a right of access to and from the Land is insured by this policy.
(j)    "Mortgage": Mortgage, deed of trust, trust deed, or other security instrument, including one evidenced by electronic means authorized by law.
(k)    "Public Records": Records established under state statutes at Date of Policy for the purpose of imparting constructive notice of matters relating to real property to purchasers for value and without Knowledge. With respect to Covered Risk 5(d), "Public Records" shall also include environmental protection liens filed in the records of the clerk of the United States District Court for the district where the Land is located.
(l)    "Title": The estate or interest described in Schedule A.
(m)    "Unmarketable Title": Title affected by an alleged or apparent matter that would permit a prospective purchaser or lessee of the Title or lender on the Title or a prospective purchaser of the Insured Mortgage to be released from the obligation to purchase, lease, or lend if there is a contractual condition requiring the delivery of marketable title.

**2.    CONTINUATION OF INSURANCE**
The coverage of this policy shall continue in force as of Date of Policy in favor of an Insured after acquisition of the Title by an Insured or after conveyance by an Insured, but only so long as the Insured retains an estate or interest in the Land, or holds an obligation secured by a purchase money Mortgage given by a purchaser from the Insured, or only so long as the Insured shall have liability by reason of warranties in any transfer or conveyance of the Title. This policy shall not continue in force in favor of any purchaser from the Insured of either (i) an estate or interest in the Land, or (ii) an obligation secured by a purchase money Mortgage given to the Insured.

**3.    NOTICE OF CLAIM TO BE GIVEN BY INSURED CLAIMANT**
The Insured shall notify the Company promptly in writing (i) in case of any litigation as set forth in Section 5(a) of these Conditions, (ii) in case Knowledge shall come to an Insured of any claim of title or interest that is adverse to the Title or the lien of the Insured Mortgage, as insured, and that might cause loss or damage for which the Company may be liable by virtue of this policy, or (iii) if the Title or the lien of the Insured Mortgage, as insured, is rejected as Unmarketable Title. If the Company is prejudiced by the failure of the Insured Claimant to provide prompt notice, the Company's liability to the Insured Claimant under the policy shall be reduced to the extent of the prejudice.

**CONDITIONS – Continued**

4.   **PROOF OF LOSS**

In the event the Company is unable to determine the amount of loss or damage, the Company may, at its option, require as a condition of payment that the Insured Claimant furnish a signed proof of loss. The proof of loss must describe the defect, lien, encumbrance, or other matter insured against by this policy that constitutes the basis of loss or damage and shall state, to the extent possible, the basis of calculating the amount of the loss or damage.

5.   **DEFENSE AND PROSECUTION OF ACTIONS**

(a)   Upon written request by the Insured, and subject to the options contained in Section 7 of these Conditions, the Company, at its own cost and without unreasonable delay, shall provide for the defense of an Insured in litigation in which any third party asserts a claim covered by this policy adverse to the Insured. This obligation is limited to only those stated causes of action alleging matters insured against by this policy. The Company shall have the right to select counsel of its choice (subject to the right of the Insured to object for reasonable cause) to represent the Insured as to those stated causes of action. It shall not be liable for and will not pay the fees of any other counsel. The Company will not pay any fees, costs, or expenses incurred by the Insured in the defense of those causes of action that allege matters not insured against by this policy.

(b)   The Company shall have the right, in addition to the options contained in Section 7 of these Conditions, at its own cost, to institute and prosecute any action or proceeding or to do any other act that in its opinion may be necessary or desirable to establish the Title or the lien of the Insured Mortgage, as insured, or to prevent or reduce loss or damage to the Insured. The Company may take any appropriate action under the terms of this policy, whether or not it shall be liable to the Insured. The exercise of these rights shall not be an admission of liability or waiver of any provision of this policy. If the Company exercises its rights under this subsection, it must do so diligently.

(c)   Whenever the Company brings an action or asserts a defense as required or permitted by this policy, the Company may pursue the litigation to a final determination by a court of competent jurisdiction, and it expressly reserves the right, in its sole discretion, to appeal any adverse judgment or order.

6.   **DUTY OF INSURED CLAIMANT TO COOPERATE**

(a)   In all cases where this policy permits or requires the Company to prosecute or provide for the defense of any action or proceeding and any appeals, the Insured shall secure to the Company the right to so prosecute or provide defense in the action or proceeding, including the right to use, at its option, the name of the Insured for this purpose. Whenever requested by the Company, the Insured, at the Company's expense, shall give the Company all reasonable aid (i) in securing evidence, obtaining witnesses, prosecuting or defending the action or proceeding, or effecting settlement, and (ii) in any other lawful act that in the opinion of the Company may be necessary or desirable to establish the Title, the lien of the Insured Mortgage, or any other matter as insured. If the Company is prejudiced by the failure of the Insured to furnish the required cooperation, the Company's obligations to the Insured under the policy shall terminate, including any liability or obligation to defend, prosecute, or continue any litigation, with regard to the matter or matters requiring such cooperation.

(b)   The Company may reasonably require the Insured Claimant to submit to examination under oath by any authorized representative of the Company and to produce for examination, inspection, and copying, at such reasonable times and places as may be designated by the authorized representative of the Company, all records, in whatever medium maintained, including books, ledgers, checks,

memoranda, correspondence, reports, e-mails, disks, tapes, and videos whether bearing a date before or after Date of Policy, that reasonably pertain to the loss or damage. Further, if requested by any authorized representative of the Company, the Insured Claimant shall grant its permission, in writing, for any authorized representative of the Company to examine, inspect, and copy all of these records in the custody or control of a third party that reasonably pertain to the loss or damage. All information designated as confidential by the Insured Claimant provided to the Company pursuant to this Section shall not be disclosed to others unless, in the reasonable judgment of the Company, it is necessary in the administration of the claim. Failure of the Insured Claimant to submit for examination under oath, produce any reasonably requested information, or grant permission to secure reasonably necessary information from third parties as required in this subsection, unless prohibited by law or governmental regulation, shall terminate any liability of the Company under this policy as to that claim.

7.   **OPTIONS TO PAY OR OTHERWISE SETTLE CLAIMS; TERMINATION OF LIABILITY**

In case of a claim under this policy, the Company shall have the following additional options:

(a)   To Pay or Tender Payment of the Amount of Insurance or to Purchase the Indebtedness.

(i)   To pay or tender payment of the Amount of Insurance under this policy together with any costs, attorneys' fees, and expenses incurred by the Insured Claimant that were authorized by the Company up to the time of payment or tender of payment and that the Company is obligated to pay; or

(ii)   To purchase the Indebtedness for the amount of the Indebtedness on the date of purchase, together with any costs, attorneys' fees, and expenses incurred by the Insured Claimant that were authorized by the Company up to the time of purchase and that the Company is obligated to pay.

When the Company purchases the Indebtedness, the Insured shall transfer, assign, and convey to the Company the Indebtedness and the Insured Mortgage, together with any collateral security.

Upon the exercise by the Company of either of the options provided for in subsections (a)(i) or (ii), all liability and obligations of the Company to the Insured under this policy, other than to make the payment required in those subsections, shall terminate, including any liability or obligation to defend, prosecute, or continue any litigation.

(b)   To Pay or Otherwise Settle With Parties Other Than the Insured or With the Insured Claimant.

(i)   to pay or otherwise settle with other parties for or in the name of an Insured Claimant any claim insured against under this policy. In addition, the Company will pay any costs, attorneys' fees, and expenses incurred by the Insured Claimant that were authorized by the Company up to the time of payment and that the Company is obligated to pay; or

(ii)   to pay or otherwise settle with the Insured Claimant the loss or damage provided for under this policy, together with any costs, attorneys' fees, and expenses incurred by the Insured Claimant that were authorized by the Company up to the time of payment and that the Company is obligated to pay.

Upon the exercise by the Company of either of the options provided for in subsections (b)(i) or (ii), the Company's obligations to the Insured under this policy for the claimed loss or damage, other than the payments required to be made, shall terminate, including any liability or obligation to defend, prosecute, or continue any litigation.

**CONDITIONS - Continued**

**8.  DETERMINATION AND EXTENT OF LIABILITY**

This policy is a contract of indemnity against actual monetary loss or damage sustained or incurred by the Insured Claimant who has suffered loss or damage by reason of matters insured against by this policy.

(a) The extent of liability of the Company for loss or damage under this policy shall not exceed the least of

  (i)   the Amount of Insurance,

  (ii)  the Indebtedness,

  (iii) the difference between the value of the Title as insured and the value of the Title subject to the risk insured against by this policy, or

  (iv)  if a government agency or instrumentality is the Insured Claimant, the amount it paid in the acquisition of the Title or the Insured Mortgage in satisfaction of its insurance contract or guaranty.

(b) If the Company pursues its rights under Section 5 of these Conditions and is unsuccessful in establishing the Title or the lien of the Insured Mortgage, as insured,

  (i)   the Amount of Insurance shall be increased by 10%, and

  (ii)  the Insured Claimant shall have the right to have the loss or damage determined either as of the date the claim was made by the Insured Claimant or as of the date it is settled and paid.

(c) In the event the Insured has acquired the Title in the manner described in Section 2 of these Conditions or has conveyed the Title, then the extent of liability of the Company shall continue as set forth in Section 8(a) of these Conditions.

(d) In addition to the extent of liability under (a), (b), and (c), the Company will also pay those costs, attorneys' fees, and expenses incurred in accordance with Sections 5 and 7 of these Conditions.

**9.  LIMITATION OF LIABILITY**

(a) If the Company establishes the Title, or removes the alleged defect, lien, or encumbrance, or cures the lack of a right of access to or from the Land, or cures the claim of Unmarketable Title, or establishes the lien of the Insured Mortgage, all as insured, in a reasonably diligent manner by any method, including litigation and the completion of any appeals, it shall have fully performed its obligations with respect to that matter and shall not be liable for any loss or damage caused to the Insured.

(b) In the event of any litigation, including litigation by the Company or with the Company's consent, the Company shall have no liability for loss or damage until there has been a final determination by a court of competent jurisdiction, and disposition of all appeals, adverse to the Title or to the lien of the Insured Mortgage, as insured.

(c) The Company shall not be liable for loss or damage to the Insured for liability voluntarily assumed by the Insured in settling any claim or suit without the prior written consent of the Company.

**10. REDUCTION OF INSURANCE; REDUCTION OR TERMINATION OF LIABILITY**

(a) All payments under this policy, except payments made for costs, attorneys' fees, and expenses, shall reduce the Amount of Insurance by the amount of the payment. However, any payments made prior to the acquisition of Title as provided in Section 2 of these Conditions shall not reduce the Amount of Insurance afforded under this policy except to the extent that the payments reduce the Indebtedness.

(b) The voluntary satisfaction or release of the Insured Mortgage shall terminate all liability of the Company except as provided in Section 2 of these Conditions.

**11. PAYMENT OF LOSS**

When liability and the extent of loss or damage have been definitely fixed in accordance with these Conditions, the payment shall be made within 30 days.

**12. RIGHTS OF RECOVERY UPON PAYMENT OR SETTLEMENT**

(a) The Company's Right to Recover.

Whenever the Company shall have settled and paid a claim under this policy, it shall be subrogated and entitled to the rights of the Insured Claimant in the Title or Insured Mortgage and all other rights and remedies in respect to the claim that the Insured Claimant has against any person or property, to the extent of the amount of any loss, costs, attorneys' fees, and expenses paid by the Company. If requested by the Company, the Insured Claimant shall execute documents to evidence the transfer to the Company of these rights and remedies. The Insured Claimant shall permit the Company to sue, compromise, or settle in the name of the Insured Claimant and to use the name of the Insured Claimant in any transaction or litigation involving these rights and remedies.

If a payment on account of a claim does not fully cover the loss of the Insured Claimant, the Company shall defer the exercise of its right to recover until after the Insured Claimant shall have recovered its loss.

(b) The Insured's Rights and Limitations.

  (i)   The owner of the Indebtedness may release or substitute the personal liability of any debtor or guarantor, extend or otherwise modify the terms of payment, release a portion of the Title from the lien of the Insured Mortgage, or release any collateral security for the Indebtedness, if it does not affect the enforceability or priority of the lien of the Insured Mortgage.

  (ii)  If the Insured exercises a right provided in (b)(i), but has Knowledge of any claim adverse to the Title or the lien of the Insured Mortgage insured against by this policy, the Company shall be required to pay only that part of any losses insured against by this policy that shall exceed the amount, if any, lost to the Company by reason of the impairment by the Insured Claimant of the Company's right of subrogation.

(c) The Company's Rights Against Noninsured Obligors

The Company's right of subrogation includes the Insured's rights against non-insured obligors including the rights of the Insured to indemnities, guaranties, other policies of insurance, or bonds, notwithstanding any terms or conditions contained in those instruments that address subrogation rights.

The Company's right of subrogation shall not be avoided by acquisition of the Insured Mortgage by an obligor (except an obligor described in Section 1(e)(i)(F) of these Conditions) who acquires the Insured Mortgage as a result of an indemnity, guarantee, other policy of insurance, or bond, and the obligor will not be an Insured under this policy.

**13. ARBITRATION**

Either the Company or the Insured may demand that the claim or controversy shall be submitted to arbitration pursuant to the Title Insurance Arbitration Rules of the American Land Title Association ("Rules"). Except as provided in the Rules, there shall be no joinder or consolidation with claims or controversies of other persons. Arbitrable matters may include, but are not limited to, any controversy or claim between the Company and the Insured arising out of or relating to this policy, any service in connection with its issuance or the breach of a policy provision, or to any other controversy or claim arising out of the transaction giving rise to this policy. All arbitrable matters when the Amount of Insurance is $2,000,000 or less shall be arbitrated at the option of either the Company or the Insured. All arbitrable matters when the Amount of Insurance is in excess of $2,000,000 shall be arbitrated only when agreed to by both the Company and the Insured. Arbitration pursuant to this policy and under the Rules shall be binding upon the parties. Judgment upon the award rendered by the Arbitrator(s) may be entered in any court of competent jurisdiction.

**CONDITIONS – Continued**

**14.    LIABILITY LIMITED TO THIS POLICY;**
**POLICY ENTIRE CONTRACT.**

(a)    This policy together with all endorsements, if any, attached to it by the Company is the entire policy and contract between the Insured and the Company. In interpreting any provision of this policy, this policy shall be construed as a whole.

(b)    Any claim of loss or damage that arises out of the status of the Title or lien of the Insured Mortgage or by any action asserting such claim shall be restricted to this policy.

(c)    Any amendment of or endorsement to this policy must be in writing and authenticated by an authorized person, or expressly incorporated by Schedule A of this policy.

(d)    Each endorsement to this policy issued at any time is made a part of this policy and is subject to all of its terms and provisions. Except as the endorsement expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsement, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance.

**15.    SEVERABILITY.**

In the event any provision of this policy, in whole or in part, is held invalid or unenforceable under applicable law, the policy shall be deemed not to include that provision or such part held to be invalid, but all other provisions shall remain in full force and effect.

**16.    CHOICE OF LAW; FORUM.**

(a)    Choice of Law: The Insured acknowledges the Company has underwritten the risks covered by this policy and determined the premium charged therefore in reliance upon the law affecting interests in real property and applicable to the interpretation, rights, remedies, or enforcement of policies of title insurance of the jurisdiction where the Land is located.

Therefore, the court or an arbitrator shall apply the law of the jurisdiction where the Land is located to determine the validity of claims against the Title or the lien of the Insured Mortgage that are adverse to the Insured and to interpret and enforce the terms of this policy. In neither case shall the court or arbitrator apply its conflicts of law principles to determine the applicable law.

(b)    Choice of Forum: Any litigation or other proceeding brought by the Insured against the Company must be filed only in a state or federal court within the United States of America or its territories having appropriate jurisdiction.

**17.    NOTICES, WHERE SENT.**

Any notice of claim and any other notice or statement in writing required to be given to the Company under this policy must be given to the Company at Claims Department at 300 East 42nd St. 10th Floor, New York, NY 10017.

Un-recorded Insured 1st and 2nd Mortgages

Record and Return to:        1st Mariner Bank
                             1501 S. Clinton Street, Suite 210
                             Baltimore, MD 21224

This instrument prepared by:  1st Mariner Bank
                             1501 S. Clinton Street, Suite 210
                             Baltimore, MD 21224

_____ [Space Above This Line For Recording Data] _____

**State of NEW YORK**              FHA Case No. 374-5237509-952
                                   Loan No.  1M01925

# ADJUSTABLE RATE
# HOME EQUITY CONVERSION MORTGAGE

THIS MORTGAGE ("Security Instrument") is given on **May 15, 2009**. The mortgagor is **Richard Besner**, whose address is **15 LUDLOW STREET, STATEN ISLAND, New York 10312** ("Borrower"). This Security Instrument is given to **1st Mariner Bank**, which is organized and existing under the laws of **MARYLAND**, and whose address is **1501 S. Clinton Street, Suite 210, Baltimore, MD 21224**("Lender"). Borrower has agreed to repay to Lender amounts which Lender is obligated to advance, including future advances, under the terms of a Home Equity Conversion Loan Agreement dated the same date as this Security Instrument ("Loan Agreement"). The agreement to repay is evidenced by Borrower's Adjustable-Rate Note dated the same date as this Security Instrument ("Note"). This Security Instrument secures to Lender: (a) the repayment of the debt evidenced by the Note, with interest at a rate subject to adjustment (interest), and all renewals, extensions and modifications of the Note, up to a maximum principal amount of **Seven Hundred Sixty Five Thousand Dollars and Zero Cents** (U.S. **$765,000.00** ); (b) the payment of all other sums, with interest, advanced under paragraph 5 to protect the security of this Security Instrument or otherwise due under the terms of this Security Instrument; and (c) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. The full debt, including amounts described in (a), (b), and (c) above, if not due earlier, is due and payable on **April  6, 2097**.  For this purpose, Borrower does hereby mortgage, grant and convey to  Lender, with power of sale, the following described property located in **RICHMOND** County, NEW YORK:

**See legal description as Exhibit A attached hereto and made a part hereof for all intents and purposes**

which has the address of
**15 LUDLOW STREET, STATEN ISLAND, New York 10312,** ("Property Address")

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, rights, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seized of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal and Interest**. Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note.

**2. Payment of Property Charges.** Borrower shall pay all property charges consisting of taxes, ground rents, flood and hazard insurance premiums, and special assessments in a timely manner, and shall provide evidence of payment to Lender, unless Lender pays property charges by withholding funds from monthly payments due to the Borrower or by charging such payments to a line of credit as provided for in the Loan Agreement.

**3. Fire, Flood and Other Hazard Insurance.** Borrower shall insure all improvements on the Property, whether now in existence or subsequently erected, against any hazards, casualties, and contingencies, including fire. This insurance shall be maintained in the amounts, to the extent and for the periods required by Lender or the Secretary of Housing and Urban Development ("Secretary"). Borrower shall also insure all improvements on the Property, whether now in existence or subsequently erected, against loss by floods to the extent required by the Secretary. All insurance shall be carried with companies approved by Lender. The insurance policies and any renewals shall be held by Lender and shall include loss payable clauses in favor of, and in a form acceptable to, Lender.

In the event of loss, Borrower shall give Lender immediate notice by mail. Lender may make proof of loss if not made promptly by Borrower. Each insurance company concerned is hereby authorized and directed to make payment for such loss to Lender instead of to Borrower and Lender jointly. Insurance proceeds shall be applied to restoration or repair of the damaged Property, if the restoration or repair is economically feasible and Lender's security is not lessened. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied first to the reduction of any indebtedness under a Second Note and Second Security Instrument held by the Secretary on the Property and then to the reduction of the indebtedness under the Note and this Security Instrument. Any excess insurance proceeds over an amount required to pay all outstanding indebtedness under the Note and this Security Instrument shall be paid to the entity legally entitled thereto.

In the event of foreclosure of this Security Instrument or other transfer of title to the Property that extinguishes the indebtedness, all right, title and interest of Borrower in and to insurance policies in force shall pass to the purchaser.

**4. Occupancy, Preservation, Maintenance and Protection of the Property; Borrower's Loan Application; Leaseholds.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence after the execution of this Security Instrument and Borrower (or at least one Borrower, if initially more than one person are Borrowers) shall continue to occupy the Property as Borrower's principal residence for the term of the Security Instrument. "Principal residence" shall have the same meaning as in the Loan Agreement.

Borrower shall not commit waste or destroy, damage or substantially change the Property or allow the Property to deteriorate, reasonable wear and tear excepted. Borrower shall also be in default if Borrower, during the loan application process, gave materially false or inaccurate information or statements to Lender (or failed to provide Lender with any material information) in connection with the loan evidenced by the Note, including, but not limited to, representations concerning Borrower's occupancy of the Property as a principal residence. If this Security Instrument is on a leasehold, Borrower shall comply with the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and fee title shall not be merged unless Lender agrees to the merger in writing.

**5. Charges to Borrower and Protection of Lender's Rights in the Property.** Borrower shall pay all governmental or municipal charges, fines and impositions that are not included in Paragraph 2. Borrower shall pay these obligations on time directly to the entity which is owed the payment. If failure to pay would adversely affect Lender's interest in the Property, upon Lender's request Borrower shall promptly furnish to Lender receipts evidencing these payments. Borrower shall promptly discharge any lien which has priority over this Security Instrument in the manner provided in Paragraph 12(c).

If Borrower fails to make these payments or the property charges required by Paragraph 2, or fails to perform any other covenants and agreements contained in this Security Instrument, or there is a legal proceeding that may significantly affect Lender's rights in the Property (such as a proceeding in bankruptcy, for condemnation or to enforce laws or regulations), then Lender may do and pay whatever is necessary to protect the value of the Property and Lender's rights in the Property, including payment of taxes, hazard insurance and other items mentioned in Paragraph 2.

To protect Lender's security in the Property, Lender shall advance and charge to Borrower all amounts due to the Secretary for the Mortgage Insurance Premium as defined in the Loan Agreement as well as all sums due to the loan servicer for servicing activities as defined in the Loan Agreement. Any amounts disbursed by Lender under this Paragraph shall become an additional debt of Borrower as provided for in the Loan Agreement and shall be secured by this Security Instrument.

**6. Inspection.** Lender or its agent may enter on, inspect or make appraisals of the Property in a reasonable manner and at reasonable times provided that Lender shall give the Borrower notice prior to any inspection or appraisal specifying a purpose for the inspection or appraisal which must be related to Lender's interest in the Property. If the Property is vacant or abandoned or the loan is in default, Lender may take reasonable action to protect and preserve such vacant or abandoned Property without notice to

HECM First Mortgage

the Borrower.

**7. Condemnation.** The proceeds of any award or claim for damages, direct or consequential, in connection with any condemnation, or other taking of any part of the Property, or for conveyance in place of condemnation shall be paid to Lender. The proceeds shall be applied first to the reduction of any indebtedness under a Second Note and Second Security Instrument held by the Secretary on the Property, and then to the reduction of the indebtedness under the Note and this Security Instrument. Any excess proceeds over an amount required to pay all outstanding indebtedness under the Note and this Security Instrument shall be paid to the entity legally entitled thereto.

**8. Fees.** Lender may collect fees and charges authorized by the Secretary.

**9. Grounds for Acceleration of Debt.**

    **(a) Due and Payable.** Lender may require immediate payment-in-full of all sums secured by this Security Instrument if:

        (i) A Borrower dies and the Property is not the principal residence of at least one surviving Borrower; or

        (ii) All of a Borrower's title in the Property (or his or her beneficial interest in a trust owning all or part of the Property) is sold or otherwise transferred and no other Borrower retains title to the Property in fee simple or retains a leasehold under a lease for not less than 99 years which is renewable or a lease having a remaining period of not less than 50 years beyond the date of the 100th birthday of the youngest Borrower or retains a life estate (or retaining a beneficial interest in a trust with such an interest in the Property).

    **(b) Due and Payable with Secretary Approval.** Lender may require immediate payment-in-full of all sums secured by this Security Instrument, upon approval of the Secretary, if:

        (i) The Property ceases to be the principal residence of a Borrower for reasons other than death and the Property is not the principal residence of at least one other Borrower; or

        (ii) For a period of longer than 12 consecutive months, a Borrower fails to occupy the Property because of physical or mental illness and the Property is not the principal residence of at least one other Borrower; or

        (iii) An obligation of the Borrower under this Security Instrument is not performed.

    **(c) Notice to Lender.** Borrower shall notify Lender whenever any of the events listed in this Paragraph 9 (a)(ii) and (b) occur.

    **(d) Notice to Secretary and Borrower.** Lender shall notify the Secretary and Borrower whenever the loan becomes due and payable under Paragraph 9 (a)(ii) and (b). Lender shall not have the right to commence foreclosure until Borrower has had 30 days after notice to either:

        (i) Correct the matter which resulted in the Security Instrument coming due and payable; or

        (ii) Pay the balance in full; or

        (iii) Sell the Property for the lesser of the balance or 95% of the appraised value and apply the net proceeds of the sale toward the balance; or

        (iv) Provide the Lender with a deed-in-lieu of foreclosure.

    **(e) Trusts.** Conveyance of a Borrower's interest in the Property to a trust which meets the requirements of the Secretary, or conveyance of a trust's interests in the Property to a Borrower, shall not be considered a conveyance for purposes of this Paragraph 9. A trust shall not be considered an occupant or be considered as having a principal residence for purposes of this Paragraph 9.

    **(f) Mortgage Not Insured.** Borrower agrees that should this Security Instrument and the Note not be eligible for insurance under the National Housing Act within eight (8) months from the date hereof, if permitted by applicable law Lender may, at its option, require immediate payment-in-full of all sums secured by this Security Instrument. A written statement of any authorized agent of the Secretary dated subsequent to eight (8) months from the date hereof, declining to insure this Security Instrument and the Note, shall be deemed conclusive proof of such ineligibility. Notwithstanding the foregoing, this option may not be exercised by Lender when the unavailability of insurance is solely due to Lender's failure to remit a mortgage insurance premium to the Secretary.

**10. No Deficiency Judgments.** Borrower shall have no personal liability for payment of the debt secured by this Security Instrument. Lender may enforce the debt only through sale of the Property.

HECM First Mortgage

Lender shall not be permitted to obtain a deficiency judgment against Borrower if the Security Instrument is foreclosed. If this Security Instrument is assigned to the Secretary upon demand by the Secretary, Borrower shall not be liable for any difference between the mortgage insurance benefits paid to Lender and the outstanding indebtedness, including accrued interest, owed by Borrower at the time of the assignment.

**11. Reinstatement.** Borrower has a right to be reinstated if Lender has required immediate payment-in-full. This right applies even after foreclosure proceedings are instituted. To reinstate this Security Instrument, Borrower shall correct the condition which resulted in the requirement for immediate payment-in-full. Foreclosure costs and reasonable and customary attorney's fees and expenses properly associated with the foreclosure proceeding shall be added to the principal balance. Upon reinstatement by Borrower, this Security Instrument and the obligations that it secures shall remain in effect as if Lender had not required immediate payment-in-full. However, Lender is not required to permit reinstatement if: (i) Lender has accepted reinstatement after the commencement of foreclosure proceedings within two years immediately preceding the commencement of a current foreclosure proceeding, (ii) reinstatement will preclude foreclosure on different grounds in the future, or (iii) reinstatement will adversely affect the priority of the Security Instrument.

**12. Lien Status.**

    **(a) Modification.**

        Borrower agrees to extend this Security Instrument in accordance with this Paragraph 12(a). If Lender determines that the original lien status of the Security Instrument is jeopardized under state law (including but not limited to situations where the amount secured by the Security Instrument equals or exceeds the maximum principal amount stated or the maximum period under which loan advances retain the same lien priority initially granted to loan advances has expired) and state law permits the original lien status to be maintained for future loan advances through the execution and recordation of one or more documents, then Lender shall obtain title evidence at Borrower's expense. If the title evidence indicates that the property is not encumbered by any liens (except this Security Instrument, the Second Security Instrument described in Paragraph 13(a) and any subordinate liens that the Lender determines will also be subordinate to any future loan advances), Lender shall request the Borrower to execute any documents necessary to protect the lien status of future loan advances. Borrower agrees to execute such documents. If state law does not permit the original lien status to be extended to future loan advances, Borrower will be deemed to have failed to have performed an obligation under this Security Instrument.

    **(b) Tax Deferral Programs.**

        Borrower shall not participate in a real estate tax deferral program, if any liens created by the tax deferral are not subordinate to this Security Instrument.

    **(c) Prior Liens.**

        Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender; (b) contests in good faith the lien by, or defends against enforcement of the lien in, legal proceedings which in the Lender's opinion operate to prevent the enforcement of the lien or forfeiture of any part of the Property; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to all amounts secured by this Security Instrument. If Lender determines that any part of the Property is subject to a lien which may attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Borrower shall satisfy the lien or take one or more of the actions set forth above within 10 days of the giving of notice.

**13. Relationship to Second Security Instrument.**

    **(a) Second Security Instrument.** In order to secure payments which the Secretary may make to or on behalf of Borrower pursuant to Section 255(i)(1)(A) of the National Housing Act and the Loan Agreement, the Secretary has required Borrower to execute a Second Note and a Second Security Instrument on the Property.

    **(b) Relationship of First and Second Security Instruments.** Payments made by the Secretary shall not be included in the debt under the Note unless:

        (i) This Security Instrument is assigned to the Secretary; or

        (ii) The Secretary accepts reimbursement by the Lender for all payments made by the Secretary.

        If the circumstances described in (i) or (ii) occur, then all payments by the Secretary,

including interest on the payments, but excluding late charges paid by the Secretary, shall be included in the debt under the Note.

**(c) Effect on Borrower.** Where there is no assignment or reimbursement as described in (b)(i) or (ii) and the Secretary makes payments to Borrower, then Borrower shall not:

(i) Be required to pay amounts owed under the Note, or pay any rents and revenues of the Property under Paragraph 19 to Lender or a receiver of the Property, until the Secretary has required payment-in-full of all outstanding principal and accrued interest under the Second Note; or

(ii) Be obligated to pay interest or shared appreciation under the Note at any time, whether accrued before or after the payments by the Secretary, and whether or not accrued interest has been included in the principal balance under the Note.

**(d) No Duty of the Secretary.** The Secretary has no duty to Lender to enforce covenants of the Second Security Instrument or to take actions to preserve the value of the Property, even though Lender may be unable to collect amounts owed under the Note because of restrictions in this Paragraph 13.

**14. Forbearance by Lender Not a Waiver.** Any forbearance by Lender in exercising any right or remedy shall not be a waiver of or preclude the exercise of any right or remedy.

**15. Successors and Assigns Bound; Joint and Several Liability.** The covenants and agreements of this Security Instrument shall bind and benefit the successors and assigns of Lender. Borrower may not assign any rights or obligations under this Security Instrument or under the Note, except to a trust that meets the requirements of the Secretary. Borrower's covenants and agreements shall be joint and several.

**16. Notices.** Any notice to Borrower provided for in this Security Instrument shall be given by delivering it or by mailing it by first class mail unless applicable law requires use of another method. The notice shall be directed to the Property Address or any other address all Borrowers jointly designate. Any notice to Lender shall be given by first class mail to Lender's address stated herein or any address Lender designates by notice to Borrower. Any notice provided for in this Security Instrument shall be deemed to have been given to Borrower or Lender when given as provided in this Paragraph 16.

**17. Governing Law; Severability.** This Security Instrument shall be governed by Federal law and the law of the jurisdiction in which the Property is located. In the event that any provision or clause of this Security Instrument or the Note conflicts with applicable law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision. To this end the provisions of this Security Instrument and the Note are declared to be severable.

**18. Borrower's Copy.** Borrower shall be given one conformed copy of the Note and this Security Instrument.

NON-UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**19. Assignment of Rents.** Borrower unconditionally assigns and transfers to Lender all the rents and revenues of the Property. Borrower authorizes Lender or Lender's agents to collect the rents and revenues and hereby directs each tenant of the Property to pay the rents to Lender or Lender's agents. However, prior to Lender's notice to Borrower of Borrower's breach of any covenant or agreement in the Security Instrument, Borrower shall collect and receive all rents and revenues of the Property as trustee for the benefit of Lender and Borrower. This assignment of rents constitutes an absolute assignment and not an assignment for additional security only.

If Lender gives notice of breach to Borrower: (a) all rents received by Borrower shall be held by Borrower as trustee for benefit of Lender only, to be applied to the sums secured by this Security Instrument; (b) Lender shall be entitled to collect and receive all of the rents of the Property; and (c) each tenant of the Property shall pay all rents due and unpaid to Lender or Lender's agent on Lender's written demand to the tenant.

Borrower has not executed any prior assignment of the rents and has not and will not perform any act that would prevent Lender from exercising its rights under this Paragraph 19.

Lender shall not be required to enter upon, take control of or maintain the Property before or after giving notice of breach to Borrower. However, Lender or a judicially appointed receiver may do so at any time there is a breach. Any application of rents shall not cure or waive any default or invalidate any other right or remedy of Lender. This assignment of rents of the Property shall terminate when the debt secured by this Security Instrument is paid in full.

HECM First Mortgage

**20. Foreclosure Procedure.** If Lender requires immediate payment-in-full under Paragraph 9, Lender may foreclose this Security Instrument by judicial proceeding.  Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Paragraph 20, including, but not limited to, attorneys' fees and costs of title evidence.

**21. Lien Priority.** The full amount secured by this Security Instrument shall have the same priority over any other liens on the Property as if the full amount had been disbursed on the date the initial disbursement was made, regardless of the actual date of any disbursement. The amount secured by this Security Instrument shall include all direct payments by Lender to Borrower and all other loan advances permitted by this Security Instrument for any purpose. This lien priority shall apply notwithstanding any State constitution, law or regulation, except that this lien priority shall not affect the priority of any liens for unpaid State or local governmental unit special assessments or taxes.

**22. Adjustable-Rate Feature.** Under the Note, the initial stated interest rate of **3.368%** which accrues on the unpaid principal balance ("Initial Interest Rate") is subject to change, as described below. When the interest rate changes, the new adjusted interest rate will be applied to the total outstanding principal balance. Each adjustment to the interest rate will be based upon the average of interbank offered rates for one-month U.S. dollar denominated deposits in the London Market ("LIBOR"), as published in The Wall Street Journal ("Index") plus a margin.  If the Index is no longer available, Lender will be required to use any index prescribed by the Department of Housing and Urban Development. Lender will give Borrower notice of new index.

Lender will perform the calculations described below to determine the new adjusted interest rate. The interest rate may change on **August 1, 2009** and **on the first day of each succeeding month.**  "Change Date" means each date in which the interest rate could change.

The value of the Index will be determined, using the most recent Index figure available thirty (30) days before the Change Date ("Current Index"). Before each Change Date, the new interest rate will be calculated by adding a margin to the Current Index. The sum of the margin plus the Current Index will be called the "Calculated Interest Rate" for each Change Date. The Calculated Interest Rate will be compared to the interest rate in effect immediately prior to the current Change Date (the "Existing Interest Rate").

The Calculated Interest Rate will never increase above **13.368%**

The Calculated Interest Rate will be adjusted if necessary to comply with the rate limitation(s) described above and will be in effect until the next Change Date. At any change date, if the Calculated Interest Rate equals the Existing Interest Rate, the interest rate will not change.

**23. Lender's Obligation to Discharge this Security Instrument.** When Lender has been paid all amounts due under the Note and under this Security Instrument, Lender will discharge this Security Instrument by delivering a certificate stating that this Security Instrument has been satisfied. Borrower will pay all costs for recording the discharge in the proper official records. Borrower agrees to pay a fee for the discharge of this Security Instrument, if Lender so requires. Lender may require Borrower to pay such a fee but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under applicable law.

**24. Agreements about New York Lien Law.** Borrower will receive all amounts lent by Lender subject to the trust fund provisions of Section 13 of the New York Lien Law. Borrower will: (A) hold all amounts which Borrower receives and which Borrower has a right to receive from Lender under the Note as a "trust fund"; and (B) use those amounts to pay for "Cost of Improvement" (as defined in Section 13 of the New York Lien Law)  before Borrower uses them for any other purpose. Borrower acknowledges that the fact that Borrower is holding those amounts as a "trust fund" means that for any building or other improvement located on the Property, Borrower has a special responsibility under the law to use the amount in the manner described in this Paragraph 24.

**25. Mortgage Tax Notice.** The Property is or will be principally improved by a 1 or 2 family house or dwellings only.

**26. Riders to this Security Instrument.** If one or more riders are executed by Borrower and recorded together with this Security Instrument, the covenants of each such rider shall be incorporated into and shall amend and supplement the covenants and agreements of this Security Instrument as if the rider(s) were a part of this Security Instrument. [Check applicable box(es).]

☐ Condominium Rider          ☐ Planned Unit Development Rider

☐ Other [Specify]

BY SIGNING BELOW, Borrower accepts and agrees to the terms contained in this Security Instrument and in any rider(s) executed by Borrower and recorded with it.

_____ (SEAL)    _____
Richard Besner                                   Date

_____ [Space Below This Line For Acknowledgment] _____

STATE OF NEW YORK
COUNTY OF _Richmond_      SS:

On the ____15th____ day of ____May_____ in the year _2009_, before me, the

undersigned, a Notary Public in and for said State, personally appeared _____

_____ _Richard  Besner_____,

personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s)

whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they

executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument,

_____
Notary Public

My commission expires: _____

Nicole J. McCarthy
Notary Public, State of New York
No. 01MC6002339
Qualified in Richmond County
Commission Expires March 29, 2011

HECM First Mortgage

**EXHIBIT A**

Exhibit A to the Mortgage made on **May 15, 2009**, by **Richard Besner** ("Borrower") to **1st Mariner Bank** ("Lender"). The Property is located in the county of **RICHMOND**, state of **New York**, described as follows:

**Description of Property**

LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF

## Stewart Title Insurance Company

### Schedule A Description

Title No:  NMR-09-13439

ALL that certain plot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in the Borough of Staten Island, County of Richmond, City and State of New York, being described as follows:

BEGINNING at a point on the Easterly side of Ludlow Street, a distance of 118 feet Southerly from the point formed by the intersection of the Southerly side of McArthur Avenue with the Easterly side of Ludlow Street;

RUNNING THENCE North 80 degrees 23 minutes 13 seconds East 100 feet to a point;

RUNNING THENCE South 9 degrees 36 minutes 47 seconds East 30 feet to a point;

RUNNING THENCE South 80 degrees 23 minutes 13 seconds West and part of the distance through a party wall 100 feet to a point;

RUNNING THENCE Northerly along the Easterly side of Ludlow Street North 9 degrees 36 minutes 47 seconds West 30 feet to the point or place of BEGINNING.



# MORTGAGE TAX AFFIDAVIT FOR A REVERSE MORTGAGE

State of New York                                    }
                                                     } ss.
County of **RICHMOND**          }

_____ being duly sworn, deposes and says:

1.    I am the _____ of **1st Mariner Bank** (mortgagee), the owner and holder of the mortgage which is being submitted for recording. I am familiar with the facts set forth herein.

2.    On **May 15, 2009, Richard Besner** executed and delivered to **1st Mariner Bank** a mortgage for property located at and known as Tax Lot _____, in Block _____ on the Tax Map of _____ the of _____, County of **RICHMOND**, State of New York in the amount of **$765,000.00**.

3.    The mortgage is a reverse mortgage that conforms to the applicable federal law and regulations under 12 USC § 1715z-20 and, therefore, is exempt pursuant to section 280(4) (or, if applicable, section 280-a(4)) of the Real Property Law and exempt from the mortgage recording taxes pursuant to section 252-a.2 of the Tax Law.

4.    A second mortgage referencing the Home Equity Conversion Loan Agreement and naming the Secretary of Housing and Urban Development as mortgagee is recorded at the same time the reverse mortgage is recorded.

5.    The mortgage is on real property improved by a one-to-four family dwelling or condominium unit.

6.    The deponent respectfully requests that this reverse mortgage tendered herewith for recording be declared exempt from taxation pursuant to the provisions of Section 252-a.2 of Article 11 of the Tax Laws of the State of New York.

_____
Signature of Deponent

Sworn to before me this _____ day of _____ .

_____
Notary Public

My Commission Expires:

MortgageTaxAffidavit_NY

## AFFIDAVIT UNDER SECTION 255 TAX LAW
### ( Reverse Mortgage )

| | |
|---|---|
| STATE OF NEW YORK | ) |
| | : SS.: |
| COUNTY OF RICHMOND | ) |

**Richard Besner**

being duly sworn, deposes and says that he/she is one of the mortgagors under the hereinafter described mortgage, and he/she is familiar with the facts set forth herein.

That a certain primary mortgage was made by: **Richard Besner** to **1st Mariner Bank** which mortgage was dated **May 15, 2009**, and Intended to be recorded in the Office of the clerk of the county of **RICHMOND** in the principal sum of **$765,000.00** and upon which a mortgage tax in the sum of $0.00 is being paid, upon which mortgage there is now due and owing the full principal sum stated above.

That a second mortgage was made by: **Richard Besner** to THE SECRETARY OF HOUSING AND URBAN EVELOPMENT, which mortgage is dated **May 15, 2009** and is being presented simultaneously herewith for recording in the same principal sum of **$765,000.00**.

That said second mortgage secures the same debt and is given as collateral security for the guaranty made by THE SECRETARY OF HOUSING AND URBAN DEVELOPMENT.

That said second mortgage accordingly, does not create or secure any new or further indebtedness or obligation other than the principal indebtedness or obligation secured by the primary mortgage.

That exemption from further tax is claimed under Section 255 Article 11 of the Tax Law.

_____ (SEAL)    _____ 5/15/09
Richard Besner                     Date

Sworn to before me this
15 th day of May, 2009             _____
                                   Notary Public

My Commission Expires:

Nicole J. McCarthy
Notary Public, State of New York
No. 01MC6022329
Qualified in Richmond County
Commission Expires March 29, 2011

MortgageTaxAffidavit_NY

*Copy*

Record and Return to:     1st Mariner Bank
1501 S. Clinton Street, Suite 210
Baltimore, MD 21224

This instrument prepared by:     1st Mariner Bank
1501 S. Clinton Street, Suite 210
Baltimore, MD 21224

_____ [Space Above This Line For Recording Data] _____

**State of NEW YORK**     FHA Case No. 374-5237509-952
Loan No. **1M01925**

# ADJUSTABLE RATE
# HOME EQUITY CONVERSION SECOND MORTGAGE

THIS MORTGAGE ("Security Instrument" or "Second Security Instrument") is given on **May 15, 2009**. The mortgagor is **Richard Besner**, whose address is **15 LUDLOW STREET, STATEN ISLAND, New York 10312** ("Borrower"). This Security Instrument is given to the Secretary of Housing and Urban Development, whose address is 451 Seventh Street, SW, Washington, DC 20410 ("Lender" or "Secretary"). Borrower has agreed to repay to Lender amounts which Lender is obligated to advance, including future advances, under the terms of a Home Equity Conversion Loan Agreement dated the same date as this Security Instrument ("Loan Agreement"). The agreement to repay is evidenced by Borrower's Adjustable-Rate Note dated the same date as this Security Instrument ("Second Note"). This Security Instrument secures to Lender: (a) the repayment of the debt evidenced by the Second Note, with interest at a rate subject to adjustment (interest), and all renewals, extensions and modifications of the Note, up to a maximum principal amount of **Seven Hundred Sixty Five Thousand Dollars and Zero Cents (U.S. $765,000.00** ); (b) the payment of all other sums, with interest, advanced under paragraph 5 to protect the security of this Security Instrument or otherwise due under the terms of this Security Instrument; and (c) the performance of Borrower's covenants and agreements under this Security Instrument and the Second Note. The full debt, including amounts described in (a), (b), and (c) above, if not due earlier, is due and payable on **April 6, 2097**. For this purpose, Borrower does hereby mortgage, grant and convey to Lender, with power of sale, the following described property located in **RICHMOND** County, NEW YORK:

**See legal description as Exhibit A attached hereto and made a part hereof for all intents and purposes**

which has the address of
**15 LUDLOW STREET, STATEN ISLAND, New York 10312**, ("Property Address")

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, rights, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is only encumbered by a First Security Instrument given by Borrower and dated the same date as this Security Instrument ("First Security Instrument"). Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal and Interest.** Borrower shall pay when due the principal of, and interest on,

the debt evidenced by the Second Note.

**2. Payment of Property Charges.** Borrower shall pay all property charges consisting of taxes, ground rents, flood and hazard insurance premiums, and special assessments in a timely manner, and shall provide evidence of payment to Lender, unless Lender pays property charges by withholding funds from monthly payments due to the Borrower or by charging such payments to a line of credit as provided for in the Loan Agreement. Lender may require Borrower to pay specified property charges directly to the party owed payment even though Lender pays other property charges as provided in this Paragraph.

**3. Fire, Flood and Other Hazard Insurance.** Borrower shall insure all improvements on the Property, whether now in existence or subsequently erected, against any hazards, casualties, and contingencies, including fire. This insurance shall be maintained in the amounts, to the extent and for the periods required by Lender. Borrower shall also insure all improvements on the Property, whether now in existence or subsequently erected, against loss by floods to the extent required by Lender. The insurance policies and any renewals shall be held by Lender and shall include loss payable clauses in favor of, and in a form acceptable to, Lender.

In the event of loss, Borrower shall give Lender immediate notice by mail. Lender may make proof of loss if not made promptly by Borrower. Each insurance company concerned is hereby authorized and directed to make payment for such loss to Lender, instead of to Borrower and Lender jointly. Insurance proceeds shall be applied to restoration or repair of the damaged Property, if the restoration or repair is economically feasible and Lender's security is not lessened. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied first to the reduction of any indebtedness under the Second Note and this Security Instrument. Any excess insurance proceeds over an amount required to pay all outstanding indebtedness under the Second Note and this Security Instrument shall be paid to the entity legally entitled thereto.

In the event of foreclosure of this Security Instrument or other transfer of title to the Property that extinguishes the indebtedness, all right, title and interest of Borrower in and to insurance policies in force shall pass to the purchaser.

**4. Occupancy, Preservation, Maintenance and Protection of the Property; Borrower's Loan Application; Leaseholds.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence after the execution of this Security Instrument and Borrower (or at least one Borrower, if initially more than one person are Borrowers) and shall continue to occupy the Property as Borrower's principal residence for the term of the Security Instrument. "Principal residence" shall have the same meaning as in the Loan Agreement.

Borrower shall not commit waste or destroy, damage or substantially change the Property or allow the Property to deteriorate, reasonable wear and tear excepted. Borrower shall also be in default if Borrower, during the loan application process, gave materially false or inaccurate information or statements to Lender (or failed to provide Lender with any material information) in connection with the loan evidenced by the Note, including, but not limited to, representations concerning Borrower's occupancy of the Property as a principal residence. If this Security Instrument is on a leasehold, Borrower shall comply with the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and fee title shall not be merged unless Lender agrees to the merger in writing.

**5. Charges to Borrower and Protection of Lender's Rights in the Property.** Borrower shall pay all governmental or municipal charges, fines and impositions that are not included in Paragraph 2. Borrower shall pay these obligations on time directly to the entity which is owed the payment. If failure to pay would adversely affect Lender's interest in the Property, upon Lender's request Borrower shall promptly furnish to Lender receipts evidencing these payments. Borrower shall promptly discharge any lien which has priority over this Security Instrument in the manner provided in Paragraph 12(c).

If Borrower fails to make these payments or the property charges required by Paragraph 2, or fails to perform any other covenants and agreements contained in this Security Instrument, or there is a legal proceeding that may significantly affect Lender's rights in the Property (such as a proceeding in bankruptcy, for condemnation or to enforce laws or regulations), then Lender may do and pay whatever is necessary to protect the value of the Property and Lender's rights in the Property, including payment of taxes, hazard insurance and other items mentioned in Paragraph 2.

To protect Lender's security in the Property, Lender shall advance and charge to Borrower all amounts due to the Secretary for the Mortgage Insurance Premium as defined in the Loan Agreement as well as all sums due to the loan servicer for servicing activities as defined in the Loan Agreement. Any amounts disbursed by Lender under this Paragraph shall become an additional debt of Borrower as provided for in the Loan Agreement and shall be secured by this Security Instrument.

**6. Inspection.** Lender or its agent may enter on, inspect or make appraisals of the Property in a reasonable manner and at reasonable times provided that Lender shall give the Borrower notice prior to any inspection or appraisal specifying a purpose for the inspection or appraisal which must be related to Lender's interest in the Property. If the Property is vacant or abandoned or the loan is in default, Lender may take reasonable action to protect and preserve such vacant or abandoned Property without notice to the Borrower.

**7. Condemnation.** The proceeds of any award or claim for damages, direct or consequential, in connection with any condemnation or other taking of any part of the Property, or for conveyance in place of condemnation, shall be paid to Lender. The proceeds shall be applied first to the reduction of any indebtedness under the Second Note and this Security Instrument. Any excess proceeds over an amount required to pay all outstanding indebtedness under the Second Note and this Security Instrument shall be paid to the entity legally entitled thereto.

**8. Fees.** Lender may collect fees and charges authorized by the Secretary for the Home Equity Conversion Mortgage Insurance Program.

**9. Grounds for Acceleration of Debt.**

(a) **Due and Payable.** Lender may require payment-in-full of all sums secured by this Security Instrument if:

(i) A Borrower dies and the Property is not the principal residence of at least one surviving Borrower; or

(ii) All of a Borrower's title in the Property (or his or her beneficial interest in a trust owning all or part of the Property) is sold or otherwise transferred and no other Borrower retains title to the Property in fee simple or retains a leasehold under a lease for not less than 99 years which is renewable or a lease having a remaining period of not less than 50 years beyond the date of the 100th birthday of the youngest Borrower or retains a life estate (or retaining a beneficial interest in a trust with such an interest in the Property); or

(iii) The Property ceases to be the principal residence of a Borrower for reasons other than death and the Property is not the principal residence of at least one other Borrower; or

(iv) For a period of longer than 12 consecutive months, a Borrower fails to occupy the Property because of physical or mental illness and the Property is not the principal residence of at least one other Borrower; or

(v) An obligation of the Borrower under this Security Instrument is not performed.

(b) **Notice to Lender.** Borrower shall notify the Lender whenever any of the events listed in Paragraph 9(a)(ii)-(v) occur.

(c) **Notice to Borrower.** Lender shall notify Borrower whenever the loan becomes due and payable under Paragraph 9(a)(ii)-(v). Lender shall not have the right to commence foreclosure until Borrower has had 30 days after notice to either:

(i) Correct the matter which resulted in the Security Instrument coming due and payable; or

(ii) Pay the balance in full; or

(iii) Sell the Property for the lesser of the balance or 95% of the appraised value and apply the net proceeds of the sale toward the balance; or

(iv) Provide the Lender with a deed-in-lieu of foreclosure.

(d) **Trusts.** Conveyance of a Borrower's interest in the Property to a trust which meets the requirements of the Secretary, or conveyance of a trust's interests in the Property to a Borrower, shall not be considered a conveyance for purposes of this Paragraph 9. A trust shall not be considered an occupant or be considered as having a principal residence for purposes of this Paragraph 9.

**10. No Deficiency Judgments.** Borrower shall have no personal liability for payment of the debt secured by this Security Instrument. Lender may enforce the debt only through sale of the Property. Lender shall not be permitted to obtain a deficiency judgment against Borrower if the Security Instrument is foreclosed.

**11. Reinstatement.** Borrower has a right to be reinstated if Lender has required immediate payment-in-full. This right applies even after foreclosure proceedings are instituted. To reinstate this Security Instrument, Borrower shall correct the condition which resulted in the requirement for immediate payment-in-full. Foreclosure costs and reasonable and customary attorney's fees and expenses properly associated with the foreclosure proceeding shall be added to the principal balance. Upon reinstatement by Borrower, this Security Instrument and the obligations that it secures shall remain in effect as if Lender had not required immediate payment-in-full. However, Lender is not required to permit reinstatement if: (i) Lender has accepted reinstatement after the commencement of foreclosure proceedings within two years immediately preceding the commencement of a current foreclosure proceeding, (ii) reinstatement will preclude foreclosure on different grounds in the future, or (iii) reinstatement will adversely affect the priority of the Security Instrument.

**12. Lien Status.**

**(a) Modification.**

Borrower agrees to extend this Security Instrument in accordance with this Paragraph 12(a). If Lender determines that the original lien status of the Security Instrument is jeopardized under state law (including but not limited to situations where the amount secured by the Security Instrument equals or exceeds the maximum principal amount stated or the maximum period under which loan advances retain the same lien priority initially granted to loan advances has expired) and state law permits the original lien status to be maintained for future loan advances through the execution and recordation of one or more documents, then Lender shall obtain title evidence at Borrower's expense. If the title evidence indicates that the property is not encumbered by any liens (except the First Security Instrument described in Paragraph 13(a), this Second Security Instrument and any subordinate liens that the Lender determines will also be subordinate to any future loan advances), Lender shall request the Borrower to execute any documents necessary to protect the lien status of future loan advances. Borrower agrees to execute such documents. If state law does not permit the original lien status to be extended to future loan advances, Borrower will be deemed to have failed to have performed an obligation under this Security Instrument.

**(b) Tax Deferral Programs.**

Borrower shall not participate in a real estate tax deferral program, if any liens created by the tax deferral are not subordinate to this Security Instrument.

**(c) Prior Liens.**

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender; (b) contests in good faith the lien by, or defends against enforcement of the lien in, legal proceedings which in the Lender's opinion operate to prevent the enforcement of the lien or forfeiture of any part of the Property; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to all amounts secured by this Security Instrument. If Lender determines that any part of the Property is subject to a lien which may attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Borrower shall satisfy the lien or take one or more of the actions set forth above within 10 days of the giving of notice.

**13. Relationship to First Security Instrument.**

**(a) Second Security Instrument.** In order to secure payments which the Secretary may make to or on behalf of Borrower pursuant to Section 255(i)(1)(A) of the National Housing Act and the Loan Agreement, the Secretary has required Borrower to execute a Second Note and this Second Security Instrument. Borrower also has executed a First Note and First Security Instrument.

**(b) Relationship of First and Second Security Instruments.** Payments made by the Secretary shall not be included in the debt under the First Note unless:

(i) The First Security Instrument is assigned to the Secretary; or

(ii) The Secretary accepts reimbursement by the holder of the First Note for all payments made by the Secretary.

If the circumstances described in (i) or (ii) occur, then all payments by the Secretary, including interest on the payments but excluding late charges paid by the Secretary, shall be included in the debt under the First Note.

**(c) Effect on Borrower.** Where there is no assignment or reimbursement as described in (b)(i) or (ii) and the Secretary makes payments to Borrower, then Borrower shall not:

(i) Be required to pay amounts owed under the First Note, or pay any rents and revenues of the Property under Paragraph 19 to the holder of the First Note or a receiver of the Property, until the Secretary has required payment-in-full of all outstanding principal and accrued interest under the Second Note; or

(ii) Be obligated to pay interest or shared appreciation under the First Note at any time, whether accrued before or after the payments by the Secretary, and whether or not accrued interest has been included in the principal balance under the First Note.

**(d) No Duty of the Secretary.** The Secretary has no duty to the holder of the First Note to enforce covenants of the Second Security Instrument or to take actions to preserve the value of the Property, even though the holder of the First Note may be unable to collect amounts owed under

the First Note because of restrictions in this Paragraph 13.

**(e) Restrictions on Enforcement.** Notwithstanding anything else in this Security Instrument, the Borrower shall not be obligated to comply with the covenants hereof, and Paragraph 19 shall have no force and effect, whenever there is no outstanding balance under the Second Note.

**14. Forbearance by Lender Not a Waiver.** Any forbearance by Lender in exercising any right or remedy shall not be a waiver of or preclude the exercise of any right or remedy.

**15. Successors and Assigns Bound; Joint and Several Liability.** Borrower may not assign any rights or obligations under this Security Instrument or the Second Note, except to a trust that meets the requirements of the Secretary. Borrower's covenants and agreements shall be joint and several.

**16. Notices.** Any notice to Borrower provided for in this Security Instrument shall be given by delivering it or by mailing it by first class mail unless applicable law requires use of another method. The notice shall be directed to the Property Address or any other address all Borrowers jointly designate. Any notice to the Secretary shall be given by first class mail to the HUD Field Office with jurisdiction over the Property or any other address designated by the Secretary. Any notice provided for in this Security Instrument shall be deemed to have been given to Borrower or Lender when given as provided in this Paragraph 16.

**17. Governing Law; Severability.** This Security Instrument shall be governed by Federal law and the law of the jurisdiction in which the Property is located. In the event that any provision or clause of this Security Instrument or the Second Note conflicts with applicable law, such conflict shall not affect other provisions of this Security Instrument or the Second Note which can be given effect without the conflicting provision. To this end the provisions of this Security Instrument and the Second Note are declared to be severable.

**18. Borrower's Copy.** Borrower shall be given one conformed copy of the Second Note and this Security Instrument.

NON-UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**19. Assignment of Rents.** Borrower unconditionally assigns and transfers to Lender all the rents and revenues of the Property. Borrower authorizes Lender or Lender's agents to collect the rents and revenues and hereby directs each tenant of the Property to pay the rents to Lender or Lender's agents. However, prior to Lender's notice to Borrower of Borrower's breach of any covenant or agreement in the Security Instrument, Borrower shall collect and receive all rents and revenues of the Property as trustee for the benefit of Lender and Borrower. This assignment of rents constitutes an absolute assignment and not an assignment for additional security only.

If Lender gives notice of breach to Borrower: (a) all rents received by Borrower shall be held by Borrower as trustee for benefit of Lender only, to be applied to the sums secured by this Security Instrument; (b) Lender shall be entitled to collect and receive all of the rents of the Property; and (c) each tenant of the Property shall pay all rents due and unpaid to Lender or Lender's agent on Lender's written demand to the tenant.

Borrower has not executed any prior assignment of the rents and has not and will not perform any act that would prevent Lender from exercising its rights under this Paragraph 19, except as provided in the First Security Instrument .

Lender shall not be required to enter upon, take control of or maintain the Property before or after giving notice of breach to Borrower. However, Lender or a judicially appointed receiver may do so at any time there is a breach. Any application of rents shall not cure or waive any default or invalidate any other right or remedy of Lender. This assignment of rents of the Property shall terminate when the debt secured by this Security Instrument is paid in full.

**20. Foreclosure Procedure. If Lender requires immediate payment-in-full under Paragraph 9, Lender may foreclose this Security Instrument by judicial proceeding.  Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Paragraph 20, including, but not limited to, attorneys' fees and costs of title evidence.**

**21. Lien Priority.** The full amount secured by this Security Instrument shall have a lien priority subordinate only to the full amount secured by the First Security Instrument.

**22. Adjustable-Rate Feature.** Under the Note, the initial stated interest rate of **3.368%** which accrues on the unpaid principal balance ("Initial Interest Rate") is subject to change, as described below. When the interest rate changes, the new adjusted interest rate will be applied to the total outstanding principal balance. Each adjustment to the interest rate will be based upon the average of interbank offered rates for one-month U.S. dollar denominated deposits in the London Market ("LIBOR"), as published in The Wall Street Journal ("Index") plus a margin.  If the Index is no longer available, Lender will be required to use any index prescribed by the Department of Housing and Urban Development. Lender will give Borrower notice of new index.

Lender will perform the calculations described below to determine the new adjusted interest rate. The interest rate may change on **August 1, 2009** and **on the first day of each succeeding month.** "Change Date" means each date in which the interest rate could change.

The value of the Index will be determined, using the most recent Index figure available thirty (30) days before the Change Date ("Current Index"). Before each Change Date, the new interest rate will be calculated by adding a margin to the Current Index. The sum of the margin plus the Current Index will be called the "Calculated Interest Rate" for each Change Date. The Calculated Interest Rate will be compared to the interest rate in effect immediately prior to the current Change Date (the "Existing Interest Rate").

The Calculated Interest Rate will never increase above **13.368%**

The Calculated Interest Rate will be adjusted if necessary to comply with the rate limitation(s) described above and will be in effect until the next Change Date. At any change date, if the Calculated Interest Rate equals the Existing Interest Rate, the interest rate will not change.

**23. Lender's Obligation to Discharge this Security Instrument.** When Lender has been paid all amounts due under the Note and under this Security Instrument, Lender will discharge this Security Instrument by delivering a certificate stating that this Security Instrument has been satisfied. Borrower will pay all costs for recording the discharge in the proper official records. Borrower agrees to pay a fee for the discharge of this Security Instrument, if Lender so requires. Lender may require Borrower to pay such a fee but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under applicable law.

**24. Agreements about New York Lien Law.** Borrower will receive all amounts lent by Lender subject to the trust fund provisions of Section 13 of the New York Lien Law. Borrower will: (A) hold all amounts which Borrower receives and which Borrower has a right to receive from Lender under the Note as a "trust fund"; and (B) use those amounts to pay for "Cost of Improvement" (as defined in Section 13 of the New York Lien Law) before Borrower uses them for any other purpose. Borrower acknowledges that the fact that Borrower is holding those amounts as a "trust fund" means that for any building or other improvement located on the Property, Borrower has a special responsibility under the law to use the amount in the manner described in this Paragraph 24.

**25. Mortgage Tax Notice.** The Property is or will be principally improved by a 1 or 2 family house or dwellings only.

**26. Riders to this Security Instrument.** If one or more riders are executed by Borrower and recorded together with this Security Instrument, the covenants of each such rider shall be incorporated into and shall amend and supplement the covenants and agreements of this Security Instrument as if the rider(s) were a part of this Security Instrument. [Check applicable box(es).]

☐ Condominium Rider        ☐ Planned Unit Development Rider

☐ Other [Specify]

BY SIGNING BELOW, Borrower accepts and agrees to the terms contained in this Security Instrument and in any rider(s) executed by Borrower and recorded with it.

_____ (SEAL)        _____
Richard Besner                                 Date

_____ [Space Below This Line For Acknowledgment] _____

STATE OF NEW YORK

COUNTY OF *Richmond*                    SS:

On the ___*15th*___ day of ___*May*___ in the year *2009*, before me,

the undersigned, a Notary Public in and for said State, personally appeared _____

_____ *Richard Besner* ,

personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s)

whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they

executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument,

the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

Nicole J. McCarthy
Notary Public, State of New York
No. 01MC6022329
Qualified in Richmond County
Commission Expires March 29, 2011

_____
Notary Public

My commission expires: _____

## EXHIBIT A

Exhibit A to the Mortgage made on **May 15, 2009,** by **Richard Besner** ("Borrower") to the Secretary of Housing and Urban Development, and whose address is 451 Seventh Street, S.W., Washington, D.C. 20410, ("Lender" or "Secretary"). The Property is located in the county of **RICHMOND**, state of **New York,** described as follows:

### Description of Property

LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF

HECM Second Mortgage

# Stewart Title Insurance Company

Title No:   NMR-09-13439

## Schedule A Description

ALL that certain plot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in the Borough of Staten Island, County of Richmond, City and State of New York, being described as follows:

BEGINNING at a point on the Easterly side of Ludlow Street, a distance of 118 feet Southerly from the point formed by the intersection of the Southerly side of McArthur Avenue with the Easterly side of Ludlow Street;

RUNNING THENCE North 80 degrees 23 minutes 13 seconds East 100 feet to a point;

RUNNING THENCE South 9 degrees 36 minutes 47 seconds East 30 feet to a point;

RUNNING THENCE South 80 degrees 23 minutes 13 seconds West and part of the distance through a party wall 100 feet to a point;

RUNNING THENCE Northerly along the Easterly side of Ludlow Street North 9 degrees 36 minutes 47 seconds West 30 feet to the point or place of BEGINNING.



# MORTGAGE TAX AFFIDAVIT FOR A REVERSE MORTGAGE

State of New York         }
                        } ss.

County of **RICHMOND**     }

_____ being duly sworn, deposes and says:

1.     I am the _____ of **1st Mariner Bank** (mortgagee), the owner and holder of the mortgage which is being submitted for recording. I am familiar with the facts set forth herein.

2.     On **May 15, 2009, Richard Besner** executed and delivered to **1st Mariner Bank** a mortgage for property located at and known as Tax Lot _____, in Block _____ on the Tax Map of _____ the of _____, County of **RICHMOND**, State of New York in the amount of **$765,000.00**.

3.     The mortgage is a reverse mortgage that conforms to the applicable federal law and regulations under 12 USC § 1715z-20 and, therefore, is exempt pursuant to section 280(4) (or, if applicable, section 280-a(4)) of the Real Property Law and exempt from the mortgage recording taxes pursuant to section 252-a.2 of the Tax Law.

4.     A second mortgage referencing the Home Equity Conversion Loan Agreement and naming the Secretary of Housing and Urban Development as mortgagee is recorded at the same time the reverse mortgage is recorded.

5.     The mortgage is on real property improved by a one-to-four family dwelling or condominium unit.

6.     The deponent respectfully requests that this reverse mortgage tendered herewith for recording be declared exempt from taxation pursuant to the provisions of Section 252-a.2 of Article 11 of the Tax Laws of the State of New York.

_____
Signature of Deponent

Sworn to before me this _____ day of _____ .

_____
Notary Public

My Commission Expires:

MortgageTaxAffidavit_NY

## AFFIDAVIT UNDER SECTION 255 TAX LAW
### ( Reverse Mortgage )

STATE OF NEW YORK     )
                         : SS.:

COUNTY OF RICHMOND   )

**Richard Besner**

being duly sworn, deposes and says that he/she is one of the mortgagors under the hereinafter described mortgage, and he/she is familiar with the facts set forth herein.

That a certain primary mortgage was made by: **Richard Besner** to **1st Mariner Bank** which mortgage was dated **May 15, 2009**, and Intended to be recorded in the Office of the clerk of the county of **RICHMOND** in the principal sum of **$765,000.00** and upon which a mortgage tax in the sum of $0.00 is being paid, upon which mortgage there is now due and owing the full principal sum stated above.

That a second mortgage was made by: **Richard Besner** to THE SECRETARY OF HOUSING AND URBAN EVELOPMENT, which mortgage is dated **May 15, 2009** and is being presented simultaneously herewith for recording in the same principal sum of **$765,000.00**.

That said second mortgage secures the same debt and is given as collateral security for the guaranty made by THE SECRETARY OF HOUSING AND URBAN DEVELOPMENT.

That said second mortgage accordingly, does not create or secure any new or further indebtedness or obligation other than the principal indebtedness or obligation secured by the primary mortgage.

That exemption from further tax is claimed under Section 255 Article 11 of the Tax Law.

_____ (SEAL)     5/15/09
Richard Besner                            Date

Sworn to before me this
_15_th day of _May_ , 200_9_            _____
                                Notary Public

My Commission Expires:

Nicole J. McCarthy
Notary Public, State of New York
No. 01MC6022329
Qualified in Richmond County
Commission Expires March 29, 2011

                 MortgageTaxAffidavit_NY

Allonge for Note endorsement and copy of the Notes

## ALLONGE FOR NOTE ENDORSEMENT

BORROWERS:                    RICHARD BESNER

LOAN AMOUNT:                  $765,000.00

DATE OF NOTE:                 May 15, 2009

LOAN #:                       1111542252-00

PROPERTY ADDRESS:             15 LUDLOW STREET
                              STATEN ISLAND, NEW YORK
                              10312
                              RICHMOND COUNTY

PAY TO THE ORDER OF SUN WEST MORTGAGE COMPANY, INC., A CALIFORNIA CORPORATION WITHOUT RECOURSE,

1ST MARINER BANK

BY _____

State of NEW YORK

# ADJUSTABLE-RATE NOTE
## (Home Equity Conversion)

May 15, 2009

FHA Case No. 374-5237509-952
Loan No. 1M01925

**15 LUDLOW STREET, STATEN ISLAND, New York 10312** (Property Address)

## 1. DEFINITIONS
"Borrower" means each person signing at the end of this Note. "Lender" means **1st Mariner Bank** and its successors and assigns. "Secretary" means the Secretary of Housing and Urban Development or his or her authorized representatives.

## 2. BORROWER'S PROMISE TO PAY; INTEREST
In return for amounts to be advanced by Lender to or for the benefit of Borrower under the terms of a Home Equity Conversion Loan Agreement dated **May 15, 2009** ("Loan Agreement"), Borrower promises to pay to the order of Lender a principal amount equal to the sum of all Loan Advances made under the Loan Agreement with interest. All amounts advanced by Lender, plus interest, if not due earlier, are due and payable on **April 6, 2097**. Interest will be charged on unpaid principal at the rate of **Three AND Three Hundred Sixty Eight Thousandth** percent **(3.368%)** per year until the full amount of principal has been paid. The interest rate may change in accordance with Paragraph 5 of this Note. Accrued interest shall be added to the principal balance as a Loan Advance at the end of each month.

## 3. PROMISE TO PAY SECURED
Borrower's promise to pay is secured by a mortgage, deed of trust or similar security instrument that is dated the same date as this Note and called the "Security Instrument." That Security Instrument protects the Lender from losses which might result if Borrower defaults under this Note.

## 4. MANNER OF PAYMENT
### (A) Time
Borrower shall pay all outstanding principal and accrued interest to Lender upon receipt of a notice by Lender requiring immediate payment-in-full, as provided in Paragraph 7 of this Note.

### (B) Place
Payment shall be made at **1st Mariner Bank, 1501 S. Clinton Street, Suite 210, Baltimore, MD 21224** or any such other place as Lender may designate in writing by notice to Borrower.

### (C) Limitation of Liability
Borrower shall have no personal liability for payment of the debt. Lender shall enforce the debt only through sale of the Property covered by the Security Instrument ("Property"). If this Note is assigned to the Secretary, the Borrower shall not be liable for any difference between the mortgage insurance benefits paid to Lender and the outstanding indebtedness, including accrued interest, owed by Borrower at the time of the assignment.

## 5. INTEREST RATE CHANGES
### (A) Change Date
The interest rate may change on **August 1, 2009** and on the first day of each succeeding month. "Change Date" means each date on which the interest rate could change.

### (B) The Index
Beginning with the first Change Date, the interest rate will be based on an Index. The "Index" means the average of interbank offered rates for one-month U.S. dollar-denominated deposits in London market ("LIBOR"), as published in The Wall Street Journal, rounded to three digits to the right of the decimal point. The "Current Index" means the most recent Index figure available **30** days before the Change Date, and if the day that is **30** days before the Change Date is not a Sunday or Monday and not the first business day of the week, the Current Index will be the Index as published the first business day of that week. If the day that is **30** days before the Change Date is a Sunday or Monday and not the first business day of the week, the Current Index will be the Index as published the first business day of the immediately prior week. If the Index (as defined above) is no longer available, Lender will use as a new Index any index prescribed by the Secretary. Lender will give Borrower notice of the new Index.

### (C) Calculation of Interest Rate Changes
Before each Change Date, Lender will calculate a new interest rate by adding a margin of **Three AND Zero Hundredth** percentage points **(3.000%)** to the current Index. Subject to the limit stated in Paragraph 5(D) of this Note, this amount will be the new interest rate until the next Change Date.

HECM First Note

**(D) Limit on Interest Rate Changes**

The interest rate will never increase above **Thirteen AND Three Hundred Sixty Eight Thousandth percent (13.368%)**

**(E) Notice of Changes**

Lender will give notice to Borrower of any change in the interest rate. The notice must be given at least 25 days before the new interest rate takes effect, and must set forth (i) the date of the notice, (ii) the Change Date, (iii) the old interest rate, (iv) the new interest rate, (v) the Current Index and the date it was published, (vi) the method of calculating the adjusted interest rate, and (vii) any other information which may be required by law from time to time.

**(F) Effective Date of Changes**

A new interest rate calculated in accordance with paragraphs 5(C) and 5(D) of this Note will become effective on the Change Date, unless the Change Date occurs less than 25 days after Lender has given the required notice. If the interest rate calculated in accordance with Paragraphs 5(C) and 5(D) of this Note decreased, but Lender failed to give timely notice of the decrease and applied a higher rate than the rate which should have been stated in a timely notice, then Lender shall recalculate the principal balance owed under this Note so it does not reflect any excessive interest.

## 6. BORROWER'S RIGHT TO PREPAY

A Borrower has the right to pay the debt evidenced by this Note, in whole or in part, without charge or penalty. Any amount of debt prepaid will first be applied to reduce the principal balance of the Second Note described in Paragraph 11 of this Note and then to reduce the principal balance of this Note.

All prepayments of the principal balance shall be applied by Lender as follows:

First, to that portion of the principal balance representing aggregate payments for mortgage insurance premiums;

Second, to that portion of the principal balance representing aggregate payments for servicing fees;

Third, to that portion of the principal balance representing accrued interest due under the Note; and

Fourth, to the remaining portion of the principal balance. A Borrower may specify whether a prepayment is to be credited to that portion of the principal balance representing monthly payments or the line of credit. If Borrower does not designate which portion of the principal balance is to be prepaid, Lender shall apply any partial prepayments to an existing line of credit or create a new line of credit.

## 7. IMMEDIATE PAYMENT-IN-FULL

**(A) Death or Sale**

Lender may require immediate payment-in-full of all outstanding principal and accrued interest if:

(i) A Borrower dies and the Property is not the principal residence of at least one surviving Borrower, or

(ii) All of a Borrower's title in the Property (or his or her beneficial interest in a trust owning all or part of the Property) is sold or otherwise transferred and no other Borrower retains title to the Property in fee simple or retains a leasehold under a lease for not less than 99 years which is renewable or a lease having a remaining period of not less than 50 years beyond the date of the 100th birthday of the youngest Borrower or retains a life estate (or retaining a beneficial interest in a trust with such an interest in the Property).

**(B) Other Grounds**

Lender may require immediate payment-in-full of all outstanding principal and accrued interest, upon approval by an authorized representative of the Secretary, if:

(i) The Property ceases to be the principal residence of a Borrower for reasons other than death and the Property is not the principal residence of at least one other Borrower;

(ii) For a period of longer than 12 consecutive months, a Borrower fails to physically occupy the Property because of physical or mental illness and the Property is not the principal residence of at least one other Borrower; or

(iii) An obligation of the Borrower under the Security Instrument is not performed.

**(C) Payment of Costs and Expenses**

If Lender has required immediate payment-in-full as described above, the debt enforced through sale of the Property may include costs and expenses, including reasonable and customary attorney's fees, associated with enforcement of this Note to the extent not prohibited by

HECM First Note

applicable law. Such fees and costs shall bear interest from the date of disbursement at the same rate as the principal of this Note.

**(D) Trusts**

Conveyance of a Borrower's interest in the Property to a trust which meets the requirements of the Secretary, or conveyance of a trust's interests in the Property to a Borrower, shall not be considered a conveyance for purposes of this Paragraph. A trust shall not be considered an occupant or be considered as having a principal residence for purposes of this Paragraph.

**8. WAIVERS**

Borrower waives the rights of presentment and notice of dishonor. "Presentment" means the right to require Lender to demand payment of amounts due. "Notice of dishonor" means the right to require Lender to give notice to other persons that amounts due have not been paid.

**9. GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to Borrower under this Note will be given by delivering it or by mailing it by first class mail to Borrower at the property address above or at a different address if Borrower has given Lender a notice of Borrower's different address.

Any notice that must be given to Lender under this Note will be given by first class mail to Lender at the address stated in Paragraph 4(B) or at a different address if Borrower is given a notice of that different address.

**10. OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully obligated to keep all of the promises made in this Note. Lender may enforce its rights under this Note only through sale of the Property.

**11. RELATIONSHIP TO SECOND NOTE**

**(A) Second Note**

Because Borrower will be required to repay amounts which the Secretary may make to or on behalf of Borrower pursuant to Section 255 (i)(1)(A) of the National Housing Act and the Loan Agreement, the Secretary has required Borrower to grant a Second Note to the Secretary.

**(B) Relationship of Secretary Payments to this Note**

Payments made by the Secretary shall not be included in the debt due under this Note unless:

(i) This Note is assigned to the Secretary; or

(ii) The Secretary accepts reimbursements by the Lender for all payments made by the Secretary.

If the circumstances described in (i) or (ii) occur, then all payments by the Secretary, including interest on the payments, shall be included in the debt.

**(C) Effect on Borrower**

Where there is no assignment or reimbursement as described in (B)(i) or (ii) and the Secretary makes payments to Borrower, then Borrower shall not:

(i) Be required to pay amounts owed under this Note until the Secretary has required payment-in-full of all outstanding principal and accrued interest under the Second Note held by the Secretary, notwithstanding anything to the contrary in Paragraph 7 of this Note; or

(ii) Be obligated to pay interest or shared appreciation under this Note at any time, whether accrued before or after the payments by the Secretary, and whether or not accrued interest has been included in the principal balance of this Note, notwithstanding anything to the contrary in Paragraphs 2 or 5 of this Note or any Allonge to this Note.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Note.

_____ (SEAL)          5/15/09
Richard Besner                                    Date

State of NEW YORK

# ADJUSTABLE-RATE SECOND NOTE
## (Home Equity Conversion)

**May 15, 2009**                     FHA Case No. 374-5237509-952
                                     Loan No. 1M01925

**DEFAULT IN THE PAYMENT OF THIS LOAN AGREEMENT MAY RESULT IN THE LOSS OF THE PROPERTY SECURING THE LOAN. UNDER FEDERAL LAW, YOU MAY HAVE THE RIGHT TO CANCEL THIS AGREEMENT. IF YOU HAVE THIS RIGHT, THE CREDITOR IS REQUIRED TO PROVIDE YOU WITH A SEPARATE WRITTEN NOTICE SPECIFYING THE CIRCUMSTANCES AND TIMES UNDER WHICH YOU CAN EXERCISE THIS RIGHT.**

**15 LUDLOW STREET, STATEN ISLAND, New York 10312** (Property Address)

**1. DEFINITIONS**
"Borrower" means each person signing at the end of this Note. "Secretary" or "Lender" means the Secretary of Housing and Urban Development or his or her authorized representatives.

**2. BORROWER'S PROMISE TO PAY; INTEREST**
In return for amounts to be advanced by Lender to or for the benefit of Borrower under the terms of a Home Equity Conversion Loan Agreement dated **May 15, 2009** ("Loan Agreement"), Borrower promises to pay to the order of Lender a principal amount equal to the sum of all Loan Advances made under the Loan Agreement with interest. All amounts advanced by Lender, plus interest, if not due earlier, are due and payable on **April 6, 2097**. Interest will be charged on unpaid principal at the rate of **Three AND Three Hundred Sixty Eight Thousandth percent (3.368%)** per year until the full amount of principal has been paid. The interest rate may change in accordance with Paragraph 5 of this Note. Accrued interest shall be added to the principal balance as a Loan Advance at the end of each month.

**3. PROMISE TO PAY SECURED**
Borrower's promise to pay is secured by a mortgage, deed of trust or similar security instrument that is dated the same date as this Note and called the "Security Instrument" or the "Second Security Instrument." The Security Instrument protects the Lender from losses which might result if Borrower defaults under this Note. Borrower also executed a First Security Instrument and First Note when the Second Security Instrument and this Note were executed.

**4. MANNER OF PAYMENT**
    **(A) Time**
    Borrower shall pay all outstanding principal and accrued interest to Lender upon receipt of a notice by Lender requiring immediate payment-in-full, as provided in Paragraph 7 of this Note.

    **(B) Place**
    Payment shall be made at the Office of the Housing -- FHA Comptroller, Director of Mortgage Insurance Accounting and Servicing, 451 7th Street, SW, Washington, DC 20410, or any such other place as Lender may designate in writing by notice to Borrower.

    **(C) Limitation of Liability**
    Borrower shall have no personal liability for payment of the debt. Lender shall enforce the debt only through sale of the Property covered by the Security Instrument ("Property").

**5. INTEREST RATE CHANGES**
    **(A) Change Date**
    The interest rate may change on **August 1, 2009** and on the first day of each succeeding month. "Change Date" means each date on which the interest rate could change.

    **(B) The Index**
    Beginning with the first Change Date, the interest rate will be based on an Index. The "Index" means the average of interbank offered rates for one-month U.S. dollar-denominated deposits in London market ("LIBOR"), as published in The Wall Street Journal, rounded to three digits to the right of the decimal point. The "Current Index" means the most recent Index figure available **30** days before the Change Date, and if the day that is **30** days before the Change Date is not a Sunday or Monday and not the first business day of the week, the Current Index will be the Index as published the first business day of that week. If the day that is **30** days before the Change Date is a Sunday or Monday and not the first business day of the week, the Current Index will be the Index as published the first business day of the immediately prior week. If the Index (as defined above) is no longer available, Lender will use as a new Index any index prescribed by the Secretary. Lender will give Borrower notice of the new Index.

    **(C) Calculation of Interest Rate Changes**

Before each Change Date, Lender will calculate a new interest rate by adding a margin of **Three AND Zero Hundredth** percentage points (**3.000%**) to the current Index. Subject to the limit stated in Paragraph 5(D) of this Note, this amount will be the new interest rate until the next Change Date.

**(D) Limit on Interest Rate Changes**
The interest rate will never increase above **Thirteen AND Three Hundred Sixty Eight Thousandth percent (13.368%)**

**(E) Notice of Changes**
Lender will give notice to Borrower of any change in the interest rate. The notice must be given at least 25 days before the new interest rate takes effect, and must set forth (i) the date of the notice, (ii) the Change Date, (iii) the old interest rate, (iv) the new interest rate, (v) the Current Index and the date it was published, (vi) the method of calculating the adjusted interest rate, and (vii) any other information which may be required by law from time to time.

**(F) Effective Date of Changes**
A new interest rate calculated in accordance with paragraphs 5(C) and 5(D) of this Note will become effective on the Change Date, unless the Change Date occurs less than 25 days after Lender has given the required notice. If the interest rate calculated in accordance with Paragraphs 5(C) and 5(D) of this Note decreased, but Lender failed to give timely notice of the decrease and applied a higher rate than the rate which should have been stated in a timely notice, then Lender shall recalculate the principal balance owed under this Note so it does not reflect any excessive interest.

## 6. BORROWER'S RIGHT TO PREPAY
A Borrower has the right to pay the debt evidenced by this Note, in whole or in part, without charge or penalty. Any amount of debt prepaid will first be applied to reduce the principal balance of this Note and then to reduce the principal balance of the First Note.

All prepayments of the principal balance shall be applied by Lender as follows:

First, to that portion of the principal balance representing aggregate payments for mortgage insurance premiums;

Second, to that portion of the principal balance representing aggregate payments for servicing fees;

Third, to that portion of the principal balance representing accrued interest due under the Note; and

Fourth, to the remaining portion of the principal balance. A Borrower may specify whether a prepayment is to be credited to that portion of the principal balance representing monthly payments or the line of credit. If Borrower does not designate which portion of the principal balance is to be prepaid, Lender shall apply any partial prepayments to an existing line of credit or create a new line of credit.

## 7. IMMEDIATE PAYMENT-IN-FULL
**(A) Death or Sale**
Lender may require immediate payment-in-full of all outstanding principal and accrued interest if:

(i) A Borrower dies and the Property is not the principal residence of at least one surviving Borrower, or

(ii) All of a Borrower's title in the Property (or his or her beneficial interest in a trust owning all or part of the Property) is sold or otherwise transferred and no other Borrower retains title to the Property in fee simple or retains a leasehold under a lease for not less than 99 years which is renewable or a lease having a remaining period of not less than 50 years beyond the date of the 100th birthday of the youngest Borrower or retains a life estate (or retaining a beneficial interest in a trust with such an interest in the Property).

**(B) Other Grounds**
Lender may require immediate payment-in-full of all outstanding principal and accrued interest, upon approval by an authorized representative of the Secretary, if:

(i) The Property ceases to be the principal residence of a Borrower for reasons other than death and the Property is not the principal residence of at least one other Borrower;

(ii) For a period of longer than 12 consecutive months, a Borrower fails to physically occupy the Property because of physical or mental illness and the Property is not the principal residence of at least one other Borrower; or

(iii) An obligation of the Borrower under the Security Instrument is not performed.

**(C) Payment of Costs and Expenses**

If Lender has required immediate payment-in-full as described above, the debt enforced through sale of the Property may include costs and expenses, including reasonable and customary attorney's fees, associated with enforcement of this Note to the extent not prohibited by applicable law. Such fees and costs shall bear interest from the date of disbursement at the same rate as the principal of this Note.

**(D) Trusts**

Conveyance of a Borrower's interest in the Property to a trust which meets the requirements of the Secretary, or conveyance of a trust's interests in the Property to a Borrower, shall not be considered a conveyance for purposes of this Paragraph. A trust shall not be considered an occupant or be considered as having a principal residence for purposes of this Paragraph.

**8. WAIVERS**

Borrower waives the rights of presentment and notice of dishonor. "Presentment" means the right to require Lender to demand payment of amounts due. "Notice of dishonor" means the right to require Lender to give notice to other persons that amounts due have not been paid.

**9. GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to Borrower under this Note will be given by delivering it or by mailing it by first class mail to Borrower at the property address above or at a different address if Borrower has given the Secretary a notice of Borrower's different address.

Any notice that must be given to the Secretary under this Note will be given by first class mail to the HUD Field Office with jurisdiction over the Property or any other address designated by the Secretary.

**10. OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully obligated to keep all of the promises made in this Note. Lender may enforce its rights under this Note only through sale of the Property.

**11. RELATIONSHIP TO FIRST NOTE**

**(A) Second Note**

Because Borrower will be required to repay amounts which the Secretary may make to or on behalf of Borrower pursuant to Section 255(i)(1)(A) of the National Housing Act and the Loan Agreement, the Secretary has required Borrower to grant this Note to the Secretary.

**(B) Relationship of Secretary Payments to First Note**

Payments made by the Secretary shall be included in the debt due under this Note unless:

(i) The First Note is assigned to the Secretary; or

(ii) The Secretary accepts reimbursements by the Lender for all payments made by the Secretary.

If the circumstances described in (i) or (ii) occur, then all payments by the Secretary, including interest on the payments, shall be included in the debt under the First Note.

**(C) Notice of Interest Rate Adjustments**

Borrower agrees that as long as the holder of the First Note continues to make Loan Advances, any notice of interest rate adjustment given to Borrower under Paragraph 5(E) of the First Note shall also be considered to be notice to Borrower under Paragraph 5(E) of this Note, so that the same interest rate shall apply for the First Note and this Note.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Note.

_____ (SEAL)        5/15/09
Richard Besner                          Date

Final HUD-1 Statement

**A. Settlement Statement**

U.S. Department of Housing and
Urban Development

OMB Approval No. 2502-0265
(expires 11/30/2009)

**B. Type of Loan**

| | | | | | |
|---|---|---|---|---|---|
| 1. [ ] FHA | 2. [ ] FmHA | 3. [ ] Conv. Unins. | 6. File Number: | 7. Loan Number: 1M01925 | 8. Mortgage Insurance Case Number: 374-5237509-952 |
| 4. [ ] VA | 5. [ ] Conv. Ins. | | | | |

(Note: box 1 FHA marked with X)

C. Note: This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked "(p.o.c.)" were paid outside the closing; they are shown here for informational purposes and are not included in the totals.

| D. Name & Address of Borrower: | E. Name & Address of Seller: | F. Name & Address of Lender: |
|---|---|---|
| Richard Besner<br>15 Ludlow Street<br>STATEN ISLAND, NY 10312 | Mortgage Coverage: $765,000.00 | 1st Mariner Bank<br>1501 S. Clinton Street, Suite 210<br>Baltimore, MD 21224 |

| G. Property Location: | H. Settlement Agent: | |
|---|---|---|
| 15 LUDLOW STREET<br>STATEN ISLAND, New York 10312 | ~~NORTHEASTERN METRO ABSTRACT CORP~~ William J. Goldie, P.C.<br>Place of Settlement:<br>~~3 DUFFY AVENUE~~ 15 Ludlow St.<br>~~HICKSVILLE, NY 11801~~ S.I., NY 10312 | I. Closing Date: 05/15/2009<br>Exp. Settlement Date: 05/20/2009 |



| J. Summary of Borrower's Transaction | | K. Summary of Seller's Transaction | |
|---|---|---|---|
| **100. Gross Amount Due From Borrower** | | **400. Gross Amount Due To Seller** | |
| 101. Contract sales price | $0.00 | 401. Contract sales price | |
| 102. Personal property | | 402. Personal property | |
| 103. Settlement charges to borrower (line 1400) | $20,251.20 | 403. | |
| 104. Payoff to: CitiMortgage | $94,841.51 | 404. | |
| 105. | | 405. | |
| 106. | | 406. | |
| 107. | | 407. | |
| 108. | | 408. | |
| 109. | | 409. | |
| Adjustments for items paid by seller in advance | | Adjustments for items paid by seller in advance | |
| 110. City/town taxes         to | | 410. City/town taxes         to | |
| 111. County taxes         to | | 411. County taxes         to | |
| 112. Assessments         to | | 412. Assessments         to | |
| **120. Gross Amount Due From Borrower** | $115,092.71 | **420. Gross Amount Due To Seller** | |
| **200. Amounts Paid By Or In Behalf Of Borrower** | | **500. Reductions In Amount Due To Seller** | |
| 201. Deposit or earnest money | | 501. Excess deposit (see instructions) | |
| 202. Principal amount of new loan(s) | | 502. Settlement charges to seller (line 1400) | |
| 203. Existing loan(s) taken subject | | 503. Existing loan(s) taken subject to | |
| 204. Financed Closing Costs | $20,251.20 | 504. Payoff of first mortgage loan | |
| 205. Cash Portion of Initial Draw | $15,000.00 | 505. Payoff of second mortgage loan | |
| 206. | | 506. | |
| 207. | | 507. | |
| 208. | | 508. | |
| 209. | | 509. | |
| Adjustments for items unpaid by seller | | Adjustments for items unpaid by seller | |
| 210. City/town taxes         to | | 510. City/town taxes         to | |
| 211. County taxes         to | | 511. County taxes         to | |
| 212. Assessments         to | | 512. Assessments         to | |
| 213. | | 513. | |
| 214. Payoff to: CitiMortgage (paid from Loan) | $94,841.51 | 514. | |
| 215. | | 515. | |
| 216. | | 516. | |
| 217. | | 517. | |
| 218. | | 518. | |
| 219. | | 519. | |
| **220. Total Paid By/For Borrower** | $130,092.71 | **520. Total Reduction Amount Due Seller** | |
| **300. Cash At Settlement From/To** | | **600. Cash At Settlement To/From Seller** | |
| 301. Gross Amount due from borrower (line 120) | $115,092.71 | 601. Gross amount due to seller (line 420) | |
| 302. Less amounts paid by/for borrower (line 220) | $130,092.71 | 602. Less reductions in amt. due seller (line 520) | |
| 303. Cash [ ] From [X] To Borrower | $15,000.00 | 303. Cash [ ] To [ ] From Seller | |

Section 5 of the Real Estate Settlement Procedures Act (RESPA) requires the following: • HUD must develop a Special Information Booklet to help persons borrowing money to finance the purchase of residential real estate to better understand the nature and costs of real estate settlement services;

• Each lender must provide the booklet to all applicants from whom it receives or for whom it prepares a written application to borrow money to finance the purchase of residential real estate; • Lenders must prepare and distribute with the Booklet a Good Faith Estimate of the settlement costs that the borrower is likely to incur in connection with the settlement. These disclosures are mandatory.

Section 4(a) of RESPA mandates that HUD develop and prescribe this

standard form to be used at the time of loan settlement to provide full disclosure of all charges imposed upon the borrower and seller. These are third party disclosures that are designed to provide the borrower with pertinent information during the settlement process in order to be a better shopper.

The Public Reporting Burden for this collection of information is estimated to average one hour per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information.

This agency may not collect this information, and you are not required to complete this form, unless it displays a currently valid OMB control number.

The information requested does not lend itself to confidentiality.

**L. Settlement Charges**

| | | | | Paid From Borrowers Funds at Settlement | Paid From Seller's Funds at Settlement |
|---|---|---|---|---|---|
| **700. Total Sales/Broker's Commission based on price $** | | @ | %= | | |
| Division of Commission (line 700) as follows: | | | | | |
| 701. $ | | to | | | |
| 702. $ | | to | | | |
| 703. Commission paid at Settlement | | | | | |
| 704. | | | | | |
| **800. Items Payable In Connection With Loan** | | | | | |
| 801. Loan Origination Fee | % | BARCLAY FUNDING | | $6,000.00 | |
| 803. Appraisal Fee | to | APPRAISAL ASSOCIATES | | $500.00 | |
| 804. Credit Report | to | BARCLAY FUNDING | | $9.10 | |
| 805. | | | | | |
| 806. Appraisal Review Fee | to | | | | |
| 807. | | | | | |
| 808. | | | | | |
| 809. Flood Certification Fee | to | | | | |
| 810. | | | | | |
| 811. Broker Fee (p.o.c.) $65.05 | to | BARCLAY FUNDING $65.05 (paid by lender) | | | |
| 812. Correspondent Fee (p.o.c.) $-375.00 | to | 1ST MARINER BANK $-375 (paid to lender) | | | |
| 813. | | | | | |
| 814. | | | | | |
| 815. | | | | | |
| 816. Counseling Fee | to | | | | |
| **900. Items Required By Lender To Be Paid In Advance** | | | | | |
| 901. Interest from to | @$ | /day | | | |
| 902. Mortgage Insurance Premium | to | HUD | | $10,200.00 | |
| 903. | | | | | |
| 904. | | | | | |
| 905. | | | | | |
| **1000. Reserves Deposited With Lender** | | | | | |
| 1001. Hazard insurance | months@$ | per month | | | |
| 1002. Mortgage insurance | months@$ | per month | | | |
| 1003. City property taxes | months@$ | per month | | | |
| **1100. Title Charges** | | | | | |
| 1101. Settlement or Closing Fee | to | | | | |
| 1102. Abstract or Title Search | to | NORTHEASTERN METRO | | $290.00 | |
| 1103. Title Examination | to | NORTHEASTERN METRO | | $235.00 | |
| 1104. | | | | | |
| 1105. Document Preparation | to | 1ST MARINER BANK | | $125.00 | |
| 1106. Notary Fees | to | NORTHEASTERN METRO | | $225.00 | |
| 1107. Attorney Fees | to | | | | |
| (includes above items numbers: | | | ) | | |
| 1108. Title Insurance / Lender Cove | to | NORTHEASTERN METRO | | $1,937.10 | |
| (includes above items numbers: | | | ) | | |
| 1109. | | | | | |
| 1110. | | | | | |
| 1111. Endorsement Fee | to | NORTHEASTERN METRO | | $100.00 | |
| 1112. | | | | | |
| 1113. | | | | | |
| **1200. Government Recording and Transfer Charges** | | | | | |
| 1201. Recording Fee Mortgage: Deed $0.00;  Mortgage $600.00;   Releases $0.00 | | | | $600.00 | |
| 1202. | | | | | |
| 1203. | | | | | |
| 1204. | | | | | |
| 1205. | | | | | |
| **1300. Additional Settlement Charges** | | | | | |
| 1301. | | | | | |
| 1302. | | | | | |
| 1303. Courier Fees | to | NORTHEASTERN METRO | | $30.00 | |
| 1304. | | | | | |
| 1305. | | | | | |
| 1306. | | | | | |
| 1307. | | | | | |
| **1400. Total Settlement Charges (enter on lines 103, Section J and 502, Section K)** | | | | $20,251.20 | $0.00 |

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of the HUD-1 Settlement Statement (pg 1 and 2)

Richard Beaver    Date: 5/15/09

I have prepared the HUD-1 Settlement Statement.
To the best of my knowledge, the HUD-1 Settlement Statement which I have prepared is a true and accurate account of the funds which were received, and have been or will be disbursed, by the undersigned as part of the settlement of this transaction.

By: William J. Goldey    Date: 5/15/09
Settlement Agent:

WARNING: It is a crime to knowingly make false statements to the United States on this or any similar form. Penalties upon conviction can include a fine and imprisonment. For details see: Title 18 U.S. Code Section 1001 and Section 1010.

**A. Settlement Statement**

**U.S. Department of Housing and Urban Development**

OMB Approval No. 2502-0265
(expires 11/30/2009)

**B. Type of Loan**

| | | | | | |
|---|---|---|---|---|---|
| 1. ☐ FHA | 2. ☐ FmHA | 3. ☐ Conv. Unins. | 6. File Number: | 7. Loan Number: 1M01925 | 8. Mortgage Insurance Case Number: 374-5237509-952 |
| 4. ☐ VA | 5. ☐ Conv. Ins. | | | | |

First box marked: 1. ☒ FHA

**C. Note:** This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked "(p.o.c.)" were paid outside the closing; they are shown here for informational purposes and are not included in the totals.

| D. Name & Address of Borrower: | E. Name & Address of Seller: | F. Name & Address of Lender: |
|---|---|---|
| Richard Besner<br>15 Ludlow Street<br>STATEN ISLAND, NY 10312 | Mortgage Coverage: $765,000.00 | 1st Mariner Bank<br>1501 S. Clinton Street, Suite 210<br>Baltimore, MD 21224 |

| G. Property Location: | H. Settlement Agent: |
|---|---|
| 15 LUDLOW STREET<br>STATEN ISLAND, New York 10312 | ~~NORTHEASTERN METRO ABSTRACT CORP~~ William J. Golding P.C.<br>Place of Settlement: ~~8 DUFFY AVENUE~~ 15 Ludlow St.<br>~~HICKSVILLE, NY 11801~~ S.I., NY 10312 |

| | |
|---|---|
| I. Closing Date: | 05/15/2009 |
| Exp. Settlement Date: | 05/20/2009 |

| J. Summary of Borrower's Transaction | | K. Summary of Seller's Transaction | |
|---|---|---|---|
| **100. Gross Amount Due From Borrower** | | **400. Gross Amount Due To Seller** | |
| 101. Contract sales price | | 401. Contract sales price | |
| 102. Personal property | $0.00 | 402. Personal property | |
| 103. Settlement charges to borrower (line 1400) | $20,251.20 | 403. | |
| 104. Payoff to: CitiMortgage | $94,841.51 | 404. | |
| 105. | | 405. | |
| 106. | | 406. | |
| 107. | | 407. | |
| 108. | | 408. | |
| 109. | | 409. | |
| Adjustments for items paid by seller in advance | | Adjustments for items paid by seller in advance | |
| 110. City/town taxes          to | | 410. City/town taxes          to | |
| 111. County taxes          to | | 411. County taxes          to | |
| 112. Assessments          to | | 412. Assessments          to | |
| **120. Gross Amount Due From Borrower** | $115,092.71 | **420. Gross Amount Due To Seller** | |
| **200. Amounts Paid By Or In Behalf Of Borrower** | | **500. Reductions In Amount Due To Seller** | |
| 201. Deposit or earnest money | | 501. Excess deposit (see instructions) | |
| 202. Principal amount of new loan(s) | | 502. Settlement charges to seller (line 1400) | |
| 203. Existing loan(s) taken subject | | 503. Existing loan(s) taken subject to | |
| 204. Financed Closing Costs | $20,251.20 | 504. Payoff of first mortgage loan | |
| 205. Cash Portion of Initial Draw | $15,000.00 | 505. Payoff of second mortgage loan | |
| 206. | | 506. | |
| 207. | | 507. | |
| 208. | | 508. | |
| 209. | | 509. | |
| Adjustments for items unpaid by seller | | Adjustments for items unpaid by seller | |
| 210. City/town taxes          to | | 510. City/town taxes          to | |
| 211. County taxes          to | | 511. County taxes          to | |
| 212. Assessments          to | | 512. Assessments          to | |
| 213. | | 513. | |
| 214. Payoff to: CitiMortgage (paid from Loan) | $94,841.51 | 514. | |
| 215. | | 515. | |
| 216. | | 516. | |
| 217. | | 517. | |
| 218. | | 518. | |
| 219. | | 519. | |
| **220. Total Paid By/For Borrower** | $130,092.71 | **520. Total Reduction Amount Due Seller** | |
| **300. Cash At Settlement From/To** | | **600. Cash At Settlement To/From Seller** | |
| 301. Gross Amount due from borrower (line 120) | $115,092.71 | 601. Gross amount due to seller (line 420) | |
| 302. Less amounts paid by/for borrower (line 220) | $130,092.71 | 602. Less reductions in amt. due seller (line 520) | |
| 303. Cash ☐ From  ☒ To Borrower | $15,000.00 | 303. Cash ☐ To  ☐ From Seller | |

Section 5 of the Real Estate Settlement Procedures Act (RESPA) requires the following: • HUD must develop a Special Information Booklet to help persons borrowing money to finance the purchase of residential real estate to better understand the nature and costs of real estate settlement services;
• Each lender must provide the booklet to all applicants from whom it receives or for whom it prepares a written application to borrow money to finance the purchase of residential real estate; • Lenders must prepare and distribute with the Booklet a Good Faith Estimate of the settlement costs that the borrower is likely to incur in connection with the settlement. These disclosures are mandatory.
Section 4(a) of RESPA mandates that HUD develop and prescribe this

standard form to be used at the time of loan settlement to provide full disclosure of all charges imposed upon the borrower and seller. These are third party disclosures that are designed to provide the borrower with pertinent information during the settlement process in order to be a better shopper.
The Public Reporting Burden for this collection of information is estimated to average one hour per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information.
This agency may not collect this information, and you are not required to complete this form, unless it displays a currently valid OMB control number.
The information requested does not lend itself to confidentiality.

**L. Settlement Charges**

| 700. Total Sales/Broker's Commission based on price $ | @ %= | Paid From Borrowers Funds at Settlement | Paid From Seller's Funds at Settlement |
|---|---|---|---|
| Division of Commission (line 700) as follows: | | | |
| 701. $ | to | | |
| 702. $ | to | | |
| 703. Commission paid at Settlement | | | |
| 704. | | | |
| **800. Items Payable In Connection With Loan** | | | |
| 801. Loan Origination Fee % | BARCLAY FUNDING | $6,000.00 | |
| 803. Appraisal Fee | to APPRAISAL ASSOCIATES | $500.00 | |
| 804. Credit Report | to BARCLAY FUNDING | $9.10 | |
| 805. | | | |
| 806. Appraisal Review Fee | to | | |
| 807. | | | |
| 808. | | | |
| 809. Flood Certification Fee | to | | |
| 810. | | | |
| 811. Broker Fee (p.o.c.): $65.05 | to BARCLAY FUNDING $65.05 (paid by lender) | | |
| 812. Correspondent Fee (p.o.c.): $-375.00 | to 1ST MARINER BANK $-375 (paid to lender) | | |
| 813. | | | |
| 814. | | | |
| 815. | | | |
| 816. Counseling Fee | to | | |
| **900. Items Required By Lender To Be Paid In Advance** | | | |
| 901. Interest from to | @$ /day | | |
| 902. Mortgage Insurance Premium | to HUD | $10,200.00 | |
| 903. | | | |
| 904. | | | |
| 905. | | | |
| **1000. Reserves Deposited With Lender** | | | |
| 1001. Hazard insurance | months@$ per month | | |
| 1002. Mortgage insurance | months@$ per month | | |
| 1003. City property taxes | months@$ per month | | |
| **1100. Title Charges** | | | |
| 1101. Settlement or Closing Fee | to | | |
| 1102. Abstract or Title Search | to NORTHEASTERN METRO | $290.00 | |
| 1103. Title Examination | to NORTHEASTERN METRO | $235.00 | |
| 1104. | | | |
| 1105. Document Preparation | to 1ST MARINER BANK | $125.00 | |
| 1106. Notary Fees | to NORTHEASTERN METRO | $225.00 | |
| 1107. Attorney Fees | to | | |
| (includes above items numbers: ) | | | |
| 1108. Title Insurance / Lender Cove | to NORTHEASTERN METRO | $1,937.10 | |
| (includes above items numbers: ) | | | |
| 1109. | | | |
| 1110. | | | |
| 1111. Endorsement Fee | to NORTHEASTERN METRO | $100.00 | |
| 1112. | | | |
| 1113. | | | |
| **1200. Government Recording and Transfer Charges** | | | |
| 1201. Recording Fee Mortgage: Deed $0.00; Mortgage $600.00; Releases $0.00 | | $600.00 | |
| 1202. | | | |
| 1203. | | | |
| 1204. | | | |
| 1205. | | | |
| **1300. Additional Settlement Charges** | | | |
| 1301. | | | |
| 1302. | | | |
| 1303. Courier Fees | to NORTHEASTERN METRO | $30.00 | |
| 1304. | | | |
| 1305. | | | |
| 1306. | | | |
| 1307. | | | |
| **1400. Total Settlement Charges (enter on lines 103, Section J and 502, Section K)** | | $20,251.20 | $0.00 |

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of the HUD-1 Settlement Statement (pg 1 and 2)

Richard Berner                                    Date:    5/15/09

I have prepared the HUD-1 Settlement Statement.
To the best of my knowledge, the HUD-1 Settlement Statement which I have prepared is a true and accurate account of the funds which were received, and have been or will be disbursed, by the undersigned as part of the settlement of this transaction

By:                                    5/15/09
    Settlement Agent:                                    Date

WARNING: It is a crime to knowingly make false statements to the United States on this or any similar form. Penalties upon conviction can include a fine and imprisonment. For details see: Title 18 U.S. Code Section 1001 and Section 1010.

**A. Settlement Statement**

**U.S. Department of Housing and Urban Development**

OMB Approval No. 2502-0265
(expires 11/30/2009)

**B. Type of Loan**

| 1. ☐ FHA | 2. ☐ FmHA | 3. ☐ Conv. Unins. | 6. File Number: | 7. Loan Number: | 8. Mortgage Insurance Case Number: |
|---|---|---|---|---|---|
| 4. ☐ VA | 5. ☐ Conv. Ins. | [X FHA] | 1M01925 | | 374-5237509-952 |

C. Note: This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked "(p.o.c.)" were paid outside the closing; they are shown here for informational purposes and are not included in the totals.

| D. Name & Address of Borrower: | E. Name & Address of Seller: | F. Name & Address of Lender: |
|---|---|---|
| Richard Besner 15 Ludlow Street STATEN ISLAND, NY 10312 | Mortgage Coverage: $765,000.00 | 1st Mariner Bank 1501 S. Clinton Street, Suite 210 Baltimore, MD 21224 |

| G. Property Location: | H. Settlement Agent: |
|---|---|
| 15 LUDLOW STREET STATEN ISLAND, New York 10312 | ~~NORTHEASTERN METRO ABSTRACT CORP~~ William J. Golding, P.C. Place of Settlement: ~~8 BURTT AVENUE~~ 15 Ludlow st. ~~HICKSVILLE, NY 11801~~ S.I., NY 10312 |

| | I. Closing Date: 05/15/2009 |
| | Exp. Settlement Date: 05/20/2009 |

| J. Summary of Borrower's Transaction | | K. Summary of Seller's Transaction | |
|---|---|---|---|
| **100. Gross Amount Due From Borrower** | | **400. Gross Amount Due To Seller** | |
| 101. Contract sales price | $0.00 | 401. Contract sales price | |
| 102. Personal property | | 402. Personal property | |
| 103. Settlement charges to borrower (line 1400) | $20,251.20 | 403. | |
| 104. Payoff to: CitiMortgage | $94,841.51 | 404. | |
| 105. | | 405. | |
| 106. | | 406. | |
| 107. | | 407. | |
| 108. | | 408. | |
| 109. | | 409. | |
| Adjustments for items paid by seller in advance | | Adjustments for items paid by seller in advance | |
| 110. City/town taxes       to | | 410. City/town taxes       to | |
| 111. County taxes       to | | 411. County taxes       to | |
| 112. Assessments       to | | 412. Assessments       to | |
| **120. Gross Amount Due From Borrower** | $115,092.71 | **420. Gross Amount Due To Seller** | |
| **200. Amounts Paid By Or In Behalf Of Borrower** | | **500. Reductions In Amount Due To Seller** | |
| 201. Deposit or earnest money | | 501. Excess deposit (see instructions) | |
| 202. Principal amount of new loan(s) | | 502. Settlement charges to seller (line 1400) | |
| 203. Existing loan(s) taken subject to | | 503. Existing loan(s) taken subject to | |
| 204. Financed Closing Costs | $20,251.20 | 504. Payoff of first mortgage loan | |
| 205. Cash Portion of Initial Draw | $15,000.00 | 505. Payoff of second mortgage loan | |
| 206. | | 506. | |
| 207. | | 507. | |
| 208. | | 508. | |
| 209. | | 509. | |
| Adjustments for items unpaid by seller | | Adjustments for items unpaid by seller | |
| 210. City/town taxes       to | | 510. City/town taxes       to | |
| 211. County taxes       to | | 511. County taxes       to | |
| 212. Assessments       to | | 512. Assessments       to | |
| 213. | | 513. | |
| 214. Payoff to: CitiMortgage (paid from Loan) | $94,841.51 | 514. | |
| 215. | | 515. | |
| 216. | | 516. | |
| 217. | | 517. | |
| 218. | | 518. | |
| 219. | | 519. | |
| **220. Total Paid By/For Borrower** | $130,092.71 | **520. Total Reduction Amount Due Seller** | |
| **300. Cash At Settlement From/To** | | **600. Cash At Settlement To/From Seller** | |
| 301. Gross Amount due from borrower (line 120) | $115,092.71 | 601. Gross Amount due to seller (line 420) | |
| 302. Less amounts paid by/for borrower (line 220) | $130,092.71 | 602. Less reductions in amt. due seller (line 520) | |
| 303. Cash ☐ From ☒ To Borrower | $15,000.00 | 303. Cash ☐ To ☐ From Seller | |

Section 5 of the Real Estate Settlement Procedures Act (RESPA) requires the following: • HUD must develop a Special Information Booklet to help persons borrowing money to finance the purchase of residential real estate to better understand the nature and costs of real estate settlement services;
• Each lender must provide the booklet to all applicants from whom it receives or for whom it prepares a written application to borrow money to finance the purchase of residential real estate; • Lenders must prepare and distribute with the Booklet a Good Faith Estimate of the settlement costs that the borrower is likely to incur in connection with the settlement. These disclosures are manadatory.
Section 4(a) of RESPA mandates that HUD develop and prescribe this

standard form to be used at the time of loan settlement to provide full disclosure of all charges imposed upon the borrower and seller. These are third party disclosures that are designed to provide the borrower with pertinent information during the settlement process in order to be a better shopper.
The Public Reporting Burden for this collection of information is estimated to average one hour per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information.
This agency may not collect this information, and you are not required to complete this form, unless it displays a currently valid OMB control number.
The information requested does not lend itself to confidentiality.

**L. Settlement Charges**

| | | | | Paid From Borrowers Funds at Settlement | Paid From Seller's Funds at Settlement |
|---|---|---|---|---|---|
| 700. Total Sales/Broker's Commission based on price $ | | @ | %= | | |
| Division of Commission (line 700) as follows: | | | | | |
| 701. $ | | to | | | |
| 702. $ | | to | | | |
| 703. Commission paid at Settlement | | | | | |
| 704. | | | | | |
| **800. Items Payable In Connection With Loan** | | | | | |
| 801. Loan Origination Fee | % | BARCLAY FUNDING | | $6,000.00 | |
| 803. Appraisal Fee | to | APPRAISAL ASSOCIATES | | $500.00 | |
| 804. Credit Report | to | BARCLAY FUNDING | | $9.10 | |
| 805. | | | | | |
| 806. Appraisal Review Fee | to | | | | |
| 807. | | | | | |
| 808. | | | | | |
| 809. Flood Certification Fee | to | | | | |
| 810. | | | | | |
| 811. Broker Fee (p.o.c.): $65.05 | to | BARCLAY FUNDING $65.05 (paid by lender) | | | |
| 812. Correspondent Fee (p.o.c.): $-375.00 | to | 1ST MARINER BANK $-375 (paid to lender) | | | |
| 813. | | | | | |
| 814. | | | | | |
| 815. | | | | | |
| 816. Counseling Fee | to | | | | |
| **900. Items Required By Lender To Be Paid In Advance** | | | | | |
| 901. Interest from to | @$ | /day | | | |
| 902. Mortgage Insurance Premium | to | HUD | | $10,200.00 | |
| 903. | | | | | |
| 904. | | | | | |
| 905. | | | | | |
| **1000. Reserves Deposited With Lender** | | | | | |
| 1001. Hazard Insurance | months@$ | per month | | | |
| 1002. Mortgage Insurance | months@$ | per month | | | |
| 1003. City property taxes | months@$ | per month | | | |
| **1100. Title Charges** | | | | | |
| 1101. Settlement or Closing Fee | to | | | | |
| 1102. Abstract or Title Search | to | NORTHEASTERN METRO | | $290.00 | |
| 1103. Title Examination | to | NORTHEASTERN METRO | | $235.00 | |
| 1104. | | | | | |
| 1105. Document Preparation | to | 1ST MARINER BANK | | $125.00 | |
| 1106. Notary Fees | to | NORTHEASTERN METRO | | $225.00 | |
| 1107. Attorney Fees | to | | | | |
| (includes above items numbers: | | ) | | | |
| 1108. Title Insurance / Lender Cove | to | NORTHEASTERN METRO | | $1,937.10 | |
| (includes above items numbers: | | ) | | | |
| 1109. | | | | | |
| 1110. | | | | | |
| 1111. Endorsement Fee | to | NORTHEASTERN METRO | | $100.00 | |
| 1112. | | | | | |
| 1113. | | | | | |
| **1200. Government Recording and Transfer Charges** | | | | | |
| 1201. Recording Fee Mortgage: Deed $0.00; Mortgage $600.00; Releases $0.00 | | | | $600.00 | |
| 1202. | | | | | |
| 1203. | | | | | |
| 1204. | | | | | |
| 1205. | | | | | |
| **1300. Additional Settlement Charges** | | | | | |
| 1301. | | | | | |
| 1302. | | | | | |
| 1303. Courier Fees | to | NORTHEASTERN METRO | | $30.00 | |
| 1304. | | | | | |
| 1305. | | | | | |
| 1306. | | | | | |
| 1307. | | | | | |
| **1400. Total Settlement Charges** (enter on lines 103, Section J and 502, Section K) | | | | $20,251.20 | $0.00 |

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of the HUD-1 Settlement Statement (pg 1 and 2)

Richard Besner _____   Date: 5/15/09

I have prepared the HUD-1 Settlement Statement.
To the best of my knowledge, the HUD-1 Settlement Statement which I have prepared is a true and accurate account of the funds which were received, and have been or will be disbursed, by the undersigned as part of the settlement of this transaction

By: _____
Settlement Agent: William J. Holdy   Date: 5/15/09

WARNING: It is a crime to knowingly make false statements to the United States on this or any similar form. Penalties upon conviction can include a fine and imprisonment. For details see: Title 18 U.S. Code Section 1001 and Section 1010.

# Addendum to HUD-1 Settlement Statement

*I have carefully reviewed the HUD-1 Settlement Statement, and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of the HUD-1 Settlement Statement.*

_____     5/15/09
Richard Besner                       Date

*To the best of my knowledge, the HUD-1 Settlement Statement which I have prepared is a true and accurate account of the funds which were received, and have been or will be disbursed, by the undersigned as part of the settlement of this transaction.*

_____     5/15/09
Settlement Agent                     Date

By:    William J. Golding

Title: _____

**WARNING**: *It is a crime to knowingly make false statements to the United States on this or any other similar form. Penalties upon conviction can include a fine and imprisonment. For details see Title 18 U.S. Code Section 1001 and Section 1010.*

HUD1 Addendum

# EXHIBIT G



**EARLY
SULLIVAN
WRIGHT
GIZER &
MCRAE LLP**
ATTORNEYS AT LAW

PADIDEH ZARGARI
DD:  323-301-4663
pzargari@earlysullivan.com

June 16, 2025

**VIA E-MAIL**

Michael E. Blumenfeld
Nelson Mullins Riley & Scarborough LLP
100 S. Charles Street, Ste. 1600
Baltimore, MD 21201
michael.blumenfeld@nelsonmullins.com

Re:    **Sun West Loan Number: 111154225200**
       **FNMA Loan Number: 6000694335**
       **Borrower Name: Richard Besner and Carol Besner**
       **Property Address: 15 Ludlow Street, Staten Island, New York 10312**

Dear Michael:

I write this letter on behalf of Sun West Mortgage Company ("Sun West") regarding the above-referenced loan (the "Besner Loan").  This letter is a follow up to my May 20, 2025 letter regarding the Besner Loan.  On or about June 2, 2025, Sun West self-reported this loan to FNMA.  On or about June 5, 2025, in an email correspondence, FNMA informed Sun West that it is approved to repurchase the loan.  Please see the correspondence attached hereto as <u>Exhibit A</u>.    It appears that a repurchase demand from FNMA is forthcoming and thus, we wanted to keep you appraised. Once the repurchase request is confirmed in Loan Quality Connect, we will forward that to your office. Sun West expressly reserves its rights and claims, including, but not limited to, the right to demand that FNB of Pennsylvania ("FNBP") repurchase the Besner Loan or provide Sun West indemnification regarding the Besner Loan pursuant to Paragraph 4 of the Settlement and Release Agreement between Sun West Mortgage Company, Inc. and First Mariner Bank effective May 16, 2017 (the "Settlement Agreement").

Very truly yours,

*/s/Padideh Zargari*

Padideh Zargari
on behalf of
EARLY SULLIVAN WRIGHT GIZER & MCRAE LLP

EARLY SULLIVAN WRIGHT GIZER & MCRAE LLP | 6420 WILSHIRE BOULEVARD | 17TH FLOOR | LOS ANGELES, CALIFORNIA 90048
TEL: (323) 301-4660 | FAX: (323) 301-4676 | WWW.EARLYSULLIVAN.COM

CALABASAS | LAS VEGAS | LOS ANGELES | PHOENIX

# EXHIBIT A

**Padideh Zargari**

**From:**
**Sent:**
**To:**
**Subject:**

---------- Forwarded message ---------
From: **Orr, Dwayne** <dwayne_orr@fanniemae.com>
Date: Thu, Jun 5, 2025 at 1:30 PM
Subject: RE: Re: Re: Re: Re: AVR Project
To: Blanca Hoskins <blanca.hoskins@swmc.com>

Blanca,

Please accept this as approval to proceed with the repurchase of loan **6000694335** due to the absence of a clear chain of title.

The repurchase should be processed through **eBoutique** using Action Code **65 – Repurchase**.

Please let me know if you need anything further.

Thank you

Dwayne Orr

HECM Operations - Reverse Mortgage Servicing
Fannie Mae

214-242-8376 (direct)

Fanniemae.com

This e-mail and its attachments are confidential and solely for the intended addressee(s).

Do not share or use them without Fannie Mae's approval. If received in error, delete the message, and contact the sender.

# EXHIBIT H



**EARLY SULLIVAN WRIGHT GIZER & McRae LLP**
ATTORNEYS AT LAW

PADIDEH ZARGARI
DD:  323-301-4663
pzargari@earlysullivan.com

July 10, 2025

**VIA E-MAIL**

Mr. Michael E. Blumenfeld                    Mr. Brian Mancos
Nelson Mullins Riley & Scarborough LLP       First National Bank of Pennsylvania
100 S. Charles Street, Suite 1600
Baltimore, MD 21204
Email: *michael.blumenfeld@nelsonmullins.com*  Email: *mancosb@fnb-corp.com*

Re:  **Sun West Loan Number: 111154225200**
     **FNMA Loan Number: 6000694335**
     **Borrower Name: Richard Besner and Carol Besner**
     **Property Address: 15 Ludlow Street, Staten Island, New York 10312**

Mr. Mancos and Mr. Blumenfeld:

    I write this letter on behalf of Sun West Mortgage Company ("Sun West") regarding the above-referenced loan (the "Besner Loan") which was originated by First Mariner Bank.  Pursuant to Paragraph 12 of the Settlement and Release Agreement between Sun West and First Mariner Bank effective May 16, 2017 (the "Settlement Agreement"), I am sending this correspondence to you as the representative and counsel for First National Bank of Pennsylvania ("FNBP"), which is the successor to Howard Bank, which is the successor to First Mariner Bank.

    This letter is a follow up to my May 20, 2025 letter, and my June 16, 2025 letter to Mr. Blumenfeld regarding the Besner Loan.

    Sun West has learned that it does not have a recorded first or second deed of trust on the Besner Loan in its files as such documents were not provided when the Besner Loan was transferred from First Mariner to Sun West.  Due to this issue, on or about June 2, 2025, Sun West self-reported this loan to FNMA.  On or about June 5, 2025, in an email correspondence, FNMA informed Sun West that it is approved to repurchase the loan.

    On June 27, 2025, Sun West received correspondence from Fannie Mae regarding the Besner Loan.  In the correspondence, Fannie Mae  states:

EARLY SULLIVAN WRIGHT GIZER & McRae LLP | 6420 WILSHIRE BOULEVARD | 17TH FLOOR | LOS ANGELES, CALIFORNIA 90048
TEL: (323) 301-4660 | FAX: (323) 301-4676 | WWW.EARLYSULLIVAN.COM

CALABASAS | LAS VEGAS | LOS ANGELES | PHOENIX

"Mortgage Eligibility - Miscellaneous
Without corrective action the loan falls under guideline A1-3-02. Subject to Servicing Defect Remedies Framework for servicing defects attributable to servicing violations, Fannie Mae is requiring the repurchase or the remittance of a make whole payment. As it currently stands, the lack of HUD qualification and of a recorded mortgage places the property at a very large loss risk which is not acceptable under guidelines. As a result the loan is not eligible for delivery to Fannie Mae."

As set forth in Fannie Mae's attached letter, Fannie Mae has given Sun West a deadline until August 26, 2025 to either:

1. Provide an appeal; or
2. Repurchase the Besner Loan.

Pursuant to Paragraph 4 of the Settlement and Release Agreement, please allow this letter to serve as written notice of Sun West's demand that FNBP repurchase the Besner Loan.

Nothing in this correspondence serves as a waiver of any of Sun West's rights, claims and objections, all of which are expressly reserved.

Very truly yours,

*/s/Padideh Zargari*

Padideh Zargari
on behalf of
EARLY SULLIVAN WRIGHT GIZER & McRAE LLP

5814906.1

**Fannie Mae**

**Sun West Mortgage Company Inc.**

**Date:** 6/27/2025

**Loan Information:**

**Fannie Mae Loan Number:** 6000694335
**Seller Loan Number:** 1M01925
**Servicer Loan Number:**
**Responsible Party ID:** 214110024

Fannie Mae's analysis of the subject loan reflects certain elements that do not meet, or no longer meet, the terms or requirements of the Lender Contract due to certain selling and/or servicing violations listed below.  We value your business, and want to work with you to resolve this matter.

**Mortgage Eligibility - Miscellaneous**
Without corrective action the loan falls under guideline A1-3-02. Subject to Servicing Defect Remedies Framework for servicing defects attributable to servicing violations, Fannie Mae is requiring the repurchase or the remittance of a make whole payment. As it currently stands, the lack of HUD qualification and of a recorded mortgage places the property at a very large loss risk which is not acceptable under guidelines. As a result the loan is not eligible for delivery to Fannie Mae.

Please review the options below for resolving this matter. You have until 8/26/2025 to either:

• Provide an appeal in written form through  Loan Quality Connect (LQC).
• Remit the amount due for the repurchase. Refer to the Fannie Mae Servicing Guide for specific instructions on remitting funds.

Note:  Responsible parties are reminded that if they repurchase a mortgage loan that was modified under HAMP, they are obligated to comply with any and all legal obligations created with the borrower in connection with the modification of the loan, including, without limitation,  any legal obligation to pay the borrower an earned performance incentive.

If you have any questions concerning this letter or its content, please contact the underwriter listed below.

**CURE Underwriter Name:**          LQC CURE Team E
**Phone:**
**Email:**                          terrlenders_xnt@fanniemae.com

## Additional Loan Information

**Fannie Mae Loan Number:** 6000694335
**Seller Name:** First Mariner Bank
**Seller No:** 246510016
**Servicer Name:** Sun West Mortgage Company Inc.
**Servicer No:** 214110024
**Originator Name:**
**REO Status:**
**Review Type:**
**LTV:** 55.0000%
**CLTV:** 55.0000%
**HCLTV:** 55.0000%
**Product:** Not Available At This Time
**Occupancy:** Primary Residence
**Loan Purpose:**
**Property Type:**
**AUS:** DU
**Recommendation:** DU Recommendation
**Contract Number:** DFT007478
**Closing Date:**
**LPI Date:**
**Special Feature Code(s):** See SFCs in loan review
**Origination Appraiser:**
**Master Contract No:** MP04216
**Loan Purchase Date:** 5/22/2009
**Pool#:**

# EXHIBIT I



EARLY
SULLIVAN
WRIGHT
GIZER &
MCRAE LLP
ATTORNEYS AT LAW

PADIDEH ZARGARI
DD:  323-301-4663
pzargari@earlysullivan.com

August 7, 2025

**VIA E-MAIL**

Mr. Michael E. Blumenfeld
Nelson Mullins Riley & Scarborough LLP
100 S. Charles Street, Suite 1600
Baltimore, MD 21204
Email: *michael.blumenfeld@nelsonmullins.com*

Re:  **Sun West Loan Number: 111154225200**
**FNMA Loan Number: 6000694335**
**Borrower Name: Richard Besner and Carol Besner**
**Property Address: 15 Ludlow Street, Staten Island, New York 10312**

Mr. Blumenfeld:

I write this letter on behalf of Sun West Mortgage Company ("Sun West") regarding the above-referenced loan (the "Besner Loan") which was originated by First Mariner Bank.  Pursuant to Paragraph 12 of the Settlement and Release Agreement between Sun West and First Mariner Bank effective May 16, 2017 (the "Settlement Agreement"), I am sending this correspondence to you as counsel for First National Bank of Pennsylvania ("FNBP"), which is the successor to Howard Bank, which is the successor to First Mariner Bank.

This letter is a follow up to my May 20, 2025 letter, my June 16, 2025 letter, and my July 10, 2025 letter regarding the Besner Loan.  I write to provide an update on Sun West's tender of the claims to Stewart Title.  Stewart title has retained counsel in the matter and counsel is in communication with counsel for Mr. Besner, who has indicated his client will re-execute the first and second mortgages.  That has not occurred yet.  Sun West is informed that if the mortgages are not re-executed by Mr. Besner soon, a quiet title action must be commenced.

As a reminder, FNMA's repurchase or appeal deadline on the Besner loan is August 26, 2025.  If Sun West receives the re-executed mortgages before this deadline, we will inform FNMA and FNBP.

EARLY SULLIVAN WRIGHT GIZER & MCRAE LLP | 6420 WILSHIRE BOULEVARD | 17TH FLOOR | LOS ANGELES, CALIFORNIA 90048
TEL: (323) 301-4660 | FAX: (323) 301-4676 | WWW.EARLYSULLIVAN.COM

CALABASAS | LAS VEGAS | LOS ANGELES | PHOENIX

Nothing in this correspondence serves as a waiver of any of Sun West's rights, claims and objections, all of which are expressly reserved.

Very truly yours,

*/s/Padideh Zargari*

Padideh Zargari
on behalf of
Early Sullivan Wright Gizer & McRae LLP

5819212.1

# EXHIBIT J

## Jacqueline Hosey

| | |
|---|---|
| **From:** | Padideh Zargari |
| **Sent:** | Friday, August 29, 2025 4:35 PM |
| **To:** | 'Michael Blumenfeld'; Scott Gizer |
| **Cc:** | 'Meredith Storm' |
| **Subject:** | RE: SWMC v. FNB- Besner Loan 08.25.2025(2) |
| **Attachments:** | Sun West Mortgage Company, Inc. Mail - RE_ Re_ Re_ extension request 6000694335; Denied.pdf |

Michael,

FNMA has informed Sun West that it <u>will not grant an extension</u> on the Besner Loan.

FNMA stated:  "We are unable to grant an extension on this loan. Please see the link below which addresses required response timelines. In this case, the initial request to repurchase was issued on 6/30/25. The selling guide allows 60 days to provide a first appeal (8/26/25). This significant defect was self-identified/reported and this loan closed in 2009. We will be looking for an appeal or for this loan to move to concur to repurchase status. Please let me know if you have any questions."  A copy of this denial is attached, in which you can find the referenced link.

Sun West has been informed by counsel retained by Stewart Title that the borrower has executed the deeds, and the title company is working on recording them.  Sun West has asked title for copies of the filings submitted for recording, and asked if they can expedite the recording.  We are waiting for a response from Stewart.

Please let us know how FNB would like to proceed.

Thanks,

Padideh

---

**From:** Michael Blumenfeld <michael.blumenfeld@nelsonmullins.com>
**Sent:** Tuesday, August 26, 2025 4:03 PM
**To:** Padideh Zargari <pzargari@earlysullivan.com>; Scott Gizer <sgizer@earlysullivan.com>
**Cc:** Meredith Storm <meredith.storm@nelsonmullins.com>
**Subject:** RE: SWMC v. FNB- Besner Loan 08.25.2025(2)

Thank you.



---

**MICHAEL E. BLUMENFELD**  **PARTNER**
michael.blumenfeld@nelsonmullins.com
**100 S. CHARLES STREET | SUITE 1600**
**BALTIMORE, MD 21201**
T 443.392.9402   F 443.392.9499

NELSONMULLINS.COM    VCARD    VIEW BIO

---

**From:** Padideh Zargari <pzargari@earlysullivan.com>
**Sent:** Tuesday, August 26, 2025 6:59 PM
**To:** Michael Blumenfeld <michael.blumenfeld@nelsonmullins.com>; Scott Gizer <sgizer@earlysullivan.com>
**Cc:** Meredith Storm <meredith.storm@nelsonmullins.com>
**Subject:** RE: SWMC v. FNB- Besner Loan 08.25.2025

Hi Michael,

Yesterday (August 25, 2025), Sun West requested an extension from FNMA on the Besner Loan.  In response, FNMA asked for an explanation of what has been done to resolve the defect.  Sun West responded with a detailed timeline, and an explanation of why an extension is necessary.  Sun West's response is attached here for your reference.  Sun West has not heard back from FNMA.  I will keep you posted as soon as we hear back.

As set forth in my August 7th correspondence, Stewart Title has retained counsel in this matter, and counsel has been in contact with counsel for the borrower, who originally indicated that his client will re-execute the first and second mortgages. This has not occurred as of today. Today,  Sun West received correspondence from Stewart Title that counsel for the borrower has been unresponsive and counsel for Stewart is planning on initiating an Article 15 action.  Sun West communicated this to FNMA today.

Please keep us updated on FNB's progress in its attempts to resolve this issue.

Thanks,

Padideh

---

**From:** Michael Blumenfeld <michael.blumenfeld@nelsonmullins.com>
**Sent:** Tuesday, August 26, 2025 3:35 PM
**To:** Padideh Zargari <pzargari@earlysullivan.com>; Scott Gizer <sgizer@earlysullivan.com>
**Cc:** Meredith Storm <meredith.storm@nelsonmullins.com>
**Subject:** SWMC v. FNB- Besner Loan 08.25.2025

Good Afternoon Padideh and Scott,

I hope this email finds you well. On July 10, 2025, Sun West made a written demand to First National Bank of Pennsylvania to repurchase the Besner Loan, informing that Fannie Mae had provided Sun West with a deadline of **August 26, 2025** to either (1) provide a written appeal through Loan Quality Connect, or (2) remit the amount due for repurchase. FNB has been investigating the defects cited in Fannie Mae's letter and believe they can be resolved without the need for repurchase. While FNB has been actively working to locate the missing deeds of trust and ensure their proper recordation, it needs additional time to get the issue resolved. As you are well aware, FNB is unable to personally request an extension of Fannie Mae's deadlines in Loan Quality Connect and must rely on Sun West to do so, as provided in the terms of the Settlement Agreement. Accordingly, please let this communication serve as FNB's request for Sun West to apply for an extension of Fannie Mae's repurchase/appeal deadline.

Please provide us with confirmation of the same and any response you receive from Fannie Mae. FNB will keep Sun West apprised of its progress as it continues to attempt to resolve this matter.

By way of this email, I also ask that you provide an update on Sun West's claim to Stewart Title related to the Besner Loan back in May.

Thank you,
Michael



**MICHAEL E. BLUMENFELD  PARTNER**
michael.blumenfeld@nelsonmullins.com
**100 S. CHARLES STREET | SUITE 1600**
**BALTIMORE, MD 21201**
T 443.392.9402   F 443.392.9499
**NELSONMULLINS.COM    VCARD   VIEW BIO**

---

**From:** Padideh Zargari <pzargari@earlysullivan.com>
**Sent:** Thursday, August 7, 2025 7:59 PM
**To:** Michael Blumenfeld <michael.blumenfeld@nelsonmullins.com>
**Cc:** Scott Gizer <sgizer@earlysullivan.com>
**Subject:** SWMC v. FNB- Besner Loan

Hi Michael,

Please see the attached regarding the Besner Loan.



**PADIDEH ZARGARI | PARTNER**
Early Sullivan Wright Gizer & McRae LLP
323.301.4660 Main
323.301.4663 Direct
323.301.4676 Fax

6420 Wilshire Blvd., 17th Floor, Los Angeles, CA 90048
pzargari@earlysullivan.com

**Confidentiality Notice**
This message is intended exclusively for the individual or entity to which it is addressed. This communication may contain information that is proprietary, privileged, confidential or otherwise legally exempt from disclosure. If you are not the named addressee, you are not authorized to read, print, retain, copy or disseminate this message or any part of it. If you have received this message in error, please notify the sender immediately either by phone (800-237-2000) or reply to this e-mail and delete all copies of this message.

# EXHIBIT K

| | |
|---|---|
| **From:** | Padideh Zargari |
| **Sent:** | Friday, August 29, 2025 4:35 PM |
| **To:** | 'Michael Blumenfeld'; Scott Gizer |
| **Cc:** | 'Meredith Storm' |
| **Subject:** | RE: SWMC v. FNB- Besner Loan 08.25.2025(2) |
| **Attachments:** | Sun West Mortgage Company, Inc. Mail - RE_ Re_ Re_ extension request 6000694335; Denied.pdf |

Michael,

 FNMA has informed Sun West that it <u>will not grant an extension</u> on the Besner Loan.

FNMA stated:  "We are unable to grant an extension on this loan. Please see the link below which addresses required response timelines. In this case, the initial request to repurchase was issued on 6/30/25. The selling guide allows 60 days to provide a first appeal (8/26/25). This significant defect was self-identified/reported and this loan closed in 2009. We will be looking for an appeal or for this loan to move to concur to repurchase status. Please let me know if you have any questions."  A copy of this denial is attached, in which you can find the referenced link.

Sun West has been informed by counsel retained by Stewart Title that the borrower has executed the deeds, and the title company is working on recording them.  Sun West has asked title for copies of the filings submitted for recording, and asked if they can expedite the recording.  We are waiting for a response from Stewart.

 Please let us know how FNB would like to proceed.

Thanks,

 Padideh

---

**From:** Michael Blumenfeld <michael.blumenfeld@nelsonmullins.com>
**Sent:** Tuesday, August 26, 2025 4:03 PM
**To:** Padideh Zargari <pzargari@earlysullivan.com>; Scott Gizer <sgizer@earlysullivan.com>
**Cc:** Meredith Storm <meredith.storm@nelsonmullins.com>
**Subject:** RE: SWMC v. FNB- Besner Loan 08.25.2025(2)

Thank you.



---

MICHAEL E. BLUMENFELD  PARTNER
michael.blumenfeld@nelsonmullins.com
100 S. CHARLES STREET | SUITE 1600
BALTIMORE, MD 21201

T 443.392.9402   F 443.392.9499

NELSONMULLINS.COM    VCARD    VIEW BIO

---

**From:** Padideh Zargari <pzargari@earlysullivan.com>
**Sent:** Tuesday, August 26, 2025 6:59 PM
**To:** Michael Blumenfeld <michael.blumenfeld@nelsonmullins.com>; Scott Gizer <sgizer@earlysullivan.com>
**Cc:** Meredith Storm <meredith.storm@nelsonmullins.com>
**Subject:** RE: SWMC v. FNB- Besner Loan 08.25.2025

Hi Michael,

Yesterday (August 25, 2025), Sun West requested an extension from FNMA on the Besner Loan.  In response, FNMA asked for an explanation of what has been done to resolve the defect.  Sun West responded with a detailed timeline, and an explanation of why an extension is necessary.  Sun West's response is attached here for your reference.  Sun West has not heard back from FNMA.  I will keep you posted as soon as we hear back.

As set forth in my August 7th correspondence, Stewart Title has retained counsel in this matter, and counsel has been in contact with counsel for the borrower, who originally indicated that his client will re-execute the first and second mortgages. This has not occurred as of today. Today,  Sun West received correspondence from Stewart Title that counsel for the borrower has been unresponsive and counsel for Stewart is planning on initiating an Article 15 action.  Sun West communicated this to FNMA today.

Please keep us updated on FNB's progress in its attempts to resolve this issue.

Thanks,

Padideh

---

**From:** Michael Blumenfeld <michael.blumenfeld@nelsonmullins.com>
**Sent:** Tuesday, August 26, 2025 3:35 PM
**To:** Padideh Zargari <pzargari@earlysullivan.com>; Scott Gizer <sgizer@earlysullivan.com>
**Cc:** Meredith Storm <meredith.storm@nelsonmullins.com>
**Subject:** SWMC v. FNB- Besner Loan 08.25.2025

Good Afternoon Padideh and Scott,

I hope this email finds you well. On July 10, 2025, Sun West made a written demand to First National Bank of Pennsylvania to repurchase the Besner Loan, informing that Fannie Mae had provided Sun West with a deadline of **August 26, 2025** to either (1) provide a written appeal through Loan Quality Connect, or (2) remit the amount due for repurchase. FNB has been investigating the defects cited in Fannie Mae's letter and believe they can be resolved without the need for repurchase. While FNB has been actively working to locate the missing deeds of trust and ensure their proper recordation, it needs additional time to get the issue resolved. As you are well aware, FNB is unable to personally request an extension of Fannie Mae's deadlines in Loan Quality Connect and must rely on Sun West to do so, as provided in the terms of the Settlement Agreement. Accordingly, please let this communication serve as FNB's request for Sun West to apply for an extension of Fannie Mae's repurchase/appeal deadline.

Please provide us with confirmation of the same and any response you receive from Fannie Mae. FNB will keep Sun West apprised of its progress as it continues to attempt to resolve this matter.

By way of this email, I also ask that you provide an update on Sun West's claim to Stewart Title related to the Besner Loan back in May.

Thank you,
Michael



**MICHAEL E. BLUMENFELD  PARTNER**
michael.blumenfeld@nelsonmullins.com
**100 S. CHARLES STREET | SUITE 1600**
**BALTIMORE, MD 21201**
T 443.392.9402   F 443.392.9499
**NELSONMULLINS.COM   VCARD   VIEW BIO**

**From:** Padideh Zargari <pzargari@earlysullivan.com>
**Sent:** Thursday, August 7, 2025 7:59 PM
**To:** Michael Blumenfeld <michael.blumenfeld@nelsonmullins.com>
**Cc:** Scott Gizer <sgizer@earlysullivan.com>
**Subject:** SWMC v. FNB- Besner Loan

Hi Michael,

Please see the attached regarding the Besner Loan.



**PADIDEH ZARGARI | PARTNER**
Early Sullivan Wright Gizer & McRae LLP
323.301.4660 Main
323.301.4663 Direct
323.301.4676 Fax

6420 Wilshire Blvd., 17th Floor, Los Angeles, CA 90048
pzargari@earlysullivan.com

**Confidentiality Notice**
This message is intended exclusively for the individual or entity to which it is addressed. This communication may contain information that is proprietary, privileged, confidential or otherwise legally exempt from disclosure. If you are not the named addressee, you are not authorized to read, print, retain, copy or disseminate this message or any part of it. If you have received this message in error, please notify the sender immediately either by phone (800-237-2000) or reply to this e-mail and delete all copies of this message.